IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Aearo Technologies LLC, *et al.*,[1] | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 22-02890-11 |
| | ) | |
| | ) | |
| | ) | |
| 3M OCCUPATIONAL SAFETY LLC, AEARO HOLDING LLC, AEARO INTERMEDIATE LLC, AEARO LLC, AND AEARO TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. No. 22-_____ |
| | ) | |
| THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT and JOHN AND JANE DOES 1-1000, | ) | |
| | ) | |
| Defendants. | ) | |

**DEBTORS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(I) CONFIRMING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS
AGAINST A NON-DEBTOR; (II) PRELIMINARILY ENJOINING CERTAIN ACTIONS
AGAINST A NON-DEBTOR; AND (III) GRANTING A TEMPORARY RESTRAINING
ORDER PENDING AN ORDER ON THE PRELIMINARY INJUNCTION**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, filed contemporaneously herewith. The location of the Debtors' service address for the purposes of these Chapter 11 Cases is: 7911 Zionsville Road, Indianapolis, Indiana 46268

1

Aearo Technologies LLC ("**Aearo**") and certain other of the debtors ("**Debtors**")[2] in the above-captioned Chapter 11 Cases (the "**Chapter 11 Cases**") that are defendants in over 230,000 pending civil actions in state and federal court ("**Pending Actions**") allege for their Complaint, upon knowledge of their own acts and upon information and belief as to other matters, as follows:

**NATURE OF THE ACTION AND THE NEED FOR RELIEF**[3]

1.  The Debtors commenced these Chapter 11 Cases to efficiently and equitably resolve all claims against them relating to certain hearing-protection devices manufactured and distributed by the Debtors and 3M Company ("**3M**") through the consummation of a plan of reorganization that includes the establishment of a claims trust. The relief sought in this adversary proceeding is critical to the Debtors' ability to achieve that purpose. Unless stayed, the Pending Actions will eviscerate a fundamental objective of these Chapter 11 Cases. As long as the Pending Actions are actively proceeding, the value of the estates will be at risk by, among other things, the massive direct and indirect costs of litigation. In fact, more than 100 depositions are scheduled in the Pending Actions in the next two weeks alone, along with several important briefing and expert disclosure deadlines.

2.  "Addressing mass torts through a legislative scheme enacted by Congress within the bankruptcy system… provides a judicially accepted means of aggregating and resolving mass tort claims." *In re LTL Mgmt., LLC*, 637 B.R. 396, 411 (Bankr. D.N.J. 2022). Within that legislative scheme, 11 U.S.C. § 362(a) provides "one of the fundamental protections afforded

---

[2] Not all of the Debtors have been named defendants in the Pending Actions, as defined herein. Those that have been named as defendants include: 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC. For ease of reference, this Complaint occasionally refers to these entities as the Debtors.

[3] The Debtors reserve the right to seek further relief, including an injunction under section 105 of the Bankruptcy Code, to extend the automatic stay or enjoin certain claims against non-debtors related to the Debtors' respirator liabilities.

2

to debtors by the bankruptcy laws" by automatically staying litigation to avoid the inequitable and value-destructive dynamic at issue here. *In re Grede Foundries, Inc.*, 651 F.3d 786, 790 (7th Cir. 2011) (quotation marks omitted).

3. The Debtors ask this Court to confirm that section 362(a) of the Bankruptcy Code prohibits the defendants in this adversary proceeding (the "**Stay Defendants**"[4]) from seeking to hold 3M and its non-debtor affiliates liable for any Combat Arms Claims outside of the Bankruptcy Court. As used herein, "**Combat Arms Claims**" means any claims against the Debtors or their affiliates, on any theory of liability, relating to the Combat Arms Earplug, version 2 ("**CAEv2**") and civilian versions of the CAEv2 sold commercially to non-military consumers (collectively the "**Combat Arms Earplug**"), including the Pending Actions.

4. In addition, the Debtors request a preliminary injunction under section 105(a) of Bankruptcy Code to enjoin the Stay Defendants from commencing or continuing Combat Arms Claims against 3M.

5. Finally, the Debtors also seek a temporary restraining order, entered on shortened notice, to effectuate the requested relief until the Court rules on the Debtors' request for a preliminary injunction for the maximum period permitted by Fed. R. Bankr. P. 7065 expires, whichever occurs sooner. This temporary relief is sought only as to the continued prosecution of Pending Actions with active discovery, pre-trial, trial, appellate, or other deadlines (the "**Active**

---

[4] The Stay Defendants are all plaintiffs or potential plaintiffs in lawsuits that seek to hold, or may seek to hold, the Debtors or 3M Company liable for the Combat Arms Claims, as such terms are defined herein. These Stay Defendants, with the exception of the John and Jane Doe Stay Defendants, are listed in Appendix A to this Complaint. Appendix A identifies the civil action number (where available) for each lawsuit and the law firms representing each of the Stay Defendants on account of their Combat Arms claims. The Debtors reserve the right to supplement, amend or otherwise modify Appendix A. For the avoidance of doubt, the inclusion of a Combat Arms-related claim on Appendix A is not an admission that such Stay Defendant holds a valid claim against either the Debtors or 3M.

3

**Litigation**"), which includes the lawsuits of approximately 3,000 Combat Arms plaintiffs (the "**Active Litigants**").[5]

6. Contemporaneous with the filing of this Complaint, the Debtors filed a motion (the "**Motion**") seeking the same relief requested in this Complaint.

## JURISDICTION AND VENUE

7. The United States Bankruptcy Court for the Southern District of Indiana (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the Southern District of Indiana, dated July 11, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157 and the Court has "related to" jurisdiction under 28 U.S.C. § 1334(b). The Debtors confirm their consent to the entry of a final order by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## BASIS FOR RELIEF

9. The statutory bases for the relief requested are sections 105(a) and 362(a) of the Bankruptcy Code.

10. The Debtors have commenced this adversary proceeding pursuant to Bankruptcy Rules 7001(7), 7001(9), and 7065.

## GENERAL BACKGROUND

11. On July 26, 2022, (the "**Petition Date**"), the Debtors commenced these Chapter 11 Cases by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors

---

[5] A comprehensive list of the current Active Litigants is contained in Appendix B to this Complaint. The Debtors reserve the right to supplement, amend or otherwise modify Appendix B.

4

are continuing in possession of their property and are managing their business, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## THE PARTIES

12. The Debtors manufacture and sell custom noise, vibration, thermal, and shock protection solutions, primarily serving the aerospace, commercial vehicle, heavy equipment, and electronics industries. Aearo is a limited liability company incorporated under the laws of Delaware. Collectively, the Debtors have approximately 330 employees and $108 million in direct sales in 2021. The Debtors are headquartered in Indianapolis, where they have been based for over 40 years and where they have their main operating plant.

13. Founded in 1902 as the Minnesota Mining and Manufacturing Company in Two Harbors, Minnesota, 3M is an iconic American multinational technology and manufacturing company. 3M develops products across a wide range of markets including pharmaceuticals and chemicals, digital imaging and sound technology, and office supply and consumer goods. 3M's business remains strong, with over $8.8 billion in sales reported through the first financial quarter of 2022, roughly matching their sales from the same period in 2021.

14. 3M acquired the Debtors in April 2008 through a stock purchase for approximately $1.2 billion. The acquisition was initiated with the goal of creating synergies with 3M's existing occupational health and safety business by adding the Debtors' hearing, eyewear, and fall protection product lines.

15. Each named Defendant in Appendix A is a plaintiff in a Pending Action against the Debtors and 3M seeking to recover on account of Combat Arms Claims. Without the relief requested herein and in the Motion, the Debtors anticipate that the filing of the Chapter 11 Cases will lead Stay Defendants to pursue or initiate Combat Arms Claims against 3M to avoid the automatic stay and interfere with this Court's jurisdiction.

5

16. Each of Stay Defendants John and Jane Does 1-1,000 is a prospective plaintiff who may, at any time while the Chapter 11 Cases are pending, seek to commence an action to pursue a Combat Arms Claim against the Debtors or 3M.

## FACTUAL BACKGROUND

17. The Pending Actions of Combat Arms Claims include: (1) a multi-district litigation ("**MDL**") proceeding in the United States District Court for the Northern District of Florida (the "**MDL Court**") where over 230,000 hearing-injury claims have been brought by U.S. military servicemembers and veterans, and (2) approximately 2,000 lawsuits pending in Minnesota state court. The Combat Arms MDL is the largest MDL in United States history.

*The Combat Arms Earplugs*

18. As further detailed in the *Informational Brief of Aearo Technologies LLC* ("**Informational Brief**"), the Pending Actions against the Debtors and 3M allege that a hearing protection device—the Combat Arms Earplug—did not provide appropriate hearing protection due to design defects and, as a result, caused hearing loss and tinnitus in some users. Aearo designed the Combat Arms and made key early decisions that plaintiffs now challenge, and a substantial percentage (approximately 80%) of the lifetime sales of the Combat Arms Earplug occurred prior to 3M's acquisition of the Debtors in 2008. Therefore, the claims against 3M are derived from the Debtors' alleged misconduct. The Debtors stand behind the safety and efficacy of the Combat Arms Earplug. Based on decades of government, military, and other independent testing, the Debtors maintain that the product works as intended, and did not cause any injuries.

19. In the early 1990s, a military research institute established by French and German governments—Institute de St. Louis ("**ISL**")—invented a level-dependent "filter" to be used in earplugs in which low-level sounds can pass through the filter, but sharp "impulse" noises, like gunfire, are diminished. In early 1997, ISL requested assistance from Aearo Company in

6

Indianapolis to develop a non-linear earplug based on ISL's filter and Aearo's existing UltraFit earplug, which was a premolded, triple-flanged earplug. Around the same time, a representative from the United States Army Research Laboratory concluded that the non-linear filter was a good option to protect against "impulse noises" such as mortar blasts and gunfire. But the military also needed standard linear ear protection, similar to a traditional foam earplug. Thus, two ISL scientists devised a two-ended device, with one end using the non-linear filter and the other end functioning as a traditional earplug.

20.         In 1997, the manager of the Army's Hearing Conservation Program and chair of the Defense Department's Hearing Conservation Working Group, Dr. Doug Ohlin, indicated that he preferred the two-ended earplug design, which would be easier to dispense in the field to soldiers than two separate earplugs. Heeding Dr. Ohlin's direction, Aearo and ISL developed and manufactured a two-ended earplug designed on the UltraFit. Dr. Ohlin found that these initial samples were too long, in part because because they would not fit in a standard-issue earplug carrier, so he cut down the samples himself to shorten them. Aearo then sent Dr. Ohlin samples of the shortened version of the dual-ended earplug in late April 1999. Dr. Ohlin ultimately found the shortened dual-ended earplugs acceptable, and made a Combat Arms earplug purchase request to the Department of Defense's Joint Readiness Clinical Advisory Board.

21.         At the time 3M acquired the Debtors, the Debtors were already manufacturing and distributing the Combat Arms Earplugs that would ultimately lead to the Combat Arms Claims necessitating the Chapter 11 Cases. In the first two years following the acquisition, the Debtors' business remained independent from 3M. Not until 2010 was the component of the Debtors' business responsible for the significant majority of its earplug sales transferred upstream to 3M.

*The Combat Arms Claims and Pending Actions*

22. Even though world-class military laboratories tested the Combat Arms, some several times, using multiple testing methods, a well-orchestrated and well-funded lawyer advertising campaign that cut across traditional and social media channels as well as more targeted outlets, bombarded servicemembers and veterans with messages that the Combat Arms Earplugs were to blame for any hearing-related conditions in soldiers who served between 2003 and 2015.

23. The lawyer-advertising onslaught was wildly successful. In April 2019, the Judicial Panel on Multidistrict Litigation formed MDL No. 2885 to "promote the just and efficient conduct of the litigation."[6] By then, the number of potential tag-along or related actions in federal courts had grown to nearly 700 cases. The MDL centralized claims before one judge charged with overseeing consolidated pretrial proceedings. However, in the MDL, plaintiffs' lawyers helped ensure that some of the most basic tools of MDL practice, including filing fee requirements and medical records releases and production, were shelved or suspended early on. While the MDL Court recognized the need to vet the merits of the inventory of cases in order to filter out claims that could not be supported, plaintiffs' lawyers, in response, claimed burdens in accessing their clients' military records (records that are needed to support their claims). As a result, for nearly two years, more than 99 percent of plaintiffs in the MDL were relieved of any obligation to produce documents substantiating their claims. The Combat Arms MDL is now flooded with a massive volume of claims that still have yet to be vetted—today, more than 110,000 active plaintiffs still have not been required to pay a filing fee, and their claims are languishing on an "administrative" docket.

24. The MDL bellwether trial process similarly failed to advance any meaningful resolution of the tort claims related to the Combat Arms. Of the 27 plaintiffs designated as bellwethers, eight were dismissed before trial, and six trials resulted in defense verdicts. And those

---

[6]   *In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, 366 F. Supp. 3d 1368, 1369 (J.P.M.L. 2019).

bellwether trials that resulted in plaintiffs' verdicts provided minimal information about value or resolution given the widely disparate outcomes.

25. Nonetheless, due to flaws in the bellwether process (as detailed more fully in the Informational Brief), thirteen bellwether plaintiffs prevailed at trial, and were awarded wildly divergent compensatory and punitive damages awards ranging from $1.7 million to $77.5 million that were issued against the Debtors and 3M jointly. Those cases are on appeal, pending appeal, or awaiting rulings on post-trial motions.

26. After the bellwether trials, the remaining claims in the MDL are contained on two dockets: an "administrative docket," which houses claims before they are moved to the "active docket." As of July 22, 2022, approximately 110,000 cases remain on the administrative docket, with more than 120,000 of the claims pending in the MDL on the active docket. The MDL Court has also ordered three "waves" of 500 plaintiffs each to begin producing discovery (the "**Waves**"). Three such waves have been created so far, and after voluntary dismissals, approximately 1,200 cases are currently in active discovery.

27. In Wave 1, which as of July 22, 2022, includes 374 active cases after accounting for dismissals and moves to subsequent "waves," the parties are preparing *Daubert*, choice of law, and summary judgment motions, with responses due on August 9.

28. In Wave 2, which as of July 22, 2022, includes 372 active cases after accounting for dismissals and moves to subsequent "waves," expert discovery is ongoing. Defendants' expert disclosures/reports are due August 15. Plaintiffs' rebuttal expert disclosures are due August 25. Depositions of plaintiffs' experts will mostly begin after the rebuttal deadline of August 25, but some may be held sooner. Expert depositions must be completed by September 26. *Daubert* and dispositive motions are due October 6, with responses due October 25.

29. In Wave 3, which as of July 22, 2022, includes 466 active cases, fact discovery is in progress, including records production and written discovery responses. Responses to written discovery are due by August 8. The deadlines for plaintiff and non-plaintiff fact depositions are September 6 and September 30, respectively. Defense medical exams must be completed by September 27. Plaintiffs' expert disclosures/reports are due October 11, and defendants' expert disclosures/reports are due November 10. Rebuttal expert disclosures/reports are due November 21. Expert depositions must be completed by January 10, 2023. *Daubert* and dispositive motions are due January 20, and responses are due February 8. Currently, there are approximately 343 fact depositions scheduled to occur in the Wave cases between July 26 and September 15, 2022.

30. Among Waves 1-3, as of July 22, 2022, approximately 50 depositions are scheduled to occur the week of July 25-29, and approximately 62 depositions are scheduled to occur the week of August 1-6, 2022.

31. In the coming months, the Wave cases will be remanded *en masse* to their transferor courts across the country. The MDL Court stated in June: "As of June 10, 2022, there were 233,883 plaintiffs in the MDL, down from 282,902 at its height in September 2021. That averages [to] 2,500 cases being remanded for trial to each of the 94 districts nationwide." *In Re: 3M Combat Arms Earplug Products Liability Litigation*, 3:19MD02885, 2022-06-10 Mediation Order (Dkt 3188) at 2. The MDL Court observed that "likely no district will be spared the burden" of this litigation, and "the amount of judicial resources required to handle this number of cases is staggering." *Id.* The MDL Court has already scheduled the first trial of a Wave case to begin on October 24, 2022.

32. In addition to the MDL, the Pending Actions include approximately 2,000 cases in Minnesota state court. The first of the Minnesota bellwether trials is currently scheduled to begin on August 29, 2022. Thirty additional bellwether Minnesota cases are in various phases of discovery in preparation for trials scheduled within the next two years.

*Impact of Combat Arms Claims on Debtors' and 3M's Resources*

33. Continued litigation of the Combat Arms Claims at this unprecedented scale will risk valuable estate assets, redirect resources away from a successful restructuring, and jeopardize a plan reorganization process that would allow the streamlined, systematic, and equitable and efficient resolution of Combat Arms claims.

34. The cost of litigating thousands of actions in multiple fora is immense. 3M projects that it will spend approximately $99.8 million on attorneys' fees and costs for the third and fourth quarters of 2022, not including any costs or fees associated with the October 24, 2022 trial. Indeed, in the first half of 2022, 3M spent approximately $47.77 million in attorneys' fees and costs in the first quarter of 2022, and approximately $74.5 million in the second quarter—a rate of over $4.7 million per week.

*The Funding Agreement*

35. In the months prior to commencing these Chapter 11 Cases, the Debtors established an independent decision-making protocol, retained various restructuring advisors, and began taking proactive steps to assess whether they could address their Combat Arms and other liabilities through a chapter 11 restructuring. As part of those efforts, the Debtors evaluated whether they could obtain the financing sufficient to fund successful Chapter 11 Cases, including the professional fees and the creation of a claims trust, while also remaining independent from 3M before and during the restructuring.

36. Against this backdrop, the Debtors, at the direction of the Disinterested Directors, and 3M determined to enter into a funding agreement pursuant to which 3M would fund the Debtors' Chapter 11 Cases. The Debtors sought to secure funds from 3M to satisfy administrative and professional fees, as well as additional amounts to, among other things, fund a claims trust in exchange for the Debtors' commitment to indemnify 3M and its non-debtor affiliates for losses

11

related to Combat Arms. And, in light of the shared services historically provided by 3M for the benefit of the Debtors, the Debtors also proposed to 3M that 3M commit to continue such services in the ordinary course going forward.

37. On July 25 2022, the Debtors and 3M executed the Funding and Indemnification Agreement (the "**Funding Agreement**").[7] As part of the Funding Agreement, 3M has agreed, upon the Debtors' exhaustion of cash, to fund the Debtors' operating and administrative costs and expenditures for the duration of these Chapter 11 Cases and, upon confirmation of a plan of reorganization, to contribute to a trust to ensure Combat Arms claimants entitled to compensation receive payment. In exchange, the Debtors have agreed to indemnify 3M and its non-debtor affiliates for losses related to Combat Arms.

38. The Funding Agreement therefore ensures that these Chapter 11 Cases will be fully funded, including administrative expenses, general unsecured claims, and any ultimate plan trust.

*The Debtors' Insurance Coverage*

39. The Debtors and 3M share insurance and reinsurance policies that provide coverage for claims and defense costs related to the Combat Arms Claims. The Debtors have many primary, umbrella, and excess liability insurance policies including, among others, commercial general liability policies that cover defense and indemnity costs related to the Active Combat Arms litigation. These include several insurance policies predating 3M's acquisition of the Debtors, which provide a total limit of approximately $500 million, not including any supplemental defense coverage. Additionally, the Debtors have had insurance coverage under 3M's product liability and other insurance programs, including dozens of primary and excess policies, since April 1, 2008.

---

[7] The description of the Funding Agreement set forth herein is qualified by reference to the terms of the Funding Agreement, which controls in all respects.

12

40. Critically, policies covering the 2018-2019 policy period—which include 46 separate policies comprising 18 layers of coverage—are shared between the Debtors and 3M. The policies explicitly provide retroactive coverage for Aearo claims as of April 1, 2008, and Aearo is listed as a named insured. In total, the combined limit of these policies is more than $1.05 billion—more than double the coverage available under the Debtors' separate policies.

41. 3M—on behalf of itself and the Debtors—provided notice of claims to the following insurers: (1) the Debtors' primary and excess insurers for policy periods covering 1997 to 2008, and (2) 3M's tower policy insurers and reinsurers for a policy period covering 2018 to 2019. In those notice letters, 3M and the Debtors requested coverage, including for litigation costs, for their defense of personal injury allegations and other covered claims relating to the Pending Actions. Although none of the insurers has yet acknowledged their coverage obligations, the Debtors and 3M maintain that they are entitled to coverage for the Pending Actions under these policies.

## NATURE OF RELIEF REQUESTED

42. To guard against the irreparable harm the Debtors would suffer if the Stay Defendants are permitted to continue the Pending Actions or commence new actions related to Combat Arms Claims against 3M during the Chapter 11 Cases, the Debtors seek: (a) confirmation that, while the Chapter 11 Cases remain pending, the commencement or continued prosecution of any Combat Arms Claims against 3M is prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code; and, in addition, (b) a preliminary injunction prohibiting the prosecution of the Pending Actions against 3M while the Chapter 11 Cases remain pending. Further, as to the subset of Pending Actions that constitute Active Litigation (defined above), the Debtors also seek a temporary restraining order, entered on shortened notice, to effectuate the requested relief pending an order on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Fed. R. Bankr. P. 7065, whichever occurs sooner.

13

## CLAIMS FOR RELIEF

### Count I: Declaratory Relief
### Pursuant to Section 362 of the Bankruptcy Code

43. The Debtors incorporate by reference paragraphs 1 through 42 as if fully set forth herein.

44. Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

45. In the Seventh Circuit, the automatic stay in section 362(a)(1) enjoins actions against parties who share such an identity of interests with a debtor with respect to those actions that the debtor is, in effect, the real-party defendant in those actions. Here, 3M shares such an identity of interests with the Debtors that the Debtors, in effect, are the real-party defendant in any legal action for Combat Arms Claims brought against 3M. Litigating, settling, or attempting to establish the value of the Combat Arms Claims against 3M would bind the Debtors, including by triggering the Debtors' indemnification obligations to 3M and its non-debtor affiliates under the Funding Agreement. Moreover, because the Debtors and 3M are being tried as jointly liable for the Combat Arms Claims, a judgment against 3M is a judgment against the Debtors. Additionally, prosecution of the Combat Arms Claims against 3M risks depletion of the Debtors' estates via a drawdown of the Debtors' shared insurance policies with 3M. Moreover, the prosecution of Combat Arms Claims against 3M risks binding the Debtors through *res judicata* and/or collateral estoppel. It also risks creating an evidentiary record that would prejudice the Debtors in any future adjudication of the Combat Arms Claims. Because the Debtors are a real-party defendant in any suit seeking to liquidate and recover on account of a Combat Arms Claim, section 362(a)(1) stays such actions.

46. Section 362(a)(3) of the Bankruptcy Code operates automatically to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Section 362(a)(3) bars the Stay Defendants from bringing actions against co-insured 3M based on the Combat Arms Claims because the right to insurance coverage is property of the Debtors' estates, and such actions would deplete those estate assets. Here, joint insurance coverage for Combat Arms Claims is available to both the Debtors and 3M under various insurance policies. If a Combat Arms Claim is prosecuted against 3M, then 3M may seek coverage under these shared insurance policies to satisfy any judgment, thereby reducing the coverage available to the Debtors' estates. Depleting an estate asset violates the automatic stay and, therefore, Combat Arms Claims against 3M are stayed pursuant to section 362(a)(3).

47. Accordingly, the relief the Debtors seek in this Complaint and in the Motion is necessary and appropriate to protect the integrity of the automatic stay and the Chapter 11 Cases.

### Count II: Preliminary Injunctive Relief
### Pursuant to Sections 105 and 362 of the Bankruptcy Code

48. The Debtors incorporate by reference paragraphs 1 through 47 as if fully set forth herein.

49. Section 105(a) of the Bankruptcy Code authorizes and empowers this Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Chapter 11 Cases, aid in the preservation of the assets of the Debtors' estate, and aid in the formulation and confirmation of a Chapter 11 plan that maximizes recovery to all of the Debtors' creditors.[8]

---

[8] Section 105(a) of the Bankruptcy Code provides, in relevant part, that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

15

50.     Pursuant to sections 105(a) and 362 of the Bankruptcy Code, this Court may enjoin creditor actions against non-debtors where necessary to prevent an adverse impact on the Debtors' estates or to assure the orderly administration of the Debtors' Chapter 11 estates and proceedings, including by fully effectuating the protections of the automatic stay in the context of a mass-tort bankruptcy. An injunction is needed here to prohibit the Stay Defendants from continuing to prosecute the Pending Actions against 3M while the Chapter 11 Cases remain pending. Without such an injunction, the Debtors cannot achieve one of the purposes for which they commenced this reorganization.

51.     To obtain an injunction under section 105(a), the Debtors need only show: (1) the third-party litigation would defeat or impair the bankruptcy court's jurisdiction over the cases before it, (2) there is a likelihood of success on the merits, which means a likelihood of a successful reorganization, and (3) the injunction would serve the public interest. *See In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 441, 450 (N.D. Ill. 2016). The Debtors satisfy each of these factors here.

52.     First, continued prosecution of the Pending Actions would defeat this Court's jurisdiction by depleting available insurance, which is an estate asset; frustrating and implicating the Debtors' indemnification obligations; and leading to discovery burdens on the Debtors, including redirecting resources that are necessary to a successful reorganization.

53.     Without the requested injunction, the Stay Defendants would seek to prosecute the exact same Combat Arms Claims that exist against the Debtors in the Chapter 11 Cases through increasingly piecemeal litigation against 3M outside of the Chapter 11 Cases in the tort system. Indeed, the Stay Defendants already look to 3M and the Debtors as a single entity and allege the same injuries using the same evidence in support of claims against them under a theory of joint and several liability—even though the core allegations in the Pending Actions concern actions that

16

occurred primarily at Aearo prior to its acquisition by 3M. Permitting the Stay Defendants to litigate claims against the Debtors through actions against an indemnified 3M would prevent the Debtors from establishing a trust to consolidate and collectively resolve all Combat Arms Claims against the Debtors through the Chapter 11 Cases. This non-bankruptcy litigation, if not stayed, would undermine (or eliminate) the parties' and the Court's ability to confirm a plan that treats all Combat Arms claimants fairly and equitably.

54. Further, continued litigation of the Pending Actions against 3M outside the Bankruptcy Court could bind the Debtors under the doctrines of collateral estoppel and/or *res judicata*. Prosecution of the Pending Actions against 3M also creates a substantial risk that Combat Arms claimants will use statements, testimony, and other evidence generated in those proceedings to try to establish the Combat Arms Claims against the Debtors. This would undermine the automatic stay.

55. Second, the Debtors' prospects for a successful reorganization are strong, and an injunction will enhance the prospects of a successful reorganization. The Debtors have entered bankruptcy in good faith and in an effort to permanently, fully, equitably, and efficiently resolve current and future Combat Arms Claims through the establishment of a trust. Through the Funding Agreement, the Debtors also have sufficient assets to fund the Chapter 11 Cases and a trust in the amount required by a confirmed plan of reorganization.

56. Third, granting the requested injunction is in the public interest. Courts have long recognized the public interest in a successful reorganization. This is particularly true where reorganization will aid in the efficient, global, uniform, and equitable resolution of hundreds of thousands of claims.

57. Accordingly, an injunction barring the Stay Defendants from prosecuting the Pending Actions against 3M while the Chapter 11 Cases remain pending is appropriate and essential to the orderly and effective administration of the Debtors' estates.

### Count III: Application for Temporary Restraining Order

58. The Debtors incorporate by reference paragraphs 1 through 57 as if fully set forth herein.

59. To preserve the effectiveness of the automatic stay until this Court has the opportunity to hold a final hearing on the Debtors' request for relief, and to prevent the foregoing irreparable harm upon the Debtors' estates, the Debtors request that, on shortened notice, the Court issue a temporary restraining order prohibiting and enjoining the Active Litigants from continuing to prosecute the Active Litigation against 3M pending an order on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Fed. R. Bankr. P. 7065, whichever occurs sooner.

60. The issuance of a temporary restraining order is warranted for the reasons set forth herein and as more fully set forth in the Motion. In addition, it is appropriate for the Court to grant the temporary restraining order with shortened notice to the Active Litigants, as set forth in the *Debtors'* accompanying procedural motions.

### PRAYER FOR RELIEF

**WHEREFORE**, the Debtors respectfully request that this Court enter judgment in their favor and request relief as follows:

(a) after notice and a hearing, enter an order and judgment confirming that the commencement or continued prosecution of Combat Arms Claims against 3M while the Chapter 11 cases remain pending violates the automatic stay imposed by section 362(a) of the Bankruptcy Code;

18

(b) after notice and a hearing, issue a preliminary injunction pursuant to sections 105 and 362 of the Bankruptcy Code prohibiting the Stay Defendants from continuing to prosecute the Pending Actions against 3M while the Chapter 11 Cases remain pending;

(c) after shortened notice and an expedited hearing, issue a temporary restraining order prohibiting the Active Litigants from continuing to prosecute the Active Litigation against 3M pending an order on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Fed. R. Bankr. P. 7065, whichever occurs sooner; and

(d) all such other relief as the Court finds just and equitable.

Indianapolis, Indiana
Dated: July 26, 2022

/s/ Jeffrey A. Hokanson

| | |
|---|---|
| **ICE MILLER LLP** <br> Jeffrey A. Hokanson (Ind. Atty. No. 14579-49) <br> John C. Cannizzaro (Ohio Atty. No. 85161) <br> Connor Skelly (Ind. Atty. No. 35365-06) (*pro hac vice* pending) <br> One American Square, Suite 2900 <br> Indianapolis, IN 46282-0200 <br> Telephone: (317) 236-2100 <br> Facsimile: (317) 236-2219 <br> Email: Jeff.Hokanson@icemiller.com <br> John.Cannizzaro@icemiller.com <br> Connor.Skelly@icemiller.com <br><br> *Proposed Co-Counsel to the Plaintiffs / Debtors and Debtors in Possession* | **KIRKLAND & ELLIS LLP** <br> **KIRKLAND & ELLIS INTERNATIONAL LLP** <br> Edward O. Sassower, P.C. (*pro hac vice* pending) <br> Emily Geier (*pro hac vice* pending) <br> 601 Lexington Avenue <br> New York, New York 10022 <br> Telephone: (212) 446-4800 <br> Facsimile: (212) 446-4900 <br> Email: edward.sassower@kirkland.com <br> emily.geier@kirkland.com <br><br> - and - <br><br> **KIRKLAND & ELLIS LLP** <br> **KIRKLAND & ELLIS INTERNATIONAL LLP** <br> Chad J. Husnick, P.C. (*pro hac vice* pending) <br> Spencer A. Winters (*pro hac vice* pending) <br> 300 North LaSalle Street <br> Chicago, Illinois 60654 <br> Telephone: (312) 862-2000 <br> Facsimile: (312) 862-2200 <br> Email: chad.husnick@kirkland.com <br> spencer.winters@kirkland.com <br><br> - and - <br><br> **KIRKLAND & ELLIS LLP** <br> **KIRKLAND & ELLIS INTERNATIONAL LLP** <br> Mark McKane, P.C. (*pro hac vice* pending) <br> 555 California Street <br> San Francisco, California 94104 <br> Telephone: (415) 439-1400 <br> Facsimile: (415) 439-1500 <br> Email: mmckane@kirkland.com <br><br> *Proposed Co-Counsel to the Plaintiffs / Debtors and Debtors in Possession* |