**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| AEARO TECHNOLOGIES LLC, *et al.*,[1] | Case No.  22-02890-JJG-11 |
| Debtors. | |
| 3M OCCUPATIONAL SAFETY, LLC, *et al.,* | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 22-50059 |
| THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT and JOHN AND JANE DOES 1-1000, | |
| Defendants. | |

**THE BAILEY GLASSER AND PULASKI KHERKHER PLAINTIFFS' OBJECTIONS
TO THE DEBTORS' MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF**

Fleeing adverse rulings in the multi-district litigation it previously supported, 3M seeks to shift those claims, and only those claims, from the Article III court handling them to this Court. To obtain the extraordinary relief it requests, 3M rests on a Funding Agreement it executed with its Debtor subsidiaries the day before the Debtors filed their bankruptcy petitions.  In the Funding Agreement, the Debtors "voluntarily" assumed billions of dollars of 3M liability in return for 3M's agreement to fund the repayment of those same liabilities.  This eve-of-

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Doc. 7]. The location of the Debtors' service address for the purposes of these chapter 11 cases is: 7911 Zionsville Road, Indianapolis, Indiana 46268.

bankruptcy insider transaction lacked any legitimate business purpose for the Debtors. No independent and honest debtor, with or without a funding promise, would voluntarily assume billions of dollars of liability before filing bankruptcy. Instead, that transaction served only as the basis for seeking to enjoin the earplug claimants from prosecuting their suits, thereby hindering and delaying the Debtors' earplug creditors. Thus, the Debtors and 3M, acting in concert, seek to clothe 3M—a *non-debtor*—with all the protections and benefits of the automatic stay under Section 105(a) of the Bankruptcy Code based expressly on that transaction.

This Court need not, and should not, sit idly by and allow the Debtors and 3M to hijack this Court's equitable powers in that way. The Supreme Court of the United States, acting on its own initiative on appeal, has refused to countenance such inequitable conduct.[2] And the governing statute gives this Court the power to stop it. Section 105(a) expressly vests this Court with the power to issue any order, even *sua sponte*, to prevent an abuse of process.[3]

This case cries out for the exercise of that power. It is hard to imagine a greater abuse of process than a debtor and its insider parent acting in concert to create, just one day before filing bankruptcy and moving for injunctive relief, the very basis for extraordinary injunctive relief to which they would not otherwise be entitled.

These objections are filed on behalf of more than 25,000 earplug claimants represented by Bailey & Glasser, LLP and Pulaski Kherkher PLLC (collectively, the "Bailey Glasser and Pulaski Plaintiffs"). Although the Bailey Glasser and Pulaski Plaintiffs fully agree with, and

---

[2] *See Shapiro v. Wilgus*, 287 U.S. 348 (1932).

[3] *See* 11 U.S.C, § 105(a) (providing that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" and that "[n]o provision of this title . . . shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.").

fully incorporate by reference herein, the objections of other earplug claimants, this brief focuses

on a single issue: this Court's power to prevent a clear abuse of the bankruptcy process that

employs an eve-of-bankruptcy insider transaction for the sole purpose of obtaining injunctive

relief against legitimate tort claimants.

## <u>ARGUMENT</u>

"Section 105(a) of the Bankruptcy Code provides the court with the authority to exercise

its equitable powers when necessary or appropriate to facilitate the implementation of other

provisions of the Bankruptcy Code." *In re Int'l Home Prod. Inc.*, 491 B.R. 607, 625 (Bankr.

D.P.R. 2013).  But that same section also grants a bankruptcy court broad authority to "tak[e]

any action or mak[e] any determination necessary or appropriate . . . to prevent an abuse of

process."  11 U.S.C. § 105(a); *see also Marrama v. Citizens Bank of Massachusetts*, 549 U.S.

365, 375 (2007).  This Court should exercise its equitable powers under Section 105(a) to

prevent a clear abuse of the bankruptcy process and deny 3M the protection of the automatic stay

and any injunctive relief.

### 1.  The Debtors' and 3M's Unclean Hands Bar the Issuance of a Preliminary Injunction Extending the Automatic Stay to 3M.

It is axiomatic that "a party coming before a court in equity must come with clean

hands."  *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 993 (7th Cir. 1993) (citing

*Int'l Union v. Local Union No. 589*, 693 F.2d 666, 672 (7th Cir. 1982)).  The Supreme Court set

forth the contours and application of the unclean hands doctrine in *Precision Instrument*

*Manufacturing. Co. v. Automotive Maintenance Machinery Co.*:

> The guiding doctrine in this case is the equitable maxim that "he who comes into
> equity must come with clean hands."  This maxim is far more than a mere banality.
> It is a self-imposed ordinance that closes the doors of a court of equity to one tainted
> with inequitableness or bad faith relative to the matter in which he seeks relief,
> however improper may have been the behavior of the defendant.  That doctrine is
> rooted in the historical concept of court of equity as a vehicle for affirmatively

enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be the abetter of iniquity. Thus while equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.

This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. *Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.*

324 U.S. 806, 814–15 (1945) (internal citations and quotations omitted) (emphasis added); *see also Int'l Union, Applied Indus. Workers of Am., AFL-CIO v. Local No. 589, Applied Indus. Workers of Am., AFL-CIO*, 693 F.2d 666, 672–73 (7th Cir. 1982).

Consistent with these principles, a bankruptcy court asked to grant equitable relief—as this Court is—"should always consider whether the petitioning party has acted in bad faith or with unclean hands.'" *In re Sorbera*, 483 B.R. 580, 589 (Bankr. D. Mass. 2012). The key inquiry is whether the party so charged "is impermissibly interfering with the provisions and underlying policies of the Bankruptcy Code, in a manner that justifies denial of relief to that party if such relief would be inconsistent with the intended scope and need for relief under the Bankruptcy Code." *In re Public Serv. Co. of New Hampshire*, 98 B.R. 120, 125 (Bankr. D.N.H. 1989).

Here, through the Funding Agreement entered into the day before the filing, 3M created a rigged identity of interests to try to justify this request for injunctive relief by transferring its own liability for the earplug claims to the Debtors. In 2010, two years after it acquired the Debtors in a stock transaction, 3M rolled up the earplug and its then existing assets and liabilities into 3M

itself in a transaction accounted for as a sale.[4]  That roll-up transferred all liabilities, including

any then-latent earplug products liability, from the Debtors to 3M.[5]  And from that point on, 3M

in fact shouldered all the liabilities associated with the Debtors' earplug business, including a *qui*

*tam* settlement for misconduct and all the defense costs for the MDL.[6]  No amount of massaging

of the words on the pages of the Debtors' bankruptcy filings twelve years later,[7] with some

230,000 claims asserted against the transferred earplug business in the interim, can mask the

conclusion that 3M actually assumed all earplug products liability back in 2010.  Certainly, 3M

has not conducted itself, after litigating the earplug claims for four years in the MDL, as though

that liability lies anywhere else other than at 3M.  But, here and now, 3M's tune has changed.

        In a transparent attempt to manipulate the Bankruptcy Code to limit that liability without

its own bankruptcy filing, 3M caused the Debtors to formally *reassume* these earplug related

liabilities through a broad indemnification of 3M under the Funding Agreement.  Having now

shed that liability, 3M then cynically assumed the role of the benevolent funder, providing an

"enormous contribution" (in the Debtors' words)[8] to cover its newly "indemnified" liabilities.

---

[4] *See* "2010 Aearo Safety Products Business Transferred to 3M," Alix Partners Presentation (July 19, 2022) (AEARO_CH11_00003472).

[5] *See id.* (reflecting the transfer of Aearo goodwill to 3M).  Goodwill is "[a]n intangible asset created when the purchase price [for a target company] is higher than the fair market value" of the company and is calculated "by taking the difference between the actual purchase price paid to acquire the target company and the Net Book Value of the company's assets (assets minus liabilities)."  Goodwill, Corporate Finance Institute (Feb. 6, 2022), https://corporatefinanceinstitute.com/resources/knowledge/accounting/goodwill/.

[6] *See* Settlement Agreement among the United States of America, 3M Company, and Moldex-Metric, Inc., *United States ex rel. Moldex-Metric, Inc. v. 3M Company*, Case No. 3:16-cv-01533-DCC (July 25, 2018) [Doc 23-1].

[7] *See* Declaration of John R. Castellano in Support of the Debtors' Chapter 11 Petitions and First Day Motions [Doc 11], at ¶ 23 ("In 2010, the component of the Debtors' business responsible for the significant majority of its earplug sales was transferred upstream to 3M.").

[8] Prelim. Inj. Mot. at 20.

The sole purpose of that indemnification and funding transaction, however, was to attempt to rationalize the Debtors' bankruptcy filing and the issuance of an injunction to hinder and delay earplug claimants in the prosecution of their claims.

The law does not permit this tactic. Ninety years ago, the Supreme Court presaged precisely this situation in *Shapiro v. Wilgus*, 287 U.S. 348 (1932)—and firmly rejected it. In *Shapiro*, an individual debtor engaged in the lumber business found himself unable to pay his business debts. Two of his creditors declined to go along with the debtor's proposed repayment plan and sued him to recover payment. Because the debtor did not qualify to seek an insolvency receivership under applicable state law, the debtor moved his personally held business assets into a newly formed corporation and, just three days later and in cooperation with friendly creditors, forced the corporation into a receivership and sought and obtained an injunction barring those suits.

The Supreme Court, while noting that the debtor and his counsel "acted in the genuine belief that what they planned was fair and lawful," unanimously *reversed* the lower court's injunction. *Id.* at 357. As Justice Cardozo put it, "[t]he [debtor's] belief [that he will weather the financial storm and pay his debtors in full,] even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay." *Id.* at 354. Instead, the Court concluded that "[t]he conveyance and the receivership [were] fraudulent in law as against nonassenting creditors." *Id.* at 353. The Court noted that fraudulent transfer laws bar conveyances "made with an intent to hinder and delay [creditors]." *Id.* at 354. And because "[t]he conveyance to the corporation being voidable because fraudulent in law, the Court determined that "the receivership must share its fate." *Id.* at 355. Justice Cardozo explained:

> [The receivership] was part and parcel of a scheme whereby the form of a judicial remedy was to supply a protective cover for a fraudulent design. The design would

6

have been ineffective if the debtor had been suffered to keep the business for himself.  It did not gain validity when he transferred the business to another with a capacity for obstruction believed to be greater than his own.  *The end and aim of this receivership was not to administer the assets of a corporation legitimately conceived for a normal business purpose and functioning or designed to function according to normal business methods.*  What was in view was very different.  A corporation created three days before the suit for the very purpose of being sued was to be interposed between its author and the creditors pursuing him, with a restraining order of the court to give check to the pursuers. . . .  Never is such a remedy available when it is a mere weapon of coercion, a means for the frustration of the public policy of the state or the locality.   It is one thing for a creditor with claims against a corporation that is legitimately his debtor to invoke the aid of equity to conserve the common fund for the benefit of himself and of the creditors at large. . . .  It is another thing for a debtor, co-operating with friendly creditors, to bring the corporation into being with the hindrance and delay of suitors the very aim of its existence.

*Id*. at 355–56 (emphasis added).

This language that could have been written about this case.   Here, as in *Shapiro*, the entire point of the bankruptcy filing and requested injunction is "the hindrance and delay of" certain creditors—namely, 3M's earplug tort claimants.  *Id.  Shapiro* makes crystal clear that creating the circumstances to justify such a request is impermissible.  Even if done with a genuine belief that bankruptcy provides a better avenue for resolution of these tort claims than the MDL, such conduct, standing alone, constitutes an abuse of process that should result in this Court denying the Debtors' requested equitable relief as to 3M.

## 2. The Debtors' and 3M's Unclean Hands Assume "Wider and More Significant Proportions" Given the Substantial Public Interest

Application of the clean hands doctrine in this case is particularly appropriate given the substantial public interests at issue in this case.  As the Supreme Court stated in *Precision Instrument*,

where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but

averts an injury to the public.  The determination of when the maxim should be applied to bar this type of suit thus becomes of vital significance.

324 U.S. at 814–15 (internal citations and quotations omitted).

This language applies with full force here.  There can be no doubt that the Debtors' request for a preliminary injunction extending the automatic stay to 3M implicates public as well as private interests.  This is just one of many new cases testing the bounds of abuse of process and the Bankruptcy Code.  3M's tactic has become the strategy *de jour* for large, profitable, multinational companies seeking to offload their tort liability in bankruptcy without assuming any of bankruptcy's burdens.  And that tactic has stirred a firestorm of controversy in the public sector.[9]

This is no surprise because nowhere does the Bankruptcy Code authorize such access to the equitable powers of this country's bankruptcy courts.  Yet, here, the execution of a single nineteen-page "agreement"—negotiated between parent and its subsidiaries in what can hardly be described as "arms-length" negotiations—threatens to divest 230,000 individual United States service members of their Seventh Amendment and due process rights *and* divest an Article III court of its constitutionally-derived powers.  It is hard to overstate the public interest in

---

[9] Among many others, Congress and one Court of Appeals have taken note.  On February 8, 2022, the Senate Subcommittee on Federal Courts, Oversight, Agency Action, and Federal Rights held a hearing on the corporate efforts to manipulate the Bankruptcy Code to side-step accountability for mass-tort injuries.  *See* Committee on the Judiciary, "Abusing Chapter 11: Corporate Efforts to Side-Step Accountability Through Bankruptcy" (Feb. 8, 2022), https://www.judiciary.senate.gov/ meetings/abusing-chapter-11-corporate-efforts-to-side-step-accountability-through-bankruptcy.  The U.S. Court of Appeals for the Third Circuit recently exercised its discretion to take a direct appeal on a highly expedited basis of a decision sanctioning Johnson & Johnson's use of such tactics, with argument set for next month.  *See* Orders dated May 11, 2022 and June 10, 2022, *Official Committee of Talc Claimants v. LTL Management, LLC (In re LTL Management, LLC)*, Case No 22-2003 (3d Cir.) [Doc 12-1 & 19-1].

monitoring the equitable conduct of corporate insiders that can affect so many with nothing more than a single stroke of a pen.

That interest is even further heightened in this case, where 3M is fleeing a four-year old MDL process it initially supported because it does not like that the MDL Court is, in accordance with established practice and procedure, remanding cases in waves for trial after having conducted sixteen bellwether trials. Rather than proceed with its chosen MDL forum under those circumstances—or filing its own bankruptcy case—3M chose to engage in a transparent attempt to evade the MDL process without subjecting itself to the strictures of bankruptcy.

This Court should not reward 3M with its desired injunction. As in *Precision*, this Court should exercise its equitable powers to prevent this abuse of process "not only [to] prevent[] a wrongdoer from enjoying the fruits of his transgression but [to] avert[] an injury to the public." 324 U.S. at 814–15.

\*       \*       \*

In short, 3M and the Debtors come before this Court with unclean hands rising to the level of a clear abuse of the process. Particularly in light of the substantial public interests at stake here, this Court should close the doors of equity to 3M by denying the requested injunction.

## CONCLUSION

WHEREFORE, the Bailey Glasser and Pulaski Plaintiffs request that this Court deny the Debtors' Preliminary Injunction Motion and grant the Bailey Glasser and Pulaski Plaintiffs such other and further relief as is just.

DATED: August 11, 2022                    /s/ *Kevin W. Barrett*
                                                    Kevin W. Barrett (admitted *pro hac vice*)
                                                    Maggie B. Burrus (admitted *pro hac vice*)
                                                    Katherine E. Charonko (*pro hac vice* forthcoming)
                                                    BAILEY & GLASSER, LLP
                                                    209 Capitol Street
                                                    Charleston, WV 25301

9

Telephone:  (304) 345-6555
Facsimile:  (304) 342-1110
kbarrett@baileyglasser.com
mburrus@baileyglasser.com
kcharonko@baileyglasser.com

Brian A. Glasser (admitted *pro hac vice*)
D. Todd Matthews (*pro hac vice* pending)
BAILEY & GLASSER LLP
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC  20007
Telephone:  (202) 463-2101
bglasser@baileyglasser.com
tmatthews@baileyglasser.com

David L. Selby II (*pro hac vice* pending)
BAILEY & GLASSER LLP
3000 Riverchase Galleria, Suite 905
Birmingham, AL 35244
Telephone:  (205) 988.9253
dselby@baileyglasser.com

*Counsel for the Bailey Glasser Plaintiffs*


 /s/ *Adam Pulaski*
Adam Pulaski (*pro hac vice* forthcoming)
Pulaski Kherkher, PLLC
2925 Richmond Avenue Suite 1725
Houston, TX  77098
Telephone: (703) 664-4555
Facsimile: (703) 664-7543
adam@pulaskilawfirm.com

*Counsel for the Pulaski Kherkher Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2022, a copy of the *The Bailey Glasser and Pulaski Kherkher Plaintiffs' Objections to the Debtors' Motion for Declaratory and Injunctive Relief* was filed electronically. Notice of this filing will be sent to all necessary parties via the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

<u>*/s/ Kevin W. Barrett*</u>
Kevin W. Barrett (admitted *pro hac vice*)
BAILEY & GLASSER, LLP