**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| IN RE: | Chapter 11 |
| AEARO TECHNOLOGIES LLC, ET AL., | Case No. 22-02890-JJG-11 |
| 3M OCCUPATIONAL SAFETY LLC, AEARO HOLDING LLC, AEARO INTERMEDIATE LLC, AEARO LLC, AND AEARO TECHNOLOGIES LLC, | |
| Plaintiffs, | |
| vs. | Adversary Case No. 22-50059 |
| THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT AND JOHN AND JANE DOES 1-1000, | |
| Defendants | |

**OBJECTION TO MOTION FOR PRELIMINARY INJUNCTION, OR IN THE
ALTERNATIVE, REQUEST FOR CONDITION TO IMPOSE INJUNCTION**

## I.    INTRODUCTION

Debtors ask this Court to enjoin tort plaintiff creditors from pursuing claims against non-Debtor 3M, claiming this relief is justified under both Section 362 and Section 105.[1]  This Court has already recognized that Section 362 does not extend to bar tort claims against non-Debtor 3M. *See* Ex. 1 7/27/22 Hrg. AM Tr. at 103:8-105:22.  Moreover, as addressed more fully in the separate filings by claimants' lead counsel, Aylstock Witkin Kreis & Overholtz, PLLC, Seeger Weiss LLP, and Clark, Love & Hutson, PLLC, Debtors have failed to meet their burden to justify an injunction under Section 105.  In particular, while Debtors conclusorily assert that staying tort claims against non-Debtor 3M will preserve the assets of the estate and benefit creditors, the supposed efficiency benefits of such a stay are illusory in light of tort creditors' rights under Section 157(b)(5) to pursue their claims in a district court.  And the Debtors' arguments are transparently motivated by a desire to benefit the non-Debtor 3M, rather than to actually benefit creditors.

Defendant/creditor Charles Rataj supports the objections of claimants' lead counsel and submits that the motion should be denied.  Mr. Rataj submits this brief to add a further point: to the extent this Court does grant an injunction under Section 105, that injunction should be modified to protect creditors in the face of Debtors' obvious attempts to benefit 3M at the expense of creditors.

Blackletter law holds that, if this Court deems an injunction under Section 105 necessary, it has "almost plenary discretion in fashioning the injunction so as to maximize protection and minimize prejudice," and may "condition the continuing effectiveness of the injunction on continued positive progress in the case, can require security to ensure a lack of harm to the creditor,

---

[1] The Plaintiffs in the underlying adversary proceeding do not consist of all of the Debtors in the underlying Chapter 11 proceeding because not all of the Debtors are named Defendants in the CAEv2 litigation.  For ease of reference, the "Debtors," as described herein, will refer to the Debtor-Plaintiffs.

or can require the protected individual to agree to restriction on the transfer of his or her assets."
*In re PTI Holding Corp.*, 346 B.R. 820, 827 (Bankr. D. Nev. 2006) (quoting 2 COLLIER ON
BANKRUPTCY, ¶ 105.02 (15th rev. ed., Henry Sommer & Alan Resnick, eds., 2006)).

As relevant here, in the event the Court is inclined to invoke its equitable powers, it should
use its established discretion to impose two terms as a condition of any preliminary injunction.
These conditions will best protect the debtors' estates and enhance the efficiency of these
proceedings.

*First,* to ensure that 3M can honor its obligations under the Funding Agreement, the Court
should prevent 3M from paying dividends, buying back stock, or spinning off tens of billions of
dollars worth of assets to shareholders. Debtors themselves concede that 3M's obligations under
the Funding Agreement between 3M and Debtors are the largest and most critical asset of the
bankruptcy estates. That is, 3M's agreement to pay, "uncapped," the full measure of the Veterans'
claims against the estate is an "indispensable" and "essential" contractual promise. Bankr. Dkt.
12, Infor. Br. at 12, 54; Dkt. 11-2, Funding Agmt, §§ 7(a)(ii), 8.

Debtors advocate for an injunction on the ground that continuing litigation against 3M will
cost the company $4.7 million per week. Dkt. 1, Compl. ¶ 34. But 3M pays quarterly dividends
to shareholders of almost $10 million *per day.* And on the *same day* Debtors filed for bankruptcy,
3M announced plans to spin off substantially all of its healthcare assets on September 1. Those
assets account for more than 30% of 3M's revenue. Much like litigation expenses, which are a
paltry sum by comparison, the tens of billions of dollars of assets 3M plans to disperse to
shareholders in a matter of weeks cannot be used to honor the Funding Agreement. To protect the
Debtors' most important asset, the Funding Agreement, the price of an injunction that covers 3M
must include a prohibition on potentially fraudulent transfers to shareholders.

To be sure, Debtors contend that the Veterans' claims are not worth very much. But the average jury verdict to date (almost $10 million) says otherwise. If those verdicts are considered at all, 3M is insolvent, and lacks sufficient assets to fulfill its uncapped commitment under the Funding Agreement. *See* Ex. 2, Decl. Heaton ¶¶ 20, 26. This is not an estimation proceeding, so the Court should not decide on this record whether Debtors' or the juries' valuation of the claims is correct. But the Court can and should fashion equitable relief to account for the *possibility* that Debtors' unfounded critiques of the MDL Court and the bellwether trials will not withstand scrutiny. And that possibility dictates that 3M should not receive the benefits of equity in bankruptcy court—halting the Veterans from liquidating their claims by exercising their constitutional right to jury trials—unless the company foregoes its imminent plans to give tens of billions of dollars to shareholders that will be forever lost to the Debtors.[2]

*Second*, the Court should modify any injunction to exclude 3M's appeals in the Eleventh Circuit. Debtors and 3M pretend that the Veterans' claims are worth very little—and thus that 3M's Funding Agreement obligations will be modest—in the teeth of 16 jury verdicts. That position rests on the specious premise that the MDL Court botched a series of evidentiary, scientific, and dispositive-motion decisions that permitted erroneously inflated recoveries. There is a cheap and easy way to dispel that position: permit the bonded Eleventh Circuit appeals to continue. Both sides have already submitted opening briefs in the Court of Appeals. Completing the appellate process will cost 3M precious little. And the Eleventh Circuit's decisions will settle definitively whether Judge Rodgers committed the long list of putative errors Debtors claim.

## II.    FACTUAL BACKGROUND

---

[2] The Debtors should support this condition to preserve the integrity of the estate. Undersigned counsel asked Debtors' counsel to modify their request for injunctive relief to incorporate this condition, *see* Ex. 6, Ltr. from A. Keller to D. Horowitz, 8/10/22, but has not received a response as of the time of this filing.

The United States has a sophisticated and respected means of determining whether allegations of legal wrongdoing have merit: the civil justice system. Over the past three years, that system has determined repeatedly that 3M manufactured and sold defective earplugs, which were distributed to millions of combat veterans. Having lost over a dozen jury verdicts, 3M tendentiously and cynically claims that its losses were the result of Judge Rodgers allowing the "cascading effects of substantial evidentiary errors" to "taint[]" the bellwether verdicts, rendering them unable to "provide representative data or meaningfully inform settlement." Bankr. Dkt. 12, Infor. Br. at 47. But the self-serving attempts of Debtors and 3M to re-litigate issues they have already lost does not automatically control here. At a minimum, and for purposes of this motion, the Court must entertain the *possibility* that a dozen jury verdicts are valid, and that 3M faces extensive liability. If that possibility exists, equity requires than any injunctive relief be structured in light of the creditors' interest in preserving the assets available to pay that liability.

**A.  3M's Transfers and Disbursements Threaten the Estate.**

**1.  The Debtors' injunction is premised on 3M's ability to fund the Debtors' bankruptcy, including a claims trust for the CAEv2 claimants.**

The Debtors predicate their request to shield 3M from continued litigation outside of bankruptcy court on 3M's ability to meet its obligations under the Funding Agreement. Dkt. 1, Adv. Compl. ¶¶ 1, 35-41, 55. Mr. Rataj agrees with Debtors that the Funding Agreement is absolutely critical to the bankruptcy's success, and in fact, makes up the substantial majority of the Debtors' estate. Dkt. 1, Adv. Compl. ¶¶ 37-38; Bankr. Dkt. 12, Infor. Br. at 16-17; Dkt. 11-2, Funding Agmt. § 1 ("Permitted Funding Use"); Ex. 3, 7/27/22 PM Tr. at 13:14-14:14. Pursuant to the Funding Agreement, 3M has agreed to fund the general administrative expenses of Debtors' reorganization, and more critically, an *uncapped* claims trust to resolve the claims arising out of

the defective CAEv2.  Bankr. Dkt. 11-2, Funding Agmt., §§ 1 ("Commitment"), 2.  In other words, *whatever* Debtors owe to the Veterans for their personal injuries, 3M is obliged to pay that amount in full.  *Id.* § 1.  The Debtors' Complaint for injunctive relief underscores the absolute necessity of 3M's funding: "[t]he Funding Agreement *ensures* that these Chapter 11 cases will be fully funded, including administrative expenses, general unsecured claims, and any ultimately plan trust,"  Dkt. 1, Adv. Compl. ¶ 38, and that "[t]hrough the Funding Agreement, the Debtors also have sufficient assets to fund the Chapter 11 Cases and a trust in the amount required by a confirmed plan of reorganization." *Id.* ¶ 55; *see* Bankr. Dkt. 11, Decl. Castellano.  In arguing for their Temporary Restraining Order, Debtors declared that "[3M's] liquidity is central to the entire [bankruptcy] case" and asked: "why would you put that liquidity through the [F]unding [A]greement [in] potential jeopardy." Ex. 1, 7/27/22 AM Tr. at 55:24-56:2.

The Funding Agreement makes 3M's liquidity central to both the bankruptcy estate and Debtors' request to extend an injunction to 3M. The Debtors emphasized the point over and again in their Informational Brief to this Court:

> 3M's financial contribution *is essential to a successful reorganization*, which will promptly, fully and fairly compensate servicemembers and veterans (as well as the relatively small number of civilians). 3M has to fund both these chapter 11 cases and a subsequent claims trust.  This *funding is indispensable* to the creation and implementation of a claims trust that will efficiently review and fairly compensate tort claims, and otherwise satisfy the requirements necessary to qualify for section 105(a) relief.

Bankr. Dkt. 12, Infor. Br. at 54 (emphasis added).  According to the Debtors, "3M's uncapped financial commitment to [their] organization . . . is essential." *Id.* at 12; *see also* Dkt. 3, Decl. Stein ¶ 18.[3]

---

[3] "With the Funding Agreement, and upon an application of the automatic stay to 3M as requested in the Motion, the Debtors believe they will: (a) be in the best position to maximize available funds for the greatest and most equitable distribution to all creditors, including holders of Combat Arms

In fact, 3M's ability to fund the Debtors' reorganization is so essential, according to the Debtors, that the ongoing litigation costs of the MDL posed a threat to the bankruptcy estate. *See* Dkt. 10, Compl. ¶¶ 33-34. The Debtors averred that "[c]ontinued litigation of the Combat Arms Claims at this unprecedented scale will risk valuable estate assets [and] redirect resources away from a successful restructuring" and further explained how the cost of litigating these cases is "immense." *Id.* Those costs amounted to $47.77 million spent by 3M in the first half of 2022 with an expectation that 3M would spend $74.5 million in the second quarter. *Id.* ¶ 34. 3M alone has borne these litigation costs, Bankr Dkt. 11, Castellanno Decl.¶ 49 , and continuing to incur these amounts is apparently sufficient to jeopardize 3M's ability to fully meet its Funding Agreement obligations to the estate. *See, e.g.* Ex. 1, 7/27/22 AM Tr. at 43:20-7 (arguing the litigation costs of a mere fourteen days warranted TRO because of impact on the estate); Dkt. 3, Decl. Stein ¶ 18 ("Application of the automatic stay to Combat Arms Claims asserted against 3M, and an order preliminarily enjoining the continuation of Pending Actions against 3M, will forestall the expenditure of tens (and perhaps hundreds) of millions in litigation costs fighting claims in the MDL and other courts nationwide, dollars that otherwise could be reserved to fund a settlement with the plaintiffs and a trust under the reorganization plan.").

But 3M's obligations under the Funding Agreement are "uncapped." Bankr. Dkt. 11-2, Funding Agmt., § 1. If incurring tens of millions of dollars of litigation-related expenses could impede 3M's ability to fully fund the estate, that is only because 3M may lack sufficient assets to fully honor its contract. *See id.* ("'Commitment' means the commitment by [3M] of $1.24 billion to make Payments under the Terms of this Agreement, including to fund one or more trusts and

---

Claims, under a consensual chapter 11 plan; and (b) have sufficient assets, including cash available under the Funding Agreement, (i) to fund a claims trust that will be governed by procedures that efficiently and fairly review claims and compensate Combat Arms tort claimants, and (ii) otherwise satisfy the Bankruptcy Code requirements."

$240.0 million to administer a Bankruptcy Case, it being expressly understood that . . . the Commitment does not serve as a cap on [3M's] funding obligations or otherwise limit [3M's] Payments under the terms of this Agreement.").

      **2.**      **3M's obligations to fund the claims trust could likely eclipse $100 billion, thereby making 3M woefully insolvent.**

Debtors contend the bellwether verdicts are "tainted," but Debtors' self-serving characterizations cannot control at this stage. This Court is in no position at this juncture to blindly accept Debtors' slanted mischaracterization of 19 jury verdicts after 16 separate trials as unrepresentative of the Veterans' claims. To the contrary, the law presumes that judgments are valid and enforceable unless and until they are overturned on appeal. *Prymer v. Ogden*, 29 F.3d 1208, 1213 n.2 (7th Cir. 1994); *Abbott Lab'ys v. Dey, L.P.*, 110 F. Supp. 2d 667, 671 (N.D. Ill. 2000) ("[T]he law in the Seventh Circuit is clear that exhaustion of appellate remedies is not a normal requirement of issue preclusion, and a final judgment by a district court has preclusive effect even though judgment is pending on appeal."). The judgments Debtors decry are thus the *only* relevant markers this Court has to work with when considering 3M's liquidity. And those jury verdicts show that, even putting a heavy thumb on the scale in favor of 3M, 3M's ability to fulfill its Funding Agreement obligations is, at a minimum, in serious jeopardy.

Plaintiffs have won 13 out of 19 jury verdicts, and approximately half of the total bellwether cases if one includes cases that were dismissed before trial. [4] To account for random

---

[4]The following bellwether cases returned verdicts in favor of the plaintiffs, and each case number refers to the United States District Court for the Northern District of Florida: *Estes*, 7:20-cv-137, Dkt. 184, ($2,450,500 verdict); *Keefer*, 7:20-cv-104, Dkt. 186 ($2,420,000 verdict); *Hacker*, 7:20-cv-131, Dkt. 202 ($2,260,000 verdict); *Baker*, 7:20-cv-39, Dkt. 183 ($1,054,000 verdict); *Adkins*, 7:20-cv-12, Dkt. 118 ($8,200,000 verdict); *Wayman*, 7:20-cv-149, Dkt. 198 ($21,697,264.38 verdict) *Sloan*, 7:20-cv-1, Dkt. 184 ($55,000,000 verdict); *Camarillorazo*, 7:20-cv-98, Dkt. 170 ($13,062,320 verdict); *Finley*, 7:20-cv-170, Dkt 174 ($22,500,000 verdict); *Vilsemeyer*, 7:20-cv-113, Dkt. 139 ($50,000,000 verdict); *Wilkerson*, 7:20-cv-35, Dkt. 201 ($8,000,000 verdict); *Vaughn*, 7:20-cv-134 ($2,200,000 verdict), Dkt. 163; *Beal*, 7:20-cv-6, Dkt. 176 ($77,500,000

variations between the total population of claimants and the bellwethers, movant can say with 99% confidence that plaintiffs will prevail in no fewer than 23.8% of future cases.  (The actual win percentage will almost certainly be higher, and would only be lower 1% of the time).  Ex. 2, Decl. Heaton ¶ 15.  Next, instead of taking the average bellwether win, one can use the fourth lowest verdict, which was $2.42 million, meaning that 69% (9 of 13) of the verdicts were actually higher than this amount.  *Id.* ¶ 17.  And rather than using the number of claimants as of June 10, 2022, approximately 233,000, one can further lower the number of claimants by the same percentage of claimants who dropped their claims from September 2021 (282,902) to June 2022 (233,883), a 17.3% decline.  *Id.* ¶ 18. Applying that decline to 233,883 leaves 193,358 plaintiffs rounded to 193,000.  *Id.*  "This analysis shows that the *minimum* value of the 3M CAEv2 claim is likely to be in excess of $100 billion."  *Id.* ¶ 20 (emphasis added).  Thus, "[u]sing 3M's $5.85 billion free cash flow for 2021, the likely minimum value of the 3M CAEV2 claims—more than $100 billion— represents over 17 times 3M's free cash flow."  *Id.* ¶ 22.  "Given its current financial characteristics, 3M does not have the ability to fund its likely minimum for the CAEv2 claims under its current dividend policy, its share repurchase practice, and its planned spinoffs."  *Id.* ¶ 26.

The results are even more staggering when not applying such slanted assumptions in 3M's favor.  The average bellwether verdict for the cases that have proceeded to trial is $14,018,110. Considering the eight bellwether cases that were dismissed prior to trial, the average verdict is $9,864,595.72.  Multiplying the average, $9,864,595.72, by the number of claimants shows that 3M's liability is more than $2 trillion.  As of December 31, 2021, 3M's assets were worth -

---

verdict). The following bellwether cases returned verdicts in favor of Defendants: *McCombs*, 7:20-cv-94; *Blum*, 7:20-cv-122; *Stelling*, 7:20-cv-143; *Palanki*, 3:19-cv-2324; *Montero,* 7:20-cv-67; and *Kelley*, 7:20-cv-153.  Eight bellwether plaintiffs dismissed their cases prior to trial.  *Burgus*, 7:20-cv-7; *Rowe*, 7:20-cv-26; *Hensley*, 7:20-cv-93; *McNeal*, 7:20-cv-66; *Taylor*, 7:20-cv-00071; *King*, 7:20-cv-132; *Garcia*, 7:20-cv-721; and *Lopez*, 7:20-cv-93.

approximately $46 billion at book, Ex. B to Ex. 2, Decl. Heaton, 3M June 30, 2022 10-Q at 4, and

at most $100 billion based on the company's public market capitalization. Both figures are a small

fraction of 3M's liability in the CAEv2 litigation.

Discounting the claims of the 233,000 plaintiffs "by the probability that the contingency

will occur and the liability will become real," *Baldi v. Samuel Son & Co.*, 548 F.3d 579, 582 (7th

Cir. 2008), the value of 3M's contingent liability is staggering. Even if there was a fifty percent

rate of attrition for plaintiffs—which has not been borne out in the litigation, *see* MDL Dkt. 2953

at 2-3 (noting that 86% of plaintiffs have voluntarily transferred to the MDL docket and paid the

requisite filing fee)—*and* a mere 50% likelihood of success for those remaining cases, 3M's

liabilities under the Funding Agreement from the CAEv2 litigation still outnumber its assets by

8:1.

The Debtors summarily dismiss the results of the bellwether verdicts based on their

disagreement with specific evidentiary rulings as well as the pace at which the trials took place.[5]

Debtors fail, however, to acknowledge the representative nature of the bellwether pool along with

the diversity of juries that returned the verdicts in plaintiffs' favor. The MDL Court, with the

assistance of BrownGreer and in consultation with MDL Leadership, ran analytics across the-then

plaintiff population of filed and unfiled cases to identify the factors for a "representative claimant"

---

[5] The Debtors' argument that the pace of the bellwether trials somehow improperly bolstered the jury verdict borders on the absurd. The pace does not change the fact that ten of the sixteen juries found in favor of plaintiffs (for 13 plaintiffs), and plaintiffs' counsel also participated in these trials at the same "frenetic" pace (without the benefit of the resources of two of the largest law firms in the country). Moreover, the timing of these bellwether trials is not out of step with other MDL bellwether cases. *See, e.g.*, *In re Xarelto*, 14-2592 (E.D. La.) Dkt. 4223, Case Mgmt. Order. No. 2A (setting three trials within two months). Notably, these bellwether trials—unlike many MDL bellwethers—also had the benefit of trials in different geographic locations within Florida with different jury pools. Despite these different geographic locations and jury pools, the juries *still* found in favor of plaintiffs across these locations . *See, e.g.* *Adkins*, 7:20-cv-12, Dkt. 118 (trial held in Pensacola, FL); *Camarillorazo*, 7:20-cv-98, Dkt. 170 (trial held in Tallahassee, FL); *Vaughn*, 7:20-cv-134 Dkt. 163 (trial held in Gainesville, FL).

to qualify for a bellwether in terms of age, branch of service, and injury. Ex. 4, Eighth Case Mgmt. Conf. Tr. at 3-10 (explaining how the bellwether pool is "a representative sample and shares the same trends as the overall [plaintiff] population" based on analytics run on the plaintiff population); MDL Dkt. 906 at 2-5 (BrownGreer's presentation regarding its analysis of the plaintiff population). Prior to the bellwether selection, the MDL Court stated "I'm 100 percent confident in our pool and the representativeness of the pool." Ex. 4, Eighth Case Mgmt. Conf. Tr. at 10. And this premonition proved correct, as after the final bellwether trial the Court remarked that the bellwether trials and verdicts "provided unparalleled insight into the strengths and weaknesses of the various claims and defenses *and how juries respond to the evidence*, all of which has clearly informed the parties of the risks and costs associated with the litigation." MDL Dkt. 3188 (emphasis added). Though 3M is more than willing to cast aspersions on an able and distinguished MDL judge, this Court must at least entertain the *possibility* that Judge Rodgers is right and 3M is wrong.

### 3. 3M has imminent plans to gratuitously dispense assets, which by extension, means to siphon assets away from the estate.

There is a possibility that 3M will not be able to meet its obligations under the Funding Agreement. And the expenditure of a mere tens of millions of dollars in litigation expenses is supposedly enough to justify equitable relief to halt the litigation against 3M, leaving those funds available to satisfy the Funding Agreement. Dkt. 3, Decl. Stein ¶ 18. But the CAEv2-related litigation expenses are a drop in the bucket compared to the *tens of billions* of dollars 3M plans to *imminently* give away to its shareholders. In 2021, 3M paid out 85% of its free cash flow as dividends and share repurchases. Ex. 2, Decl. Heaton ¶ 24. Dividends alone last year distributed $3.420 billion to the company's stockholders, and share repurchases accounted for $2.2 billion to shareholders. Ex. C to Ex. 2, Decl. Heaton, 3M 2021 10-K at 38; Ex. D to Ex. 2, Decl. Heaton,

11

3M Jan. 2022 8-K at 4.

3M's rich dividend policy continued this year as well. On June 12, 2022, 3M paid a quarterly dividend of $1.49 per share, which is a 1% increase over the dividend paid in the same quarter last year.[6] As 3M has about 569.1 million shares outstanding, the total payment for that single dividend was some $850 million. Earlier this year, 3M paid the same dividend of $1.49 on March 12, 2022, also totaling approximately $850 million.[7] And barring relief from this Court, 3M is likely to announce its next quarterly dividend in a matter of days, with a payment in a matter of weeks.[8] Dispersing $850 million per quarter in dividends amounts to almost $10 million per *day*, or seven times more than the estimated quarterly cost of litigation that 3M seeks to avoid.

And it is all but certain 3M will continue to pay dividends to its shareholders, as 3M "has paid dividends to its shareholders without interruption for more than 100 years and increased the annual dividend for 64 straight years." 3M Investor Relations, Stock Information 2022, *available at* https://investors.3m.com/stock-information/dividends/default.aspx. Indeed, since December 31, 2021, 3M has paid $2.25 billion in dividend and net share repurchases, "reflecting 168% of 3M's free cash flow over the period, thus paying out more to shareholders than its business generated over the period in free cash flow." Ex. 2, Decl. Heaton ¶ 24.

3M also spent $2.2 billion in share repurchases during the 2021 fiscal year. *See* Ex. D to Ex. 2, Decl. Heaton, 3M Jan. 25, 2022 8-K at 4. In November 2018, 3M authorized $10 billion in

---

[6] *See* 3M Board Declares Quarterly Dividend, May 10, 2022 *available at* https://investors.3m.com/news/news-details/2022/3M-Board-Declares-Quarterly-Dividend/default.aspx#:~:text=PAUL%2C%20Minn.%2C%20May%2010,business%20on%20May%2020%2C%202022; Ex. C. to Ex. 2, 3M 2021 10-K at 21.

[7] 3M Increases Dividend for the 64th Consecutive Year, Press Release, *available at* https://news.3m.com/2022-02-08-3M-Increases-Dividend-for-the-64th-Consecutive-Year.

[8] *See* 3M Board Declares Quarterly Dividend, May 10, 2022 *available at* https://investors.3m.com/news/news-details/2022/3M-Board-Declares-Quarterly-Dividend/default.aspx#:~:text=PAUL%2C%20Minn.%2C%20May%2010,business%20on%20May%2020%2C%202022.

stock repurchases, and as of June 30, 2022, due to 3M's aggressive dividend payments and stock repurchases, "3M reported a balance of cash and marketable securities of just $2.98 billion, compared with $4.76 billion as of year-end 2021." Ex. 2, Decl. Heaton ¶ 24. In other words, 3M has started to deplete its reserves but still has $2.98 billion that it plans to put towards stock repurchases, further siphoning off assets that could fund Debtors' reorganization.

Most troubling, an the *very day* that 3M announced Debtors' bankruptcies, it told the market of plans to spin-off its health care businesses. *See See* Bankr. Dkt. 11, Decl. Castellano ¶ 21; Ex. 2, Decl. Heaton ¶ 25. The healthcare spinoff spin-off will result in a new company that will house its health care business, which had $9.1 billion in sales in 2021—over a quarter of 3M's total sales, and representing an even greater share of 3M's total value given the market's valuation of healthcare assets. *See* Bankr. Dkt. 11, Decl. Castellano ¶ 6; Ex. 2, Decl. Heaton ¶ 25 ("According to 3M's 2021 Form 10-K, its health care business segment represented more than 25% of its net sales and nearly 30% of its operating income."). If these transactions are permitted to proceed, what remains of 3M will have far fewer assets available to honor the Funding Agreement. Ex. 2, Decl. Heaton ¶ 26. Thus, "[g]iven its current financial characteristics, 3M does not have the ability to fund its likely minimum liability for the CAEv2 claims under its current dividend policy, share repurchase practice, and planned spin offs." *Id.*

## B. Appeals Pending before the United States Court of Appeals for the Eleventh Circuit.

Debtors and 3M have appealed verdicts for four Veterans. And these appeals specifically raise the putative errors that Debtors claim "tainted" the bellwether verdicts. In particular, appellants argue that the MDL Court issued erroneous decisions regarding the admissibility of an Air Force Letter and the MDL Court's denial of 3M's Government Contractor Defense. *See 3M Co., et al. v. Estes, et al.*, Nos. 21-13131, 21-13133, 21-13135; *3M Co., et al. v. Baker*, No. 21-

12517. 3M has already filed its opening brief and posted an appeal bond with the MDL Court.[9]

All that is left is to submit a reply, and to participate in oral argument.[10]

## III. LAW AND ANALYSIS

### A. Blackletter law holds that this Court should tailor any injunctive relief to ensure further equity, including by placing conditions on non-Debtors receiving the benefits of an injunction.

The Court can tailor any equitable relief to ensure 3M can make good on its promises. *See Salazar v. Buono*, 559 U.S. 700, 718 (2010) ("A court must find prospective relief that fits the remedy to the wrong or injury that has been established."); *Pac. Coast Fed'n of Fishermen's Associations v. Raimondo*, 2022 WL 789122, at *39 (E.D. Cal. Mar. 11, 2022) ("[T]he court has considerable discretion to fashion injunctive relief to the necessities of the particular case" because "equitable remedies are a special blend of what is necessary, what is fair, and what is workable.").

In particular, it is well-established that the Court may impose conditions on non-Debtors who would receive the benefits of an injunction under Section 105:

> As Collier states, once the plaintiff has shown that the action against nondebtors will affect the bankruptcy estate in a legally cognizable manner, the most important element will be the balancing of harms. In this regard, the bankruptcy court, as a court of equity, has almost plenary discretion in fashioning the injunction so as to maximize protection and minimize prejudice. The court can condition the continuing effectiveness of the injunction on continued positive progress in the case, can require security to ensure a lack of harm to the creditor, or can require the protected individual to agree to restriction on the transfer of his or her assets.

*In re PTI Holding Corp.*, 346 B.R. 820, 827 (Bankr. D. Nev. 2006) (quoting 2 COLLIER ON BANKRUPTCY, *supra,* at ¶ 105.02[2]); *see also In re Purdue Pharma L.P.*, 632 B.R. 34, 36

---

[9] *Estes*, 7:20-cv-137 (N.D. Fl.), Dkt. 197; *Keefer*, 7:20-cv-104 (N.D. Fl.) Dkt. 199; *Hacker*, 7:20-cv-131 (N.D. Fl.), Dkt. 215; *Baker*, 7:20-cv-39 (N.D. Fl.). 3M has not posted an appeal bond in *Baker*.

[10] Although 3M's reply was due in a matter of days, the appeal has been stayed pending a determination of the automatic stay.

(Bankr. S.D.N.Y. 2021) ("one of the conditions to the Court's grant of a preliminary injunction of litigation of Purdue-related causes of action against [non-Debtor] Sackler family members has been their compliance with this investigation"); *In re G-I Holdings, Inc.*, 327 B.R. 730, 740 (Bankr. D.N.J. 2005) ("A bankruptcy court is a court of equity which may, in its discretion, deny relief which is within its powers or grant relief upon some condition dictated by equitable principles") (quoting *Twelve Percent Secured Noteholders v. Amarex, Inc. (In re Amarex, Inc.)*, 30 B.R. 763, 767 (Bankr.W.D.Okla.1983)).

The Court "has wide discretion to impose terms as a condition of granting or withholding a restraint or an injunction." *Agnew v. Alicanto, S.A.*, 125 F.R.D. 355, 359 (E.D.N.Y. 1989). "The power to impose such conditions is founded upon, and arises from, the discretion which the court has in such cases, to grant, or not to grant, the injunction applied for." *Russell*, 105 U.S. at 438–39; *see Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087, 198 L. Ed. 2d 643 (2017) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."). "In awarding a preliminary injunction a court must also consider the overall public interest," and "[i]n the course of doing so, a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087.

## B.    The Court should condition any injunction on 3M's commitment to refrain from dissipating assets while the injunction is in place.

Mr. Rataj is a Wave 1 Plaintiff who is on the cusp of remand from the MDL Court and, like so many other Wave plaintiffs, finally having his day in court. If the Debtors want to enjoin the CAEv2 claimants from pursuing their claims against 3M, and thus securing judgments against 3M, this Court should condition that relief on 3M ensuring that it has sufficient funding to ultimately satisfy those Veterans' claims. But 3M may not have sufficient funds and should

therefore be required to maintain its assets—and cease any asset spin-offs, stock dividends, or stock repurchases—as a condition of reaping the benefit of the automatic stay.

> **1.    Any transfers 3M makes for less than reasonably equivalent value, such as the health care spin-off, stock dividends or stock repurchases, will harm the bankruptcy estate because 3M may not be able to satisfy its obligations under the Funding Agreement.**

As already detailed *supra* II(B)(3), 3M may not have sufficient liquidity to fulfill its duties under the Funding Agreement. It should not benefit from equity through an injunction preventing tort victims from imminently liquidating their claims while it disposes of tens of billions of dollars of assets to shareholders.

The Court does not need to decide the value of the claims today to modify the injunction, just as it does not need to resolve the merits to grant it. It is sufficient for the Court to acknowledge the realistic possibility that the MDL was well run, that the MDL judge correctly applied the law, and that the jury verdicts are representative of the Veterans' claims. If that is so, 3M faces obligations in excess of $100 billion using even a conservative estimation. Indeed, Debtors' own counsel admitted that "[a]nalysts have published reports [about the CAEv2 liabilities] between 1.8 billion and 1.55 trillion." Ex. 1, 7/27/22 AM Tr. at 21:17-18. That is admittedly a wide range, but it is one devised by third-party market analysts who specialize in valuing assets and liabilities. If the CAEv2 liabilities are even in the 6th percentile of this range, 3M will be unable to satisfy its obligation to Debtors under the Funding Agreement.

When considering whether to grant equitable relief, the Court must consider the benefit to the beneficiary against the harm to the opponent. *See Russell v. Farley*, 105 U.S. 433, 438–39, (1881); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Irreparable harm will ensue to Mr. Rataj, all of the CAEv2 claimants, *and* the Debtors if 3M is unable to meet its obligations under the Funding Agreement. The Debtors

have been clear that the institution of the claims trusts is the *raison d'etre* for their filing for Chapter 11 bankruptcy: "[a]gainst this backdrop and after careful consideration, Aearo has shifted its approach after concluding that chapter 11 presents the only option for achieving a fair, equitable, and expeditious process to resolve these claims." Bankr. Dkt. 12, Infor. Br. at 16. The Debtors have similarly made clear that 3M's funding is "essential" to the claims process and to the Debtors' reorganization generally since 3M's funding under the Funding Agreement would provide "sufficient assets" to satisfy the claims trust. *Id.* ¶ 55. As the Debtors advocated to this Court, "[m]ake no mistake the chapter 11 cases are not about walking away from responsibilities, and it will not be used to deprive claimants of a fair recovery or their day in court. *In this respect, 3M's uncapped financial commitment to Aearo's reorganization . . . is essential*." Bankr. Dkt. 12, Infor. Br. at 12 (emphasis added). Without 3M's ability to fund the claims trust for the CAEv2 claimants, the Debtors will be unable to pay those creditors, thereby quashing the Debtors' ability to successfully reorganize and making this whole process—halting the claimants' cases in the MDL and dragging them into a new forum—a futile exercise leaving creditors like Mr. Rataj with *no recourse*.

Likely for this reason, the Debtors and 3M mutually agreed that 3M's inability to fund the bankruptcy—including the general administrative expenses and the claims trust—would result in "irreparable damage." Bankr. Dkt. 11-2, Funding Agmt., § 7(a)(ii) 8 (Pursuant to § 8, "[t]he parties agree that irreparable damage will occur in the event that any Event of Default occurs under § 7," which includes if 3M "defaults in funding obligations"). The Debtors and 3M thus recognize the magnitude of harm if 3M is unable to satisfy its payment obligations. Despite this, 3M has continued on its irresponsible path of siphoning off assets, threatening its ability to hold up its end of the bargain to Debtors, and by extension, to the Debtors' creditors. Preserving 3M's assets is

thus crucial to avoid the irreparable harm the Debtors have identified. Any injunction should include this sensible condition to ensure that relief is appropriately tailored.

### 2. The imposition of this condition fulfills the purpose of Debtors' injunctive relief and does not harm 3M.

Requiring a commitment from 3M to maintain its assets to ensure a fully funded claims trust accomplishes the goal of Debtors' injunction as well as the bankruptcy. *See* Bankr. Dkt. 11, Decl. Castellano ¶ 6. This commitment will guarantee 3M's ability to fund the Debtors' estate and avoid what would otherwise result in the bankruptcy's failure. If 3M so needs the protection of the automatic stay to ensure that it is able to fund the claims trust, steps must be taken to confirm 3M will be able to fulfill its funding duties.

The imposition of the injunction effectively robs CAEv2 claimants—like Mr. Rataj—of their ability to prosecute their claims against 3M. In the time they could be pursuing their case to trial, and liquidating their claim value, the CAEv2 claimants will be waiting on a claims trust that Debtors have assured this Court will provide a "100% recovery." Bankr. Dkt. 11, Decl. Castellano ¶ 6. 3M, a non-debtor who otherwise bears none of the bankruptcy restraints, gets a full reprieve from litigation and possible judgments with the injunction. Fairness therefore demands that this Court tailor any injunction to ensure 3M does not squander away its assets that claimants could have otherwise reached while any injunction is in place.

On the other hand, there is *no harm* to 3M from enjoining dividend payments and stock buybacks. *See* Ex. 2, Decl. Heaton ¶ 29. Preventing those corporate actions means that 3M *keeps* billions of dollars of cash. Keeping cash in a bank account—as opposed to giving it away for nothing—obviously does not harm the account holder. *Id.* ¶ 28. It does not even harm 3M's shareholders, as confirmed by modern finance principles and empirical financial analysis. When a company pays a dividend or buys back stock, its stock value drops by the precise amount of the

dividend or buyback.  That is to be expected: the company has the same non-cash assets that it did before, and those assets are worth the same market price.  But the company has reduced its cash assets by the exact amount of the distribution.  *Id.* ¶ 28.  The total value of assets, therefore, is reduced by the exact amount of the cash disbursement, which results in that exact reduction in total equity value.

### 3.    Requiring 3M to maintain its assets as a condition of the injunction serves the public interest.

The Debtors have represented to this Court that 3M's uncapped financial commitment shows "the chapter 11 cases are not about walking away from responsibilities, and it will not be used to deprive claimants of a fair recovery or deny them their day in court."  Bankr. Dkt. 12, Infor. Br. at 12.  3M has also publicly promoted this "efficient" process for a fair resolution of claims.  *See, e.g.* Ex. 5, 3M Subsidiary Aearo Technologies Takes Action to Efficiently and Equitably Resolve Litigation Related to Combat Arms Earplugs, July 26, 2022 ("The well-established chapter 11 process is intended to achieve an efficient and equitable resolution, reduce uncertainty, and increase clarity for all stakeholders, while reducing the cost and time that could otherwise be required to litigate thousands of cases.").  To make sure the Debtors and 3M make good on their representations to this Court and the public, 3M should not proceed with disposing of assets to the detriment of the estate.

There is no doubt the public interest is served by prohibiting mammoth corporations like 3M from attempting to avoid its responsibilities to the detriment of Debtors and innocent victims like Mr. Rataj.  The public interest is also served by ensuring the legitimacy of the bankruptcy system, and not allowing creditors like 3M to promise funding as a means to take advantage of equitable relief in bankruptcy court but not to take steps to ensure they can actually fulfill those obligations.  If 3M wants the benefit of a bankruptcy stay to make sure it can fulfill its "uncapped"

obligations to the Debtors, 3M should be willing to preserve its assets to satisfy those obligations.

**C.      The Court should carve out the Eleventh Circuit Appeals from any injunction as to 3M.**

If the Court enjoins prosecution of the CAEv2 claims outside of this Court, the Court should nevertheless allow the pending appeals before the Eleventh Circuit to proceed as to 3M. Those appeals are almost fully briefed, and the parties will not incur any significant cost in allowing oral argument to proceed.

The Eleventh Circuit will rule on the very issues that the Debtors allege are critical to the claims-estimation process. *See* Bankr. Dkt. 12, Infor. Br. at 45-50. The best way to gauge whether Judge Rodgers actually committed the various errors Debtors claim "tainted" the bellwether verdicts is to allow the only Court of Appeals with jurisdiction over her final judgments to rule. If Debtors truly believe the MDL Court committed such glaring errors of law, it should welcome this modification to any injunction.

## IV.      CONCLUSION

Mr. Rataj objects to the Debtors' motion for a preliminary injunction. If, however, the Court is inclined to grant such relief, Mr. Rataj respectfully asks this Court to impose the two conditions specified above.

Dated: August 11, 2022                           _/s/ Ashley C. Keller_____

Ashley C. Keller (admitted *pro hac vice*)
ack@kellerpostman.com
Nicole C. Berg (admitted *pro hac vice*)
ncb@kellerpostman.com
Ashley Barriere (admitted *pro hac vice*)
ashley.barriere@kellerpostman.com
Frank G. Dylewski (admitted *pro hac vice*)
frank.dylewski@kellerpostman.com
Amanda Hunt (admitted *pro hac vice*)
amanda.hunt@kellerpostman.com
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

*Counsel for Charles Rataj and Keller Postman
LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2022, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following parties through the Court's Electronic Case

Filing System.

| | |
|---|---|
| **Bryan F. Aylstock** | baylstock@awkolaw.com |
| **Michael Andolina** | mandolina@whitecase.com<br>jdisanti@whitecase.com<br>mco@whitecase.com |
| **Adam Arceneaux** | adam.arceneaux@icemiller.com<br>michelle.mosgrove@icemiller.com |
| **Laura Elizabeth Baccash** | laura.baccash@whitecase.com |
| **Kevin W. Barrett** | bkarrett@baileyglasser.com |
| **Brent Barriere** | bbarriere@fishmanhaygood.com |
| **John Bougiamas** | jbougiamas@otterbourg.com |
| **Bobby Jene Bradford** | bbradford@awkowlaw.com |
| **Kayla D. Britton** | kayla.britton@faegredrinker.com;<br>noticeFRindy@faegrebd.com |
| **David R. Buchanan** | dbuchanan@seegerweiss.com |
| **Jason Walker Burge** | jburge@fishmanhaygood.com |
| **Maggie B. Burrus** | mburrus@baileyglasser.com |
| **Deborah Caruso** | dcaruso@rubin-levin.net<br>dwright@rubin-levin.net<br>cgilly@rubin-levin.net<br>atty_dcaruso@bluestylus.com |
| **Clayton A. Clark** | cclark@triallawfirm.com |
| **Melanie Louise Cyganowski** | Mcyganowski@otterbourg.com |
| **Kevin M. Davis** | kdavis@capdale.com |
| **Laura A DuVall** | Laura.Duvall@usdoj.gov,<br>Catherine.henderson@usdoj.gov |
| **Phillip Fajgenbaum** | phillipfajgenbaum@parkerpoe.com |
| **Jennifer S. Feeney** | jfeeney@otterbourg.com |
| **Kiah T. Ford, IV** | chipford@parkerpoe.com |
| **Brian A. Glasser** | bglasser@baileyglasser.com |
| **Sasha M. Gurvitz** | sgurvitz@ktbslaw.com |
| **Samuel P. Hershey** | shershey@whitecase.com |
| **Jennifer M. Hoekstra** | jhoekstra@awkolaw.com |
| **Jeffrey A Hokanson** | jeff.hokanson@icemiller.com<br>bgnotices@icemiller.com;<br>david.young@icemiller.com |
| **Shelley Van Natter Hutson** | shutson@triallawfirm.com |

| Jay Jaffe | jay.jaffe@faegredrinker.com; noticeFRindy@faegrebd.com |
|---|---|
| Jessica Lauria | jessica.lauria@whitecase.com; jdisanti@whitecase.com; mco@whitecase.com |
| Martha R. Lehman | mlehman@smithamundsen.com |
| Matthew Evan Linder | mlinder@whitecase.com |
| Elizabeth Marie Little | elizabeth.little@faegredrinker.com; noticeFRindy@faegredrinker.com; anita.sery@faegredrinker.com; docketgeneral@faegredrinker.com; beth.olivere@faegredrinker.com |
| Kevin C. Maclay | kmaclay@capdale.com |
| Tristan Manthey | tmanthey@fishmanhaygood.com |
| Nir Maoz | nmaoz@ktbslaw.com |
| Harmony A Mappes | harmony.mappes@faegredrinker.com; kristina.tinsley@faegrebd.com |
| Todd Mathews | tmathews@baileyglasser.com |
| William Michael Moreland | MMoreland@triallawfirm.com |
| Cherie D. Nobles | cnobles@fishmanhaygood.com |
| Thomas E Patterson | tpatterson@ktbslaw.com |
| Robert J Pfister | rpfister@ktbslaw.com |
| Todd E. Phillips | tphillips@capdale.com |
| Christopher A. Seeger | cseeger@seegerweiss.com |
| David L. Selby II | dselby@baileyglasser.com |
| Adam C. Silverstein | asilverstein@otterbourg.com |
| Gregory Starner | gstarner@whitecase.com |
| Harrison Edward Strauss | harrison.strauss@usdoj.gov |
| Meredith R. Theisen | mtheisen@rubin-levin.net; atty_mtheisen@bluestylus.com; mralph@rubin-levin.net; cgilly@rubin-levin.net |
| Patricia B. Tomasco | pattytomasco@quinnemanuel.com; barbarahowell@quinnemanuel.com; joannacaytas@quinnemanuel.com; ericwinston@quinnemanuel.com; matthosen@quinnemanuel.com; adamwolfson@quinnemanuel.com |
| Michael L. Tuchin | mtuchin@ktbslaw.com |
| Justin G. Witkin | jwitkin@awkolaw.com |
| Robert C. Yan | ryan@otterbourg.com |
| U.S. Trustee | ustpregion10.in.ecf@usdoj.gov |

*/s/ Ashley C. Keller*
Ashley C. Keller