**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re<br><br>AEARO TECHNOLOGIES LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.  22-02890-JJG-11 |
| 3M OCCUPATIONAL SAFETY LLC,<br>AEARO HOLDING LLC, AEARO<br>INTERMEDIATE LLC, AEARO LLC,<br>AND AEARO TECHNOLOGIES LLC,<br><br>Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON<br>APPENDIX A TO THE COMPLAINT<br>and JOHN AND JANE DOES 1-1000,<br>Defendants. | Adv. Pro. No. 22-50059 |

**CLAIMANTS' SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE**
**IN SUPPORT OF THEIR OBJECTION TO THE DEBTORS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 7]. The location of the Debtors' service address for the purposes of these chapter 11 cases is: 7911 Zionsville Road, Indianapolis, Indiana 46268.

**TO THE HONORABLE CHIEF JUDGE JEFFREY J. GRAHAM, UNITED STATES BANKRUPTCY JUDGE, AND ALL PARTIES IN INTEREST:**

The claimants represented by counsel on the signature page hereto (collectively, the "Claimants") respectfully request that this Court take judicial notice pursuant to Federal Rule of Evidence 201 of certain facts in support of Claimants' Objection to Debtors' Motion for a Preliminary Injunction ("Debtors' Motion") (Adv. Proc. Docket No. 108).

This Court may judicially notice an adjudicative fact "that is not subject to reasonable dispute" because it either "is generally known within the trial court's territorial jurisdiction," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). While a federal court *may* take judicial notice on its own, "it '*must* take judicial notice if a party requests it and the court is supplied with the necessary information.'" *Freeman v. Ocwen Loan Servicing, LLC*, No. 118CV03844TWPDLP, 2019 WL 3860354, at *1 (S.D. Ind. Aug. 16, 2019) (quoting Fed. R. Evid. 201(c)) (emphasis added).

Under Rule 201, courts in the Seventh Circuit have taken judicial notice of "public records and government documents, including those available from reliable sources on the Internet." *Wynn v. City of Indianapolis*, No. 1:20-CV-1638-JMS-MJD, 2022 WL 1120490, at *15 (S.D. Ind. Apr. 14, 2022) (citing cases).[2] Likewise, a court may "take judicial notice of statutes and regulations." *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 574 (7th Cir. 2022). *See also, United States v. Arroyo*, 310 F. App'x 928, 929 (7th Cir. 2009) (citing cases); *United States v. Williams*, 442 F.3d 1259, 1261 (10th Cir. 2006) ("Statutes are considered legislative

---

[2]     *Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 931 n.2 (S.D. Ill. 2006); *see also Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (district court's withdrawal of judicial notice of information from National Personnel Record Center's official website concluding that the district court was abuse of discretion); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information available at the official website of the Federal Deposit Insurance Corporation); *United States Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 763 (N.D. Ill. 2017) ("fact sheet" published on the Environmental Protection Agency's website was a proper subject of judicial notice).

facts –'established truths, facts or pronouncements that do not change from case to case but apply universally'-and courts may take notice of legislative facts.") (quoting *United States v. Coffman,* 638 F.2d 192, 195 (10th Cir.1980))*; Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 3:16-CV-466, 2022 WL 1913334, at *4 (S.D. Ohio June 3, 2022) ("Courts can, and often do, take judicial notice of federal statutes."); *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) ("A legal rule may be a proper fact for judicial notice if it is offered to establish the factual context of the case, as opposed to stating the governing law.").

Public records, including "not only the court's own records but also [ ] the records of other courts in related matters," are also proper subjects of judicial notice. *SG & Co. Ne., LLC v. Good*, 461 B.R. 532, 535 (Bankr. N.D. Ill. 2011) (citing, *inter alia*, *Opoka v. INS,* 94 F.3d 392, 394 (7th Cir.1996) (proceedings in other courts, both inside and outside the federal system, may be judicially noticed); *In re Ulz,* 401 B.R. 321, 324 n. 1, *aff'd sub nom. C & R Mortg. Corp. v. Ulz,* 419 B.R. 793 (N.D.Ill.2009) (bankruptcy court may take judicial notice both of its own record in the bankruptcy case, and of the record in the related district court action)).  Matters of public record extend beyond court *orders* in related actions to "'*papers* filed in other courts'", and "*proceedings* in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue." *Herz v. Hamilton*, No. 1:15-CV-161-WTL-DML, 2015 WL 1224516, at *1–2 (S.D. Ind. Mar. 17, 2015) (emphases added) (quoting *Green v. Warden, U.S. Penitentiary,* 699 F.2d 364, 369 (7th Cir.1983) (taking judicial notice of appellant's extensive filing history as a fact of public record "and particularly relevant to the proposed injunction"). *See also Griffin v. City of Chicago*, 497 F. Supp. 3d 307, 309 (N.D. Ill. 2020) (taking judicial notice of filings and hearing transcripts from a prior litigation involving the same litigant) (citing cases); *H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 631–32 (7th

Cir. 2020) (same); *Daniel v. Cook Cty.*, 833 F.3d 728, 742 (7th Cir. 2016) ("Courts routinely take judicial notice of the actions of other courts or the contents of filings in other courts."); *Cameron v. Patterson*, No. 11 C 4529, 2012 WL 1204638, at *1 (N.D. Ill. Apr. 10, 2012) (complaints, pleadings, and transcripts from another proceeding are public records of which judicial notice may be taken).

Court filings from another action may be judicially noticed to show "that the document was filed, that [a] party took [a] certain position, and that certain judicial findings, allegations or admissions were made." *In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.,* No. 305-MD-527 RM, 2010 WL 1253891, at *4 (N.D. Ind. Mar. 29, 2010) (citing *General Elec. Capital v. Lease Resolution,* 128 F.3d 1074, 1081 (7th Cir.1997)).  Finally, the Seventh Circuit has indicated in *dicta* that a court may take judicial notice of findings of fact from other proceedings "for the truth asserted therein" if the prior court's factual finding satisfies "the indisputability requirement of Fed.R.Evid. 201(b)." *General Elec.*, 128 F.3d at 1082, n.6 ("This requirement simply has not been satisfied in this case.") *See also, In re Snider Farms, Inc.,* 83 B.R. 977, 986–87 (Bankr. N.D. Ind. 1988) (the court may take judicial notice of the *truth* of facts asserted in court in documents such as orders, judgments, and findings of fact and conclusions of law "because of the principles of collateral estoppel, *res judicata,* and the law of the case.").

Claimants therefore respectfully request that this Court take judicial notice of the undisputed matters of public record established by the exhibits attached hereto as follows.

1.      On May 17, 2016, the United States Department of Justice Criminal Investigative Division received Qui Tam, 3:16-01533-MBS, against 3M Company.  A true and correct copy of the complaint is attached hereto at Exhibit 1.  The Court may also take judicial notice that on July 23, 2018, 3M entered into a settlement agreement with the US Department of Justice; as part

of their agreement "3M agreed to pay back $9,100,000; of which $4,560,000 is restitution." A true and correct copy of the settlement agreement is attached hereto as <u>Exhibit 2</u>.

2.        On February 19, 2019, 3M Company filed a Response to the Motion to Transfer Related Actions for Coordinated Pretrial Proceedings with the Judicial Panel for Multidistrict Litigation. A true and correct copy of 3M Company's Response is attached hereto as <u>Exhibit 3</u>. The Court may take judicial notice that 3M Company "support[ed] centralization of the more than two hundred Combat Arms Earplug actions that have been filed against it to date (the "Related Actions"), and the "thousands" of additional similar cases plaintiffs' counsel have stated they intend to file in the future." Ex. 3 at 1.

3.        On August 14, 2022, the MDL Court issued Order denying a Motion for Ruling on 3M Company's Waiver and/or Judicial Estoppel of Any Defense Regarding its Full Liability. A true and correct copy of this order is attached hereto as <u>Exhibit 4</u>. The Court may take judicial notice that the MDL Court determined that "the defendants themselves have explicitly disavowed the notion that Aearo has a meaningful role or identity in this litigation," Ex. 4 at 5, that "3M Company comported itself as the sole entity (besides the federal government or the individual plaintiffs, of course) directly and independently responsible for the plaintiffs' claims," *Id.* at 3, and that "3M Company's statements and course of conduct since the start of the MDL are premised on two truths—that 3M is directly and independently responsible for the CAEv2 liability in this litigation and that its subsidiaries are parties in name only." *Id.* at 9.

*[The remainder of this page is intentionally left blank.]*

Dated August 17, 2022

**KTBS LAW LLP**

/s/ Robert J. Pfister

Michael L. Tuchin (*pro hac vice*)
Thomas E. Patterson  (*pro hac vice*)
Robert J. Pfister (IN Bar No. 23250-02)
Sasha M. Gurvitz  (*pro hac vice*)
Nir Maoz  (*pro hac vice*)
1801 Century Park East, 26th Floor
Los Angeles, California 90067
Telephone: (310) 407-4000
Facsimile: (310) 407-9090
Email: mtuchin@ktbslaw.com
         tpatterson@ktbslaw.com
         rpfister@ktbslaw.com
         sgurvitz@ktbslaw.com
         nmaoz@ktbslaw.com

*Attorneys for Aylstock, Witkin, Kreis &*
*Overholtz, PLLC*

**RUBIN & LEVIN, P.C.**

Deborah J. Caruso (IN Bar No. 4273-49)
Meredith R. Theisen (IN Bar No. 28804-49)
135 N. Pennsylvania Street, Suite 1400
Indianapolis, Indiana 46204
Telephone: (317) 860-2867
Facsimile: (317) 453-8616
Email: dcaruso@rubin-levin.net
        mtheisen@rubin-levin.net

-and-

**OTTERBOURG P.C.**

Melanie L. Cyganowski (*pro hac vice*)
Adam C. Silverstein (*pro hac vice*)
Jennifer S. Feeney (*pro hac vice*)
230 Park Avenue
New York, New York 10169
Telephone: (213) 661-9100
Email:  mcyganowski@otterbourg.com
        asilverstein@otterbourg.com
        jfeeney@otterbourg.com

*Counsel for Seeger Weiss LLP*

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

Adam Wolfson (*pro hac vice)*
Eric D. Winston (*pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: adamwolfson@quinnemanuel.com
ericwinston@quinnemanuel.com

-and-

Patricia B. Tomasco (*pro hac vice*)
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile: (713) 221-7100
Email: pattytomasco@quinnemanuel.com
patrickking@quinnemanuel.com
joannacaytas@quinnemanuel.com

-and-

Matthew S. Hosen (*pro hac vice*)
1109 1st Avenue, Suite 210
Seattle, Washington 98101
Telephone: (206) 905-7000
Email: matthosen@quinnemanuel.com

*Counsel to the Bellwether Plaintiffs*

**FISHMAN HAYGOOD, L.L.P.**

Brent B. Barriere (*pro hac vice*)
Tristan Manthey (*pro hac vice*)
Cherie D. Nobles (*pro hac vice*)
Jason W. Burge (pending *pro hac vice*)
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Fax: (504) 586-5250
Email:  bbarriere@fishmanhaygood.com
        tmanthey@fishmanhaygood.com
        cnobles@fishmanhaygood.com
        jburge@fishmanhaygood.com

*Counsel for Clark, Love & Hutson, PLLC*

**BAILEY & GLASSER, LLP**

Brian Glasser
Kevin W. Barrett
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
Telephone: (304) 345-6555
Fax: (202) 463-2103
Email: BGlasser@baileyglasser.com
KBarrett@baileyglasser.com

*Counsel for the Bailey & Glasser Plaintiffs*

**PULASKI KHERKHER, PLLC**

Adam Pulaski (pro hac vice forthcoming)
2925 Richmond Avenue Suite 1725
Houston, TX 77098
Telephone: (703) 664-4555
Facsimile: (703) 664-7543
Email: adam@pulaskilawfirm.com

*Counsel for the Pulaski Herkher Plaintiffs*

**CAPLIN & DRYSDALE, CHARTERED**

Kevin C. Maclay (*pro hac vice*)
Todd E. Phillips (*pro hac vice*)
Kevin M. Davis (*pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, District of Columbia 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
Email: kmaclay@capdale.com
          tphillips@capdale.com
          kdavis@capdale.com

*Counsel for Certain Claimants Represented
by Cory Watson, P.C.; Certain Claimants
Represented by Heninger Garrison Davis,
LLC; and Certain Claimants Represented by
The Gori Law Firm, P.C.*

**SMITHAMUNDSEN, LLC**

Martha R. Lehman (IN Bar No. 14287-49)
Mark R. Wenzel (IN Bar No. 1797-49)
201 North Illinois Street, Suite 1400
Indianapolis, Indiana 46204
Telephone: (317) 464-4100
Facsimile: (317) 464-4101
Email: mlehman@smithamundsen.com
        mwenzel@smithamundsen.com

*Counsel for Tracey Fox King & Walters and
The Johnson Law Group*

**JACOBSON HILE KIGHT LLC**

Michael W. Hile
Andrew T. Kight
The Elliott House
108 E. 9th Street
Indianapolis, Indiana 46202
Telephone: (317) 608-1131
Email: mhile@jhklegal.com
       akight@jhklegal.com

*Counsel for Weitz & Luxenberg, PC*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MOLDEX-METRIC, INC., <br><br>             Plaintiff/Relator, <br><br>     vs. <br><br> 3M COMPANY, <br><br>             Defendant. | CASE NO.   3:16-1533-MBS <br><br> **ORIGINAL COMPLAINT FILED IN CAMERA** <br><br> **SEALED PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> JURY TRIAL DEMANDED |

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## INTRODUCTION

This is an action by *qui tam* Plaintiff/Relator Moldex-Metric, Inc. ("Moldex"), in the name of the United States Government, to recover penalties and damages arising from false statements made by Defendant 3M Company ("3M" or the "Company") to the Government regarding its dangerously defective dual-ended Combat Arms™ earplugs, which 3M sold to the U.S. military for more than a decade without its knowledge of the defect.  Plaintiff/Relator's claims reveal the protracted fraud perpetrated on the military by 3M, whose dual-ended Combat Arms™ earplugs—which were standard issue in certain branches of the military during foreign conflicts between 2003 and 2015—have likely caused thousands of soldiers to suffer significant hearing loss and tinnitus in addition to exposing millions to the risk caused by 3M's defective earplugs.[1]  The indirect cost to the public of 3M's fraud has been enormous.  In addition to funding the military's repeated purchases of the defective earplugs from 3M for more than a decade, tax payers must shoulder the massive expense of treating veterans with hearing damage and impairment, which represents the largest ongoing medical cost to the military. Plaintiff/Relator Moldex alleges as follows:

## THE PARTIES

1.    Moldex is a family-owned business organized and existing under the laws of California with its principal place of business in Culver City, California.  It is in the business of designing, manufacturing and selling worker safety products, including hearing protection

---

[1]  As 3M explains in a press release trumpeting its sales of its Combat Arms™ earplugs to the military, "[t]innitus, often referred to as 'ringing in the ears,' and noise-induced hearing loss can be caused by a one-time exposure to hazardous impulse noise, or by repeated exposure to excessive noise over an extended period of time."  Ex. 1, 3M Newsroom, *3M Hearing Protection Devices Now Added to the Federal Procurement List* (Aug. 30, 2012), *available at* http://solutions.3m.com/wps/portal/3M/en_US/3M-Defense-US/Defense/About-3M-Defense/News/ (last visited Apr. 25, 2016).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

products and respirators.  In 2011, Moldex introduced a non-linear dual-mode earplug, called

BattlePlugs®. Moldex's BattlePlugs® provided the first actual competition to 3M's Combat

Arms™ earplugs in the market for non-linear earplugs approved for purchase by the military.

      2.      3M Company is a corporation organized and existing under the laws of the state

of Delaware with its principal place of business in St. Paul, Minnesota.  Among other things, it is

in the business of designing, manufacturing, and selling worker safety products, including

hearing protectors and respirators. 3M has a dominant market share in virtually every safety

product market, including hearing protection.  3M is one of the largest companies in the country.

**JURISDICTION AND VENUE**

      3.      This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq*.

      4.      Jurisdiction over this action is conferred upon the Court by 31 U.S.C. § 3732(a)

and 28 U.S.C. § 3130 in that this action arises under the laws of the United States.

      5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. §

3732(a) because Defendant 3M transacts business in this District and can be found within the

United States.

      6.      Venue is also proper because this District has general jurisdiction over 3M due to

its extensive, long-standing presence.  Defendant 3M operates manufacturing facilities at 1400

Perimeter Road, Greenville, South Carolina 29605-5467, which includes at least two plants.  3M

has operated facilities at this location since 1974, and in 2007 began a $100 million ongoing

expansion project.  Ex. 3, *History of 3M Greenville*, *available at*

http://solutions.3m.com/wps/portal/3M/en_US/Greenville/Plant/Facility/History/  (last visited

May 6, 2016).  3M touts the benefits of its active participation in the Greenville community on

its website.  Ex. 4, *Community Involvement*, *available at*

3

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

http://solutions.3m.com/wps/portal/3M/en_US/Greenville/Plant/Community/Involvement/    (last

visited May 6, 2016).

      7.     Venue is also proper because, in addition to the statutory bases, this District has

specific jurisdiction over false statements and claims related to 3M's distribution of the Combat

Arms earplugs to South Carolinian soldiers.  Starting in 2004, all soldiers deployed to Iraq and

Afghanistan were issued Combat Arms earplugs.  Ex. 5, McIlwain, D. Scott *et al.*, *Heritage of

Army Audiology and the Road Ahead: The Army Hearing Program*, AMERICAN JOURNAL OF

PUBLIC HEALTH, Vol. 98 No. 12 (Dec. 2008).  South Carolina is home to several Army, Air

Force, Navy, and Marine military bases from which soldiers were trained and deployed to these

combat zones—including Fort Jackson, Shaw Air Force Base, the Marine Corp Recruiting Depot

at Parris Island, and the Naval Weapons Station Charleston.  With respect to Fort Jackson, for

example, 3M was the supplier of Combat Arms earplugs prior to Moldex assuming the contract

in 2012.

**FACTUAL ALLEGATIONS**

I.     **3M'S DEFECTIVE COMBAT ARMS™ EARPLUGS**

**3M's dual-ended Combat Arms™ earplugs**

      8.     3M's dual-ended Combat Arms™ earplugs, which are non-linear, or selective

attenuation, earplugs, were designed to provide soldiers with a single set of earplugs that offer

them two options for hearing attenuation depending upon how the plugs are worn.  If worn in the

4

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

"closed" or "blocked" position (olive end in), the earplugs are supposed to block sound like traditional earplugs.  If worn in the "open" or "unblocked" position (yellow end in), the earplugs are supposed to block, or at least significantly reduce, loud impulse sounds of battlefield explosions, while still allowing the wearer to hear quieter noises such as commands spoken by fellow soldiers and approaching enemy combatants.  These earplugs were originally created by a company called Aearo Technologies ("Aearo").  3M acquired Aearo in 2008 (and thus any liability associated with its past conduct) and hired the employees at Aearo that developed and tested the defective earplugs.  These 3M employees were aware of the defects as early as 2000, several years before 3M/Aearo became the exclusive provider of the earplugs to the military.

9.    As known to 3M/Aearo at the time it bid for and won the underlying Indefinite-Quantity Contracts ("IQCs") that made it the exclusive supplier of selective attenuation earplugs to the military between 2003 and 2012, these earplugs have dangerous design defects that can cause them to loosen in the wearer's ear, imperceptibly to the wearer and even trained audiologists visually observing a wearer, thereby permitting damaging sounds to enter the ear canal by traveling around the outside of the earplug while the user and/or audiologist incorrectly believes that the earplug is working as intended.  Because the stem of the dual-ended earplug is too short, it is difficult to insert the plug deeply into some wearer's ear canals and obtain a proper fit.   Specifically, when the earplug is inserted into the ear according to standard fitting instructions, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some wearers' ear canals and fold back to its original shape, thereby loosening the seal in their ear canals.  The defect has the same effect when either end is inserted because the earplugs are symmetrical.  In either scenario, the effect is that the earplug may not maintain a

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

tight seal in some wearers' ear canals such that dangerous sounds can bypass the plug altogether
thereby posing serious risk to the wearer's hearing unbeknownst to him or her.

10.     These dangerous design defects were known to Aearo in 2000 (and later 3M)
when it completed testing of the dual-ended Combat Arms™ earplugs.  This is evidenced by the
fact that when Aearo retested the closed end of the earplug starting in February 2000, as detailed
below, its personnel rolled back the non-inserted yellow flanges in order to mitigate the
loosening effect of the defect caused by the short stem.  Further, the 3M/Aearo scientist who
oversaw and documented this testing, and the 3M/Aearo lab technician who conducted the
testing, are still employed by 3M to this day.

11.     Despite this knowledge, in 2003, Aearo submitted a bid in response to the
military's Request for Proposal ("RFP") to supply large quantities of these defective earplugs
and entered into an IQC pursuant to which it became the exclusive supplier of earplugs to the
military.  When it responded to the RFP, Aearo was required to expressly certify that the
earplugs complied with the Salient Characteristics of Medical Procurement Item Description
("MPID") of Solicitation No. SP0200-06-R-4202.  *See* Ex. 2, Solicitation No. SP0200-06-R-
4202.  The earplugs did not, however, comply with those Salient Characteristics, which Aearo
knew at the time it made its certification.  Thus, Aearo's response to the RFP constitutes a false
statement or record and each of Aearo's and later 3M's subsequent requests for payment
pursuant to the IQC resulting from these false statements or records constitutes a false claim
within the meaning of the False Claims Act ("FCA").  Each of Aearo's and 3M's subsequent
responses to the military's RFPs and the resulting IQC payment requests constitute additional,
distinct false statements and claims by 3M/Aearo for which 3M is now liable.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## II.   THE SALIENT CHARACTERISTICS OF THE MILITARY'S RFPs

12.   Since 2003, 3M/Aearo has been awarded multiple IQC's in response to RFPs, including but not limited to SP0200-06-R-4202,  issued by the military requesting bids to supply non-linear, selective attenuation earplugs.  In response to each of these RFPs, 3M/Aearo was required to certify that its dual-ended Combat Arms™ earplugs complied with the Salient Characteristics of the associated MPIDs.  The pertinent Salient Characteristics set forth in the MPID, which was uniform across all RFPs, in relevant part, are as follows:

> 2.1.1.   Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.
>
> 2.2.2.   The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19….
>
> 2.4   Workmanship.   The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.
>
> 2.5   Instructions.   Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit….

Ex. 2, Solicitation No. SP0200-06-R-4202 at 41-42.

13.   The Environmental Protection Agency ("EPA") has also promulgated regulations pursuant to the Noise Control Act, 42 U.S.C. § 4901, *et seq.*, that govern the testing and attendant labeling of hearing protective devices like the dual-ended Combat Arms™ earplugs. Specifically, 40 C.F.R. § 211.206-1 provides that:

> The value of sound attenuation to be used in the calculation of the Noise Reduction Rating must be determined according to the "Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs." This standard is approved as the American National Standards Institute Standard (ANSI-STD) S3.19-1974.

7

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

14.    Additionally, 40 C.F.R. § 211.204-4(e) of the EPA regulations requires that certain "supporting information" must accompany hearing protection devices sold in the United States:

> The following minimum supporting information must accompany the device in a manner that insures its availability to the prospective user. In the case of bulk packaging and dispensing, such supporting information must be affixed to the bulk container or dispenser in the same manner as the label, and in a readily visible location…. **Instructions as to the proper insertion or placement of the device**.

Emphasis added.

## III.    3M'S DELIBERATELY FLAWED TESTING OF THE EARPLUGS, RESULTING FALSE AND MISLEADING NRRs, AND IMPROPER INSTRUCTIONS FOR USE OF THE EARPLUGS

15.    Earplugs like 3M's are sold with a listed NRR that is supposed to represent the amount of sound attenuation perceived by a test group when tested under certain conditions required by the statutorily required test methodology.  The military can only purchase 3M's dual-ended Combat Arms™ earplugs if they meet the testing standards required by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be promulgated by other military services.  As such, before 3M/Aearo could sell its earplugs to the military, 3M/Aearo had to test them to determine the NRR, which would be included on the product label.

16.    In or around January 2000, personnel at Aearo commenced NRR testing on each end of the earplug.  Rather than outsource the testing to an independent lab, Aearo chose to conduct the testing at its own E-A-RCAL laboratory (which also is now owned by 3M).  Aearo's personnel selected ten test subjects, some of whom were their own employees, to test the earplug.  Aearo's personnel tested, in no particular order: (1) the subject's hearing without an earplug inserted; (2) the subject's hearing with the open/unblocked (yellow) end of the dual-

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

ended Combat Arms™ earplug inserted; and (3) the subject's hearing with the closed/blocked

(olive) end of the earplug inserted.

17.     Aearo personnel monitored the noise attenuation results of each subject as each

test was performed and could stop the test if they did not get the NRR results they wanted, which

violated the ANSI S3.19-1974 testing protocol.  After eight of the ten test subjects had been

tested on both the open and closed ends of the earplug, Aearo personnel decided not to test the

last two subjects' hearing with the closed/blocked end of the earplug inserted.  At that point, the

average of the results for the first eight subjects suggested an NRR of 10.9, which was far below

the "22" NRR that 3M/Aearo would have expected for the closed end of the plug.  This result

was directly attributable to the design defect in the earplugs causing some wearers to receive

little or no sound attenuation, due to the imperceptible slip explained above, while others

achieved the expected levels of sound attenuation.

18.     Aearo personnel apparently liked the low NRRs they were getting from the same

test subjects due to the design defect on the open end of the plug, however.  As such, Aearo

completed testing all ten of the subjects' hearing with the open end of the plug inserted and

obtained a facially invalid -2 NRR, meaning the earplug would actually function as a hearing aid

by amplifying sound.  Aearo personnel reported the -2 NRR as a "0" NRR, which 3M/Aearo has

displayed on the packaging of the dual-ended Combat Arms™ earplugs since the product was

launched.  Since late 2003, 3M/Aearo has touted this rating as an added benefit to the military on

the theory that wearers of these earplugs would be able to hear commands from friendly soldiers

and approaching enemy combatants, unimpaired, in the same way as if they had nothing in their

ears.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

19.     After prematurely terminating testing of the closed/blocked end of the earplug, Aearo personnel immediately investigated the cause of the closed/blocked end's implied and unacceptably low NRR and discovered that, because the stem of the earplug was so short, it was difficult to insert the plug deeply into the subject's ear canals and obtain a proper fit, as required by ANSI S3.19-1974, Section 3.2.3.  Ex. 8, Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975).  Furthermore, Aearo personnel discovered that when the olive, closed end of the earplug was inserted into the subject's ear according to standard fitting instructions, the basal edge of the third flange of the yellow, open end of the earplug pressed against the subject's ear canal and folded backwards.  When the inward pressure on the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the test subject.  The dual-ended Combat Arms™ earplugs are symmetrical and thus this problem would be experienced when the plug is reversed as well.  The image below illustrates how the basal edge of the earplug interacts with the ear canal.



Image from J.G. Casali, *et al.*, *A field investigation of hearing protection and hearing enhancement in one device: For soldiers whose ears and lives depend upon it*, 11 NOISE & HEALTH JOURNAL 42, 69-90 (2009).

10

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

20.     Aearo personnel then determined that in order for a test subject to obtain proper plug insertion, the flanges on the opposite, non-inserted end of the earplugs had to be folded back prior to insertion into the test subject's ear.

21.     Once it had identified the design defect of the earplugs, Aearo decided to retest the olive, closed end of the earplug starting in February 2000 using different fitting instructions. Ex. 9, 3M's Answer to First Amended Complaint in *Moldex-Metric, Inc. v. 3M Company, et al.*, No. 14-cv-1821-JNE-FLN (D. Minn.), ¶¶ 35-36.  During this retest of the closed end, Aearo personnel folded back the yellow flanges on the open end of the earplug (essentially elongating the too-short defective stem) to allow the experimenter to insert the closed end of the plug deeply into the subject's ear in order to obtain a proper fit.  *Id.*  Furthermore, as the yellow flanges were folded back during this retest, the basal edge of the third flange of the yellow, open end of the earplug no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing.  *Id.*  As a result of using this manipulated fitting procedure during the retest, as 3M/Aearo was aware before it sold the earplugs to the military, Aearo's personnel achieved a "22" NRR on the closed end of the dual-ended Combat Arms™ earplug.  *Id.*

22.     As explained above, due to the symmetrical structure of the dual-ended Combat Arms™ earplug, the design defects that affect the fit of the earplug on the closed end of the earplug also impact the fit on the open end.  It is facially obvious from the -2 NRR test data Aearo obtained on the open end of the earplug that multiple test subjects were not properly fitted with the open end, as required by ANSI S3.19-1974 Section 3.2.3.  During Aearo's testing of the open end, there was not a proper seal between certain of the subjects' ear canal and the earplug, thereby allowing noise to bypass the earplug filter and go directly into the ear canal.  As a result, certain test subjects had large standard deviations across trials on the open end test, which

11

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

artificially drove down the NRR to -2 in the open position. 3M/Aearo knew before selling the

earplugs to the military that, notwithstanding these facially unreliable testing results, it did not go

back and retest the open end of the earplug using the "modified" fitting procedure, *i.e.*, folding

back the flanges on the olive, closed end of the earplug prior to inserting the yellow, open end

into the ear.

23.    The reasoning for this inaction is clear: 3M/Aearo wanted a very low NRR on the

open end of 3M's Combat Arms™ earplug (like the rounded up "0" NRR it previously obtained)

so that the military would be more likely to buy it. If the open end of the plug were fitted

securely into the test subjects' ears using the modified fitting procedure, the NRR would have

been much higher on the open end of the earplug and hence less marketable to the military as an

earplug that supposedly would allow soldiers to hear commands and approaching combatants.

24.    3M/Aearo also knowingly used the deliberately flawed retest of the closed end of

the earplugs to sell dual-ended Combat Arms™ earplugs to the military with a "22" NRR in the

closed position. 3M/Aearo includes standard instructions for "proper use" of the earplugs in the

packaging for the earplugs as required by the EPA, Noise Control Act, and the MPID. *See* Ex.

10, Combat Arms Earplugs Instructions. 3M's/Aearo's standard instructions for "proper use" of

its Combat Arms™ earplugs do not instruct wearers to fold back the flanges before inserting the

plug into the ear. *Id.* Instead, 3M/Aearo improperly instructs wearers to simply insert the

earplugs as-is into the ear canal. *Id.* By failing to instruct wearers of the dual-ended Combat

Arms™ earplug to fold back the flanges on the open/unblocked end of the plug before inserting

the closed/blocked end of the plug into their ears (which is necessary to achieve the "22" NRR

and avoid the defect associated with the short stem), 3M/Aearo falsely overstates the amount of

hearing protection provided by the closed end of the plug. 3M's/Aearo's packaging and

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

marketing of such earplugs with a labeled NRR of "22" thereby misleads the military, and has likely caused thousands of soldiers to suffer significant hearing loss and tinnitus in addition to exposing millions more to the risk caused by 3M's/Aearo's defective earplugs.

25.     3M/Aearo also has continued to sell the dual-ended Combat Arms™ earplugs to the military with a "0" NRR in the open position and with standard fitting instructions, which is false and misleading for the same reasons.  Given the symmetrical nature of the earplugs, the defective stem issue that causes the earplug to imperceptibly loosen when the closed end is inserted also causes the plug to loosen when the open end is inserted.  As a result, soldiers who wear the plug with the yellow end inserted desiring to block out dangerous impulse noise while still being able to hear voice commands or approaching combatants are at risk of serious hearing impairment.  When the seal between the earplug and the soldier's ear canal is broken, dangerous impulse noise can bypass the filter on the open end leaving the soldier with no hearing protection at all.  3M/Aearo would not have achieved a facially invalid -2 NRR if this were not the case.

26.     In sum, as 3M/Aearo was aware prior to selling the earplugs to the military, testing procedures and fitting instructions were unlawfully manipulated to obtain the NRRs it wanted on both ends of the dual-ended Combat Arms™ earplug, and 3M/Aearo has continued to use these inaccurate NRRs to market the earplugs to the military for more than ten years without disclosing the design defect in the plugs.  The closed end provides a "22" NRR only if inserted using non-standard instructions for use that 3M/Aearo does not disclose to purchasers (*i.e.*, the military) nor end user wearers (*i.e.*, soldiers).  This grossly overstates the noise protection offered by this end of the plug in violation of ANSI S3.19, EPA regulations, 40 C.F.R. § 211.201, *et seq.*, and the NCA, 42 U.S.C. § 4901, *et seq.*  Meanwhile, the open end of the earplug's "0" NRR

13

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

is based on facially unreliable test data derived from tests in which the earplugs were not fitted

properly in the subjects' ears.

## IV.    FALSE CERTIFICATIONS TO THE MILITARY

27.    Although 3M/Aearo was aware when it first bid for the IQCs to supply its Combat

Arms™ to the military that testing of the earplugs violated ANSI S3.19-1974, 3M/Aearo

certified to the military that the testing complied with that testing standard.  In response to the

military's RFPs, 3M/Aearo were required  to certify that testing of the earplugs was done in

accordance with ANSI S3.19-1974, and thus each response by 3M/Aearo would constitute a

false statement or record within the meaning of the FCA.

28.    3M/Aearo was further required to certify in response to each RFP that it provided

accurate "instructions explaining the proper use and handling of the ear plugs."  As discussed

above, 3M/Aearo was aware at the time it bid for the IQCs that personnel folded back the flanges

of the yellow, open end of the earplug when testing the closed end and did not similarly

manipulate the fit of the earplugs when testing the open end.  Yet, despite knowing that its

flawed testing involved steps to manipulate the fit of the earplug, 3M's/Aearo's instructions for

use of the earplugs do not instruct, and never have instructed, the wearer to fold back the flanges

on the open end of the plug before inserting the closed end of the plug into their ears (which is

necessary to achieve the "22" NRR and avoid the defect associated with the short stem). Ex. 10,

Combat Arms Earplugs Instructions.  Since it first began supplying the earplugs to the military,

3M's/Aearo's instructions instead have provided standard fitting instructions for inserting the

earplug on both ends.   *Id.*   These use instructions are, therefore, facially inadequate.

Certification to the contrary is a false statement for purposes of the FCA and has put soldiers at

risk of suffering serious hearing impairment on the battlefield.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

29.     Pursuant to Section 2.4 of the MPID, when responding to the RFPs, 3M/Aearo also was required to certify that "[t]he ear plugs shall be free from all defects that detract from their appearance or impair their serviceability." Ex. 2, Solicitation No. SP0200-06-R-4202 at 42. As explained above, 3M/Aearo knew as early as 2000 that its dual-ended Combat Arms™ earplugs were designed with too short a stem, which causes the plugs to imperceptibly loosen in the wearer's ear when the flanges are not rolled back. Despite this knowledge, 3M/Aearo marketed and sold the defective earplugs to the military over a period of more than a decade with fitting instructions that do not instruct the purchaser/wearer to roll back the flanges, all the while being required to certify that the earplugs were free of defects. Further, soldiers moving around on the battlefield are even more likely to experience the harmful effects of the earplug's defects than are test subjects during an NRR test, because NRR tests typically only last a few minutes and are performed in a laboratory setting where the subject's head remains virtually motionless during testing. Thus, such defects place thousands of soldiers at risk of suffering hearing damage or impairment.

V.    THE ENORMOUS DAMAGE TO THE GOVERNMENT AND PUBLIC RESULTING FROM 3M'S FRAUD

30.     The impact of 3M's fraud cannot be overstated. In addition to the cost borne by the military for its repeated purchases of the defective earplugs, 3M's fraud has likely contributed to the enormous medical costs associated with treating returning combat soldiers impaired by significant hearing damage and impairment. Given the imperceptibility of the defect, wearers would not have been able to detect whether the earplug had come loose. Similarly, given how imperceptible it is, military personnel, including trained audiologists, fitting the plugs and observing a wearer with the plugs inserted also likely could not perceive the

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

defect. 3M was thus able to perpetrate its fraud on the military for more than ten years at enormous cost to the public.

31.    The military has paid millions of dollars over the past ten plus years to purchase the defective earplugs and, unbeknownst to it, when issuing the earplugs to combat soldiers, was putting their hearing at risk. Hearing loss is a significant ongoing healthcare issue for the Department of Veteran Affairs ("VA"). Data collected by the VA indeed shows that as many as 52% of combat soldiers return from foreign conflicts with significant hearing damage, which represents the largest ongoing medical cost of the military. Ex. 12, David E. Gillespie, *Researchers Evaluate True Effects of Hearing Loss for Soldiers* (Dec. 16, 2015), *available at* http://www.army.mil/article/160050/Researchers_evaluate_true_effects_of_hearing_loss_for_sol diers/ (last accessed May 4, 2016). A 2015 article, for example, estimates that the VA spends more than $1 billion per year to treat hearing loss for more than 800,000 veterans. *Id.*; *see also* Ex. 6, Kay Miller, *Hearing loss widespread among post-9/11 veterans*, The Center for Public Integrity      (Aug.      29,      2013),      *available      at* https://www.publicintegrity.org/2013/08/29/13283/hearing-loss-widespread-among-post-911- veterans (last visited Apr. 25, 2016) (noting that "[t]he most-widespread injury for [post-911] veterans has been hearing loss and other auditory complications" and that "[h]earing maladies cost more than $1.4 billion in veterans disability payments annually, according to fiscal year 2010 data from the Hearing Center of Excellence, a part of the Department of Defense.").

32.    The military likely purchased, at a minimum, one pair of 3M's Combat Arms™ earplugs for each deployed soldier annually involved in certain foreign engagements between 2003 and 2015. *See* Ex. 5, McIlwain, D. Scott *et al.*, *Heritage of Army Audiology and the Road*

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

*Ahead: The Army Hearing Program*, AMERICAN JOURNAL OF PUBLIC HEALTH, Vol. 98 No. 12 (Dec. 2008).

33.    In 2006, the military entered into an IDQ with 3M/Aearo pursuant to which 3M/Aearo supplied 10,000 packages (50 pairs per package = 500,000 pairs), an estimated annual quantity of 15,000 packages (750,000 pairs), and estimated maximum of 45,000 packages (2,250,000 pairs) of 3M's/Aearo's Combat Arms™ earplugs.   Ex. 11, Award Notice, 65 – Plug, Ear, Combat Arms, Dbl-Ended, 50 Pair (Dec. 19, 2006).   According to the award notice for this IDQ, 3M/Aearo was guaranteed at least $9,000,000 in sales of the earplugs in 2006.   *Id.*

34.    3M's/Aearo's dual-ended Combat Arms™ earplugs were sold to the military beginning in late 2003 and continued to be sold directly and indirectly by 3M to the military until late 2015 when 3M discontinued the earplugs.   Ex. 7, Discontinuation: 3M Combat Arms Earplugs Version 2 (Nov. 17, 2015).   However, the defective earplugs were not recalled (and thus are likely still used by soldiers) and continue to be sold by others.

## COUNT I
## False Claims Act – Presentation of False Claims
## 31 U.S.C. § 3729(a)(1)(A)

35.    Plaintiff/Relator Moldex re-alleges and incorporates by reference the allegations contained in paragraphs 1-34.

36.    Defendant 3M, by and through its predecessor Aearo, and their officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the United States Government false claims for payment or approval of multiple IQCs awarded under Solicitation Nos. SP0200-06-R-4202, SP0200-07-D-4103, and related solicitations for the supply of 3M's dual-ended Combat Arms™ earplugs to the military.   Such false claims are in violation of 31 U.S.C. § 3729(a)(1)(A).

17

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

37.     In 2003, and several times since then and through 2015, 3M/Aearo was awarded several IQCs in response to the military's RFPs to supply large quantities of its Combat Arms™ earplugs to the military pursuant to which 3M/Aearo became the exclusive supplier of earplugs to the military.  When it responded to these RFPs, 3M/Aearo was required to expressly certify that the earplugs complied with the Salient Characteristics of the MPID of the RFP.  The earplugs did not, however, comply with those Salient Characteristics.  Thus, every contract awarded as a result of these RFPs represents a false claim.  Plaintiff/Relator is currently unaware of the specific number of such false claims, but will prove such number at trial.

38.     The Salient Characteristics required earplugs designed "to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield."  MPID Section 2.1.1.  To meet this requirement, and in violation of ANSI S3.19-1974, as it was aware prior to supplying the earplugs to the military, 3M/Aearo took advantage of a known design defect during testing of the open/unblocked end of the earplugs by not rolling back the flanges on the opposite end prior to insertion.  This resulted in an improper fit and a false NRR of -2, which 3M/Aearo have reported as an NRR of "0" and continually used to market the earplugs to the Government.  Correcting for the known design defect, as it was aware before it sold the earplugs to the military, 3M/Aearo tested the closed/blocked end of the earplugs by rolling back the flanges on the opposite end prior to insertion to achieve a false NRR of "22" which 3M/Aearo knew was not accurate without instructions to roll back the flanges but nevertheless used the 22 NRR without such instructions to market the earplugs to the Government.  3M/Aearo were required to certify to the military that its earplugs had an accurate, properly tested NRR of "0"

18

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

when worn in the open/unblocked position and an accurate, properly tested NRR of "22" when worn in the closed/blocked position.

39.     The Salient Characteristics of the MPID required testing of the earplugs in compliance with ANSI S3.19-1974.  MPID Section 2.2.2.  3M's/Aearo's testing failed to comply with ANSI S3.19-1974 because it initially tested only eight subjects on the closed end in contravention of the requirement to test no less than ten subjects on both ends.  Additionally, as 3M/Aearo was aware prior to selling the earplugs to the military, 3M's/Aearo's testing failed to comply with ANSI S3.19-1974 because reported NRRs included test results from subjects for which 3M/Aearo knew there was not an adequate fit, thus making the result invalid.  3M/Aearo was nonetheless required to certify to the military that its testing of the earplugs complied with ANSI S3.19-1974 as required by the Solicitation.

40.     The Salient Characteristics of the MPID also required that 3M/Aearo supply to the military earplugs that were "free from all defects that detract from their appearance or impair their serviceability."  MPID Section 2.4.  3M/Aearo knew as early as 2000 that its dual-ended Combat Arms™ earplugs were defectively designed with too short a stem that caused the plugs to imperceptibly loosen in the wearer's ear when the flanges were not rolled back prior to insertion.  3M/Aearo was required to certify to the military that the earplugs were free of defects.

41.     The Salient Characteristics of the MPID further required the provision of accurate "instructions explaining the proper use and handling of the ear plugs."  MPID Section 2.5. 3M's/Aearo's instructions for use of the earplugs do not instruct the wearer to fold back the flanges on the non-inserted end before inserting the other end of the plug into their ears (which 3M/Aearo knew was necessary to achieve the "22" NRR and avoid the defect associated with the short stem).  3M's/Aearo's instructions instead provide standard fitting instructions for inserting

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

the earplug on both ends and are, therefore, inadequate to ensure a proper fit. 3M/Aearo was nonetheless required to certify to the military that the instructions for "proper use" of the earplugs are complete and accurate.

42.     Each false statement alleged in this Count was knowingly presented, made, or used as the term "knowingly" is defined in 31 U.S.C. § 3729(b). The falsely obtained and reported NRR ratings, failure to comply with ANSI S3.19-1974, design defects requiring special fitting instructions, and the failure to provide such instructions were known to 3M/Aearo at least by 2000 when testing of the dual-ended Combat Arms™ earplugs was completed. 3M/Aearo therefore had actual knowledge of the falsity of its claims at the time it made them, but exercised deliberate indifference and reckless disregard toward such falsity in seeking payment under the IQCs awarded in connection with the RFPs.

43.     3M's/Aearo's false representations in being awarded the IQCs in response to the military's RFPs were material to the Government's decision to purchase the dual-ended Combat Arms™ earplugs. 3M's/Aearo's products were not eligible for such contracts unless they complied with the Salient Characteristics of the MPID. But for false certifications of compliance, the Government would not have awarded the contracts to 3M/Aearo and paid 3M's/Aearo's claims pursuant to the IQCs. 3M's/Aearo's actions therefore had a natural tendency to influence, or were capable of influencing, the payment or receipt of money.

44.     As a result of required certifications, the Government did in fact award several IQCs for the purchase of dual-ended Combat Arms™ earplugs to 3M/Aearo, 3M's/Aearo's requests for payment under each of which constitutes a claim to the Government within the meaning of the FCA.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

45.    The United States has been damaged as a result of 3M's/Aearo's violations of the FCA because it has received a product inferior to that which it specified and for which it paid.  In addition to damages directly associated with the contractual cost of the earplugs, the United States has been damaged by the large and ongoing medical costs associated with treating veterans who likely suffered hearing damage and impairment as a result of the defective earplugs.

WHEREFORE, Plaintiff/Relator Moldex demands compensatory and multiple damages, costs, attorney fees, and such other legal and equitable relief as the Court may provide, including, but not limited to, exclusion or debarment.

## COUNT II
## False Claims Act – Use of False Statements
## 31 U.S.C. § 3729(a)(1)(B)

46.    Plaintiff/Relator Moldex re-alleges and incorporates by reference the allegations contained in paragraphs 1-45.

47.    As described above, Defendant 3M, by and through its predecessor Aearo, and their officers, agents, supervisors, and employees, knowingly made, used, or caused to be made or used false records or statements material to the United States Government's payment or approval of the false claims pursuant to multiple IQCs awarded under Solicitation Nos. SP0200-06-R-4202, SP0200-07-D-4103 and related solicitations for the supply of dual-ended Combat Arms™ earplugs to the military.  Such false records or statements are in violation of 31 U.S.C. § 3729(a)(1)(B).

48.    Each false record or statement alleged in this Count was knowingly presented, made, or used as the term "knowingly" is defined in 31 U.S.C. § 3729(b).  The falsely obtained and reported NRR ratings, failure to comply with ANSI S3.19-1974, design defects requiring

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

special instructions, and the failure to provide such instructions were known to 3M/Aearo before it was awarded the IQCs in response to each RFP. 3M/Aearo therefore had actual knowledge of the falsity of its claims at the time it made them, but exercised deliberate indifference and reckless disregard toward such falsity in seeking payment under the IQCs awarded in connection with the RFPs.

49.     These required false statements in response to RFPs were material to the Government's decision to award 3M/Aearo the IQCs to purchase the dual-ended Combat Arms™ earplugs and its payments to 3M/Aearo. 3M's/Aearo's products were not eligible for such contracts unless they complied with the salient characteristics of the MPID. But for false certifications of compliance, the Government would not have awarded the contracts to 3M/Aearo and paid 3M's/Aearo's claims pursuant to the IQCs. 3M's/Aearo's actions therefore had a natural tendency to influence, or were capable of influencing, the payment or receipt of money.

50.     As a result of these required fraudulent statements, the Government did in fact award several IQCs for the purchase of dual-ended Combat Arms™ earplugs, the RFP underlying each of which constitutes a false record or statement to the Government within the meaning of the FCA.

51.     The United States has been damaged as a result of 3M's/Aearo's violations of the False Claims Act because it has received a product inferior to that which it specified and for which it paid. In addition to damages directly associated with the contractual cost of the earplugs, the United States has been damaged by the large and ongoing medical costs associated with treating veterans who likely suffered hearing damage and impairment as a result of the defective earplugs.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

WHEREFORE, Plaintiff-Relator Moldex demands compensatory and multiple damages, costs, attorney fees, and such other legal and equitable relief as the Court may provide, including, but not limited to, exclusion or debarment.

### COUNT III
### False Claims Act – Conspiracy
### 31 U.S.C. § 3729(a)(1)(C)

52.      Plaintiff/Relator Moldex re-alleges and incorporates by reference the allegations contained in paragraphs 1-51.

53.      Defendant 3M, by and through its predecessor Aearo, and their officers, agents, supervisors, and employees, conspired to defraud the United States Government in order to get false or fraudulent claims paid by the United States Government pursuant to multiple IQCs awarded under Solicitation Nos. SP0200-06-R-4202, SP0200-07-D-4103 and related solicitations for the supply of its dual-ended Combat Arms™ earplugs to the military.  In furtherance of this conspiracy, 3M/Aearo and certain of its employees took substantial steps, as set forth above, to effect the objects of the conspiracy alleged herein.  Such conspiracy is in violation of 31 U.S.C. § 3729(a)(1)(C).

54.      At all relevant times, 3M/Aearo knew about, advanced, and conspired in directing and perpetuating the fraudulent conduct.

55.      As a result of 3M/Aearo conspiring to submit required false, fraudulent claims pursuant to the IQCs to the United State Government, the United States Government paid 3M/Aearo based on these false claims.

56.      The United States has been damaged as a result of 3M's/Aearo's violations of the FCA because it has received a product inferior to that which it specified and for which it paid.  In addition to damages directly associated with the contractual cost of the earplugs, the United

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

States has been damaged by the large and ongoing medical costs associated with treating veterans who likely suffered hearing damage and impairment as a result of the defective earplugs.

WHEREFORE, Plaintiff/Relator Moldex demands compensatory and multiple damages, costs, attorney fees, and such other legal and equitable relief as the Court may provide, including, but not limited to, exclusion or debarment.

<u>**COUNT IV**</u>
<u>**Unjust Enrichment**</u>

57.    Plaintiff/Relator Moldex re-alleges and incorporates by reference the allegations contained in paragraphs 1-56.

58.    By reason of the United States Government's payments pursuant to multiple IQCs awarded under to Solicitation Nos. SP0200-06-R-4202, SP0200-07-D-4103 and related solicitations for the supply of dual-ended Combat Arms™ earplugs to the military, 3M/Aearo received monies to which it was not entitled and has thereby been unjustly enriched to the detriment of the United States Government in an amount to be determined at trial.

WHEREFORE, Plaintiff/Relator demands compensatory damages, costs, attorneys fees, and such other legal and equitable relief as the Court may provide.

**JURY TRIAL DEMAND**

Pursuant to Federal **Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by** jury on all issues triable by **jury.**

Date: May 11, 2016                By:  *s/ James M. Griffin*
                                 James M. Griffin, Fed ID 1053
                                  jgriffin@griffindavislaw.com
                                 Margaret N. Fox, Fed ID 10576
                                  mfox@griffindavislaw.com
                                 GRIFFIN DAVIS

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

Marlboro Building
1116 Blanding Street | PO Box 999
Columbia, SC 29202
Telephone: (803) 744-0800

**OF COUNSEL:**

Sam Sheldon
  (*pro hac vice* application to be filed)
  samsheldon@quinnemanuel.com
Tara Lee
  (*pro hac vice* application to be filed)
  taralee@quinnemanuel.com
Lauren Weeman Misztal
  (*pro hac vice* application to be filed)
  laurenmistzal@quinnemanuel.com
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
777 6th Street, NW
Washington, D.C.  20001
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Joseph M. Paunovich
  (*pro hac vice* application to be filed)
  joepaunovich@quinnemanuel.com
Matthew Hosen
  (*pro hac vice* application to be filed)
  matthosen@quinnemanuel.com
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Plaintiff/Relator Moldex-Metric, Inc.*

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| United States of America, *ex rel.*<br>Moldex-Metric, Inc.,<br><br>       Plaintiffs,<br><br>v.<br><br>3M Company<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. No.: 3:16-cv-01533-DCC


**FILED *EX PARTE***
**AND UNDER SEAL**

### JOINT STIPULATION OF DISMISSAL

Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), the United States and Relator Moldex-Metric, Inc., ("Relator") hereby notify the Court of the voluntary dismissal of all claims in this action as set forth below.

In accordance with, and subject to, the terms of the attached Settlement Agreement among the United States, Relator, and Defendant 3M Company, executed on July 23, 2018, the United States dismisses with prejudice the Covered Conduct as identified in Paragraph C of the Settlement Agreement. The Relator dismisses this action with prejudice as to all claims included in Relator's Complaint.

A proposed Order reflecting the relief requested is being provided to the Court.

[SIGNATURE BLOCK ON FOLOWING PAGE]

Respectfully submitted,

SHERRI A. LYDON
United States Attorney

By:  s/ Stanley D. Ragsdale
Stanley D. Ragsdale (Fed. I.D. #3197)

s/Brook B. Andrews
Brook B. Andrews (Fed. I.D. #10231)
Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, S.C. 29201
Telephone (803) 929-3078
*Attorneys for the United States of America*

July 25, 2018

By:  s/ James M. Griffin
James M. Griffin (Fed. I.D. #1053)
Griffin | Davis
1116 Blanding Street
P.O. Box 999 (29202)
Columbia, SC 29201
jgriffin@griffindavislaw.com

*Attorney for Moldex-Metric, Inc.*

July 23, 2018

SETTLEMENT AGREEMENT

This Settlement Agreement (Agreement) is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Defense Logistics Agency (DLA) (collectively the "United States"), 3M Company ("3M" or "Defendant"), and Moldex-Metric, Inc. ("Moldex" or "Relator") (hereafter collectively referred to as "the Parties"), through their authorized representatives.

RECITALS

A.    3M Company is a for-profit corporation headquartered in St. Paul, Minnesota, that manufactures and sells worker safety products.  As relevant here, 3M manufactured and caused to be sold to the United States a hearing protection device known as the Combat Arms Earplug (Version 2) (the "CAEv2").  The CAEv2 was first developed and sold by Aearo Technologies, Inc. ("Aearo"), a company which 3M acquired in 2008.

B.    On May 12, 2016, Moldex filed a *qui tam* action in the United States District Court for the District of South Carolina captioned *United States ex rel. Moldex-Metric, Inc. v. 3M Company*, 3:16-cv-01533-MBS, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").  Relator alleges that the CAEv2 had a design defect which could cause the earplug to imperceptibly loosen in users' ears, thereby rendering the earplugs useless or less effective; that the testing methodology employed by 3M did not comply with required and/or accepted standards; and, that the Noise Reduction Rating (NRR) listed on the CAEv2 packaging materials and instructions did not accurately reflect the true characteristics of the CAEv2.  Relator further alleges that 3M and/or its affiliated companies knowingly sold the CAEv2 to the

United States military without first disclosing the design defect, flawed testing, and inaccurate NRR rating, which resulted in the submission of false claims.

C.    The United States contends that it has certain civil claims against 3M arising from the submission or causing the submission of claims for reimbursement for sales of the CAEv2 to the United States military from January 2006 through December 2015.  Prior to delivering the CAEv2 to the United States, the United States alleges that 3M, and its predecessor Aearo, knew that the CAEv2 was too short for proper insertion in users' ears and, therefore, did not perform as well in certain individuals.  Additionally, the United States alleges that 3M did not disclose this information to the United States and delivered the CAEv2 to the United States knowing that the product contained defects that impaired the CAEv2's serviceability.  That conduct is referred to below as the Covered Conduct.

D.    3M expressly denies the allegations in the Covered Conduct and all of the allegations in the *qui tam* complaint.  This Settlement Agreement is neither an admission of liability by 3M, nor a concession by the United States that its claims are not well founded.

E.    Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees and costs.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

2

<u>TERMS AND CONDITIONS</u>

1.      3M shall pay to the United States Nine Million One Hundred Thousand

Dollars ($9,100,000.00) (Settlement Amount), of which Four Million Five Hundred Sixty

Thousand Dollars ($4,560,000.00) is restitution.  The Settlement Amount shall be paid

within seven days of the Effective Date of this Agreement, as the term is defined in

Paragraph 23 below.  The Settlement Amount shall be paid to the United States by

electronic funds transfer pursuant to written instructions to be provided by the Civil

Division of the United States Department of Justice no later than the Effective Date of

this Agreement.  Notwithstanding any provision of this Agreement, interest on any

unpaid balance of the Settlement Amount shall accrue at a rate of twelve percent per

annum, compounded daily beginning on the eighth day after the Effective Date of this

Agreement, on the remaining unpaid balance.

2.      Conditioned upon the United States receiving the Settlement Amount from

3M and as soon as feasible after receipt, the United States shall pay One Million Nine

Hundred and Eleven Thousand Dollars ($1,911,000) to Relator by electronic funds

transfer.

3.      3M further agrees to pay the Relator the agreed upon amount of

$645,000.00 for attorneys' fees, expenses and other legal costs (the "Relator's Costs").

3M agrees to pay the Relator's Costs no later than 14 days from the Effective Date of this

Agreement by electronic funds transfer pursuant to written instructions to be provided by

Relator no later than the Effective Date of this Agreement.

4.      Subject to the exceptions in Paragraph 6 (concerning excluded claims)

below, and conditioned upon 3M's full payment of the Settlement Amount, the United

3

States releases 3M, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them, from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; and the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, or any other statutory provision creating a cause of action for civil damages or civil penalties that the Civil Division of the Department of Justice has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part O, Subpart I, § 0.45(d) or common law theories of breach of contract, payment by mistake, unjust enrichment, and fraud.

5.      Subject to the exceptions in Paragraph 6 below, and conditioned upon 3M's full payment of the Settlement Amount and full payment of the Relator's Costs, Relator, for itself and for its successors, attorneys, agents, and assigns, releases 3M, together with its current and former parent corporations; current and former directors, officers, agents and employees; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them (collectively the "Releasees") from all of the following claims:

(a)      Any and all claims, whether disclosed or undisclosed, which Relator has asserted, could have asserted, or may assert now or in the future against the Releasees arising out of or in any way connected with the Civil Action, the Covered Conduct, and the Relator's investigation and prosecution thereof, including but not limited to any civil monetary claim the Relator or the United States has or may have under the False Claims

Act, 31 U.S.C. §§ 3729-3733; any claim for attorneys' fees, expenses or costs under 31 U.S.C. § 3730(d); any other statute creating a cause of action for civil damages or penalties, or any common law theories, including but not limited to breach of contract, payment by mistake, unjust enrichment and fraud.

6.      Notwithstanding the releases given in Paragraphs 4 and 5 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

      a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

      b.      Any criminal liability;

      c.      Except as explicitly stated in the Agreement, any administrative liability, including the suspension and debarment rights of any federal agency;

      d.      Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

      e.      Any liability based upon obligations created by this Agreement;

      f.      Any liability for failure to deliver goods or services due;

      g.      Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

7.      Relator and its successors, attorneys, agents, and assigns shall not object to this Agreement and agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon Relator's receipt of the payment described in Paragraph 2, Relator and

5

its successors, attorneys, agents, and assigns fully and finally release, waive, and forever

discharge the United States, its agencies, officers, agents, employees, from any claims

arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any

claims to a share of the proceeds of this Agreement and/or the Civil Action.

8.      3M waives and shall not assert any defenses it may have to any criminal

prosecution or administrative action relating to the Covered Conduct that may be based in

whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth

Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth

Amendment of the Constitution, this Agreement bars a remedy sought in such criminal

prosecution or administrative action.

9.      3M fully and finally releases the United States, its agencies, officers,

agents, employees, and servants, from any claims (including attorney's fees, costs, and

expenses of every kind and however denominated) that 3M has asserted, could have

asserted, or may assert in the future against the United States, its agencies, officers,

agents, employees, and servants, related to the Covered Conduct and the United States'

investigation and prosecution thereof.

10.     3M, for itself and for its successors, attorneys, agents, and assigns,

releases Relator, together with its current and former parent corporations; current and

former directors, officers, agents and employees; direct and indirect subsidiaries; brother

or sister corporations; divisions; current or former corporate owners; and the corporate

successors and assigns of any of them (collectively the "Moldex Releasees") from any

claims (including attorney's fees, costs, and expenses of every kind and however

denominated) that 3M has asserted, could have asserted, or may assert now or in the

future against the Moldex Releasees arising out of or in any way connected with the Civil

Action, the Covered Conduct, and the Relator's investigation and prosecution thereof,

including but not limited to any cause of action for civil damages or penalties, or any

common law theories, including but not limited to breach of contract, payment by

mistake, unjust enrichment and fraud.

   11. a. Unallowable Costs Defined: All costs (as defined in the Federal

Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of 3M, and its

present or former officers, directors, employees, shareholders, and agents in connection

with:

   (1) the matters covered by this Agreement;

   (2) the United States' audit(s) and civil investigation(s) of the

matters covered by this Agreement;

   (3) 3M's investigation, defense, and corrective actions

undertaken in response to the United States' audit(s) and

civil investigation(s) in connection with the matters

covered by this Agreement (including attorney's fees);

   (4) the negotiation and performance of this Agreement;

   (5) the payment 3M makes to the United States pursuant to this

Agreement and any payments that 3M may make to

Relator, including costs and attorney's fees,

are unallowable costs for government contracting purposes (hereinafter referred to as

Unallowable Costs).

b.    Future Treatment of Unallowable Costs:  These Unallowable Costs will be separately determined and accounted for by 3M, and 3M shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

c.    Treatment of Unallowable Costs Previously Submitted for Payment:  Within 90 days of the Effective Date of this Agreement, 3M shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by 3M or any of its subsidiaries or affiliates from the United States.  3M agrees that the United States, at a minimum, shall be entitled to recoup from 3M any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment.  The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine 3M's books and records and to disagree with any calculations submitted by 3M or any of its subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by 3M, or the effect of any such Unallowable Costs on the amount of such payments.

12.    This Agreement is intended to be for the benefit of the Parties only.

13.    Upon receipt of the payment described in Paragraph 1, above, the Parties shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action pursuant to Rule 41(a)(1).

14.    Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

15.    Each party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

8

16.     This Agreement is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of South Carolina.  For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

17.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

18.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.  The Relator represents that it has discussed this Agreement with its counsel prior to signing.

19.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

20.     This Agreement is binding on 3M's successors, transferees, heirs, and assigns.

21.     This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

22.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

23.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

DATED: *7-23-18* BY: _____

                   Brandie N. Weddle
                   Trial Attorney
                   Commercial Litigation Branch
                   Civil Division
                   United States Department of Justice

DATED: _____ BY: _____

                   Stan Ragsdale
                   Brook Andrews
                   Assistant United States Attorneys
                   District of South Carolina

3M COMPANY - DEFENDANT

DATED: _____ BY: _____

                   3M COMPANY
                   Mojdeh Poul
                   Executive Vice President – Safety & Graphics Business
                   Group

DATED: _____ BY: _____

                   Courtney Enloe
                   Associate General Counsel
                   3M Legal Affairs

MOLDEX-METRIC - RELATOR

DATED: _____ BY: _____

                   MOLDEX-METRIC
                   Mark Magidson
                   President and CEO

<u>THE UNITED STATES OF AMERICA</u>

DATED: _____ BY: _____
                                      Brandie N. Weddle
                                      Trial Attorney
                                      Commercial Litigation Branch
                                      Civil Division
                                      United States Department of Justice

DATED: 7-23-18 BY: _____
                                      Stan Ragsdale
                                      Brook Andrews
                                      Assistant United States Attorneys
                                      District of South Carolina

<u>3M COMPANY - DEFENDANT</u>

DATED: _____ BY: _____
                                      3M COMPANY
                                      Mojdeh Poul
                                        Executive Vice President – Safety & Graphics Business
                                      Group

DATED: _____ BY: _____
                                      Courtney Enloe
                                      Associate General Counsel
                                      3M Legal Affairs

<u>MOLDEX-METRIC - RELATOR</u>

DATED: _____ BY: _____
                                      MOLDEX-METRIC
                                      Mark Magidson
                                      President and CEO

THE UNITED STATES OF AMERICA

DATED: _____ BY: _____
                              Brandie N. Weddle
                              Trial Attorney
                              Commercial Litigation Branch
                              Civil Division
                              United States Department of Justice

DATED: _____ BY: _____
                              Stan Ragsdale
                              Brook Andrews
                              Assistant United States Attorneys
                              District of South Carolina

3M COMPANY - DEFENDANT

DATED: 7/23/18 BY: _____
                              3M COMPANY
                              Mojdeh Poul
                              Executive Vice President – Safety & Graphics Business
                              Group

DATED: 7/23/18 BY: _____
                              Courtney Enloe
                              Associate General Counsel
                              3M Legal Affairs

MOLDEX-METRIC - RELATOR

DATED: _____ BY: _____
                              MOLDEX-METRIC
                              Mark Magidson
                              President and CEO

THE UNITED STATES OF AMERICA

DATED: _____ BY: _____

Brandie N. Weddle
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: _____ BY: _____

Stan Ragsdale
Brook Andrews
Assistant United States Attorneys
District of South Carolina

3M COMPANY - DEFENDANT

DATED: _____ BY: _____

3M COMPANY
Mojdeh Poul
Executive Vice President – Safety & Graphics Business
Group

DATED: _____ BY: _____

Courtney Enloe
Associate General Counsel
3M Legal Affairs

MOLDEX-METRIC - RELATOR

DATED: 7-20-18 BY: _____

MOLDEX-METRIC
Mark Magidson
President and CEO

10

DATED: <u>7/20/2018</u> BY: _____

Counsel for MOLDEX-METRIC
Sam S. Sheldon
Quinn Emanuel Urquhart & Sullivan LLP
777 6th Street, NW
Washington DC 20001

# EXHIBIT 3

**BEFORE THE UNITED STATES JUDICIAL PANEL ON**
**MULTIDISTRICT LITIGATION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **IN RE 3M COMBAT ARMS EARPLUG** | ) | **MDL DOCKET NO. 2885** |
| **PRODUCTS LIABILITY LITIGATION** | ) | |
| | ) | |
| | ) | |

**DEFENDANT 3M COMPANY'S RESPONSE TO THE MOTION TO TRANSFER**
**RELATED ACTIONS FOR COORDINATED PRETRIAL PROCEEDINGS**

3M Company ("3M") supports centralization of the more than two hundred Combat Arms Earplug actions that have been filed against it to date (the "Related Actions"), and the "thousands" of additional similar cases plaintiffs' counsel have stated they intend to file in the future. The complaints in the Related Actions are nearly identical and involve numerous questions that, once resolved, may—and likely will—be dispositive of many of the claims. Given this overlap, centralization pursuant to 28 U.S.C. 1407 will "eliminate duplicative discovery, prevent inconsistent pretrial rulings on *Daubert* issues and other pretrial matters, . . . conserve the resources of the parties, their counsel, and the judiciary," and facilitate the coordination of any related state court litigation. *In re Farxiga (Dapagliflozin) Prod. Liab. Litig.*, 273 F. Supp. 3d 1380, 1382 (J.P.M.L. 2017).

3M also agrees with plaintiff's suggestion in the MDL transfer motion that the Related Actions be transferred to the District of Minnesota. (*See* Docket No. 1, at ¶ 5; Docket No. 1-1, at 1, 3.) As noted therein, "the District of Minnesota is the most appropriate forum" because 3M has its "principal place[] of business there" and "relevant documents and witnesses are located there." (*Id.*) Moreover, consolidation in the District of Minnesota will facilitate the coordination of related

state court cases, many of which are presently pending in Minnesota at a courthouse less than half a mile from the federal courthouse in downtown Minneapolis.  Finally, as the Panel has previously recognized, the District of Minnesota is a "centrally located" venue for nationwide litigation, and "possesses the necessary resources, facilities, and technology to sure-handedly devote the substantial time and effort to pretrial matters that [a] complex [MDL] docket is likely to require." *In re Baycol Prod. Liab. Litig.*, 180 F. Supp. 2d 1378, 1380 (J.P.M.L. 2001).

In sharp contrast to this principled suggestion, the venues and judicial picks suggested in various plaintiffs' responses to the MDL transfer motion—including the Eastern District of Louisiana, the Western District of Missouri, the Southern District of California, the Central District of California, the Middle District of Georgia, the Eastern District of Pennsylvania, the District of South Carolina, the Northern District of Florida, the Southern District of Georgia, and the Western District of Texas—have no more connection to the issues and evidence in this litigation than any other district, and certainly less than the District of Minnesota.  Plaintiffs offer no principled reason why the cases should be transferred to these venues.  Rather, as certain plaintiffs have stated, their preference for some of these forums is driven by the desire to consolidate the cases in a district with a large military presence or in front of a judge with military experience.  But selecting one district with a military presence over another would inequitably favor those plaintiffs over others with similar claims who happened to be located on or near a different military base.  Plaintiffs provide no reasonable justification for making such a preferential selection over a forum that is centrally located and would not objectively favor some plaintiffs over others.  Forum shopping for an MDL jurisdiction should be rejected.  *See* MULTIDISTRICT LITIGATION MANUAL § 7:7 ("The Panel does not give the parties an opportunity to judge-shop . . . . The Panel is quite ready to ignore the positions taken by the parties, especially when the odor of forum shopping is

2

present.").  In short, the District of Minnesota is a far more appropriate district to manage this MDL.

## BACKGROUND

The Related Actions assert products liability claims against 3M—and, in some cases, Aearo Technologies Inc. ("Aearo")—related to the Combat Arms Earplugs.  Plaintiffs in the Related Actions allege, among other things, that the earplugs were defective in that the design prevented a snug fit in the wearer's ear, which purportedly caused hearing loss or tinnitus.  (*E.g.*, Docket No. 1-1, at 4-5; Docket No. 11, at 3.)  To date, 3M is aware of 222 Related Actions filed in federal district courts across the country.[1]

### A.  3M Company and Aearo Technologies Inc.

3M is headquartered in St. Paul, Minnesota.  The company was founded in 1902 in Minnesota as a mining venture, and began expanding in the 1920s into other products.  3M currently produces more than 60,000 products used in homes, businesses, hospitals and other industries.

3M acquired Aearo in 2008.  At that time, Aearo was a global leader in personal protection equipment headquartered in Indianapolis, Indiana.  The acquisition added, among other things, hearing protection, eyewear protection, and fall protection to 3M's product lines, including the Combat Arms Earplugs.

### B.  Version 2 of the Combat Arms Earplugs.

The specific model at issue in the Related Actions is version 2 of the Combat Arms Earplugs ("CAE2").  CAE2 is a dual-sided earplug with a yellow end and green end.  Each end

---

[1]    Contemporaneously with this filing, 3M is filing a Notice of Related Actions listing those Related Actions 3M is presently aware of that have not been separately identified in other Notices of Related Actions filed to date.

has a different purpose.  When the yellow end of the earplug is inserted, users can still hear nearby low-level sounds, like verbal communication, but receive protection from high-level impulse noise, like gunfire.  In contrast, when the green end of the earplug is inserted, CAE2 acts like a traditional earplug, providing steady and continuous protection from ambient noise.

CAE2 was designed by Aearo at the request of and in consultation with the United States military.  CAE2 represented a revolutionary breakthrough in hearing protection for the military in that it was the first product to offer differential attenuation with constant impulse noise protection.  Thus, soldiers wearing CAE2 could maintain situational awareness (*e.g.*, to hear nearby voice commands) while also maintaining some protection from gunfire and other higher decibel sounds.  After acquiring Aearo in 2008, 3M continued to sell CAE2 through 2015.

**C.   The MDL Transfer Motion Seeks Consolidation In The District Of Minnesota.**

On January 25, 2019, a Related Action plaintiff filed a motion with the Panel to transfer the Related Actions to the District of Minnesota for coordinated pretrial proceedings.  (Docket No. 1.)  The moving plaintiff notes, among other things, that "[t]he District of Minnesota is the most appropriate venue because . . . Defendant[] 3M … ha[s] [its] corporate headquarters and principal place[] of business in the District of Minnesota, and it is thus where the relevant documents and witnesses are located."  (*Id.* at ¶ 5.)  Since then, numerous other plaintiffs have filed responses also supporting consolidation in the District of Minnesota for the same (and additional) reasons.  (Docket No. 60; Docket No. 70; Docket No. 72; Docket No. 87.)

**D.   Other Plaintiffs Seek Consolidation In Districts With No Particular Connection To The Issues And Evidence In These Cases.**

Although the MDL transfer motion acknowledges that the District of Minnesota is "the most appropriate venue," and 3M and other plaintiffs agree with that position, counsel for certain Related Action plaintiffs have suggested that the MDL should instead be located in one of several

4

other districts with no particular connection to the issues or evidence in these cases. In particular, plaintiffs have to date suggested that Related Actions be transferred to: the Eastern District of Louisiana (*see* Docket Nos. 6, 49); Judge Bough in the Western District of Missouri (*see* Docket Nos. 11, 33, 91); the Southern District of California (*see* Docket No. 11); Judges Staton, Guilford, Selna or Carter in the Central District of California (Docket No. 55); the Middle District of Georgia (Docket No. 65); the Southern District of Georgia (Docket No. 82); Judges Schiller, Sanchez, Goldberg, or Joyner in the Eastern District of Pennsylvania (Docket No. 68, 90); the District of South Carolina (Docket No. 77, 83); Judge Rodgers in the Northern District of Florida (Docket No. 80); and the Western District of Texas (Docket No. 92).

## ARGUMENT & AUTHORITIES

## I.    TRANSFER FOR CONSOLIDATED PRETRIAL PROCEEDINGS IS APPROPRIATE.

Coordination for pretrial purposes is appropriate where "civil actions involving one or more common questions of fact are pending in different districts." 28 U.S.C. § 1407(a). "Transfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues[.]" *In re Kugel Mesh Hernia Patch Prod. Liab. Litig.*, 493 F. Supp. 2d 1371, 1373 (J.P.M.L. 2007). Rather, coordination is appropriate where there is an "overlap in the central factual issues, parties, and claims." *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litg.,*, 201 F. Supp. 3d at 1375, 1378 (J.P.M.L. 2016).

3M agrees that coordination is appropriate here. *First*, 3M is aware of 222 Related Actions filed to date, and plaintiffs' counsel have stated their intention of filing "thousands" of additional Related Actions in the future. (*E.g.*, Docket No. 1-1, at 3.) All of the Related Actions allege products liability claims against 3M on behalf of U.S. military personnel who allegedly now suffer

from hearing loss and/or tinnitus.[2]   ***Second***, coordination of the Related Actions would be "convenien[t] … [for the] parties and witnesses" and "promote the just and efficient conduct of such actions" (28 U.S.C. 1407) by, among other things, "eliminat[ing] duplicative discovery, prevent[ing] inconsistent rulings on *Daubert* and other pretrial matters, and conserv[ing] the resources of the parties, their counsel, and the judiciary." *Farxiga*, 2017 WL 1282904 at 1382; *see also In re: Plasma-Derivative Protein Therapies Antitrust Litig.*, 657 F. Supp. 2d 1371, 1372 (J.P.M.L. 2009.)  Accordingly, 3M supports consolidation of the Related Actions for coordinated pretrial proceedings.[3]

## II.   THE DISTRICT OF MINNESOTA IS THE MOST APPROPRIATE FORUM FOR THIS LITIGATION.

3M also agrees with the suggestion in the MDL transfer motion that "[t]he District of Minnesota is the most appropriate forum." (Docket No. 1-1, MDL Transfer Motion at 3.)  To date, over 20 Related Actions have been filed in the District of Minnesota.  Numerous relevant factors weigh in favor of consolidating the other Related Actions in that venue.

***First,*** the District of Minnesota has a "nexus" to the litigation because it is the location of the defendant and relevant evidence.  As noted in the MDL transfer motion, 3M is headquartered

---

[2]   Two of the Related Actions—*Lynch et al v. 3M Company*, 19-cv-00273-RC (D.D.C.) and *Mathis et al v. 3M Company*, 19-cv-20606-UU (S.D. Fl.)—are putative class actions.  Although not appropriate for class certification, these cases raise many of the same factual issues as the other Related Actions, and thus warrant consolidation in a single forum for the same reasons, including "eliminat[ing] duplicative discovery, prevent[ing] inconsistent rulings on *Daubert* and other pretrial matters, and conserv[ing] the resources of the parties, their counsel, and the judiciary." *Farxiga*, 2017 WL 1282904 at 1382.

[3]   In its order setting a briefing schedule, the Panel directed the parties to "address what steps they have taken to pursue alternatives to centralization (including, but not limited to, engaging in informal coordination of discovery and scheduling, and seeking Section 1404 transfer of one or more of the subject cases)." (Docket No. 3.)  Given the volume of presently filed Related Actions—and the expected "thousands" of additional Related Actions (*e.g.*, Docket No. 1-1, at 3)—informal coordination and other alternatives to centralization are not practicable.

in St. Paul, Minnesota, and "relevant documents and witnesses are located there."  (Docket No. 1-1, at 1.)  This nexus weighs heavily in favor of transfer to the District of Minnesota.  *See e.g.*, *In re Delphi Corp. Sec., Derivative & ""Erisa" Litig.*, 403 F. Supp. 2d 1358, 1360 (J.P.M.L. 2005) (selecting district with "a significant nexus to the litigation" because "[t]his district is where many relevant documents and witnesses are likely to be found, inasmuch as [defendant's] principal place of business is located there."); *In re: Midland Credit Mgmt., Inc., Tel. Consumer Prot. Act Litig.*, 818 F. Supp. 2d 1377, 1378 (J.P.M.L. 2011) (selecting the district with "a nexus to the allegations given the location of the defendants there, and relevant documents and witnesses likely will be found there.").[4]  This is particularly true where, as here, centralization in the district with a nexus to the litigation is supported by numerous plaintiffs, including the moving party.  (*See* Docket No. 1, at ¶ 5 (moving plaintiff advocating for the District of Minnesota); Docket Nos. 60, 70, 87 (responding plaintiffs advocating for the District of Minnesota); *see also In re: Verizon Wireless Data Charges Litig.*, 701 F. Supp. 2d 1380, 1382 (J.P.M.L. 2010) ("Common defendant Verizon Wireless has its headquarters in New Jersey, giving the district a clear nexus to the allegations,

---

[4]        *See also In re Polyurethane Foam Antitrust Litig.*, 753 F.Supp.2d 1376 (J.P.M.L., 2010) (choosing a district that has a "nexus to the litigation through the location of the headquarters of [one of the defendants]");  *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 249 F. Supp. 3d 1357, 1361 (J.P.M.L. 2017) (selecting the district "near [defendant's] corporate headquarters [], where many of the common documents and witnesses are likely to be located"); *In re Mirena IUD Prod. Liab. Litig.*, 938 F. Supp. 2d 1355, 1358 (J.P.M.L. 2013) (selecting district where "the primary witnesses and documentary evidence on the common factual issues likely will be located"); *In re: Cook Med., Inc., IVC Filters Mktg., Sales Practices & Prod. Liab. Litig.,* , 53 F. Supp. 3d 1379, 1381 (J.P.M.L. 2014) (transferring to district in which defendant was headquartered and "where relevant documents and witnesses are likely to be found"); *In re: Darvocet, Darvon & Propoxyphene Prod. Liab. Litig.*, 780 F. Supp. 2d 1379, 1382 (J.P.M.L. 2011) (selecting Eastern District of Kentucky because "[r]elevant documents and witnesses likely are located within the Eastern District of Kentucky at defendant Xanodyne's Newport headquarters.").

and centralization in the District of New Jersey has the support of moving plaintiffs, defendant

Verizon Wireless, and plaintiff in an action pending outside the district.").[5]

    ***Second***, the District of Minnesota has extensive experience managing complex MDLs, and

is well-equipped to handle this large and complex action.  The Panel has transferred over 45 MDLs

to the District of Minnesota, including at least fourteen involving products liability cases.[6]  Nine

of the fourteen judges in the District of Minnesota have presided over MDLs,[7] and one of the

fourteen judges has an active MDL in which 3M is a defendant.  *See Bair Hugger Forced Air*

*Warming Devices Products Liability Litigation*, MDL No. 2666 (Ericksen, J.).  As the Panel has

previously recognized, the District of Minnesota "possesses the necessary resources, facilities, and

technology to sure-handedly devote the substantial time and effort to pretrial matters that [a]

complex [MDL] docket is likely to require."  *In re Baycol Prod. Liab. Litig.*, 180 F. Supp. 2d at

1380.

    Certain plaintiffs have argued that other districts are more appropriate because they have

fewer active MDLs, and can thus "take on the potential caseload of this litigation."  (Docket No.

11, at 11-12; *see also* Docket No. 6, at 5-6.)  Any concerns regarding the District of Minnesota's

capacity for an additional MDL are unfounded.  Six of the ten MDLs currently pending in the

---

[5]    *See also In re: Brican Am. LLC Equip. Lease Litig.*, 731 F. Supp. 2d 1358, 1359 (J.P.M.L 2010) ("The Southern District of Florida has a nexus to the actions given the presence of Brican in that district, and centralization in this district has the support of plaintiffs in both Southern District of Florida actions as well as the Brican defendants.").

[6]    *Multidistrict Litigation Terminated Through September 30, 2018*, at 33-34 (available at https://www.jpml.uscourts.gov/sites/jpml/files/JPML_Cumulative_Terminated_Litigations-FY-2018.pdf); *MDL Statistics Report - Distribution of Pending MDL Dockets by District*, at 3 (available                                    at https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-January-15-2019.pdf).

[7]    *Id.*

8

District of Minnesota have fewer than 25 active cases; four have fewer than three; and two have zero.[8]  In any event, numerous of the judges in the District of Minnesota do not presently have an MDL, and each would make an excellent choice to manage this litigation.  *Cf. In re: Midland Credit Mgmt., Inc., Tel. Consumer Prot. Act Litig.*, 818 F. Supp. 2d 1377, 1378 (J.P.M.L 2011) (selecting a district that both "has a nexus to the allegations given the location of the defendants []" and relevant documents," and "also permits the Panel to assign the litigation to a judge who is not presently presiding over other multidistrict litigation.").

*Third*, transfer to the District of Minnesota would promote state and federal coordination. Four first-filed state court cases are pending in Hennepin County, Minnesota, at a courthouse less than half a mile from the federal courthouse in downtown Minneapolis.  3M may seek removal in these (and any future) state court cases.  However, to the extent they remain or are remanded, these first-filed state court cases are the most likely to outpace and disrupt the MDL in the absence of coordination.  The potential benefits of preempting any conflicts through close coordination by the courts in Minneapolis is another factor weighing in favor of consolidation in the District of Minnesota.  *In re Sundstrand Data Control, Inc. Patent Litig.*, 443 F. Supp. 1019, 1021 (J.P.M.L. 1978) (noting that a Washington state court action "could, if appropriate, be coordinated with the federal actions," which "is another factor favoring the selection of the Western District of Washington.").[9]

---

[8]     *MDL Statistics Report - Distribution of Pending MDL Dockets by District*, at 2-3 (available at  https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-January-15-2019.pdf).

[9]     *See also In re Internal Revenue Serv. 1031 Tax Deferred Exch. Litig.*, 528 F. Supp. 2d 1343, 1344 (J.P.M.L 2007) ("Nevada is also the location of related state court proceedings, and centralization in the District of Nevada will enhance the potential for coordination between the state and federal courts regarding this matter."); *In re Oil Spill by "Amoco Cadiz" Off Coast of France on Mar. 16, 1978*, 471 F. Supp. 473, 478–79 (J.P.M.L. 1979) ("Additionally, the related actions that are pending in the Illinois state courts can be coordinated with the federal proceedings

9

*Finally*, the District of Minnesota is a convenient forum for all parties, witnesses, and their counsel, who are scattered across the country.  A major international airport serves Minneapolis and St. Paul.  It handles over 400,000 flights per year, provides nonstop service to 136 domestic and 27 international markets, and was named the 2017 top North American airport for efficiency excellence in its size category by the Air Transportation Research Society.  (*See* http://mspairport.com/about-msp).  Two federal courthouses in the district are located less than ten miles from this airport.  Thus, as the Panel has previously recognized, "Minnesota is a geographically central and accessible location" for nationwide litigation.  *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 844 F. Supp. 1553, 1554 (J.P.M.L. 1994); *see also In re Baycol Prod. Liab. Litig.*, 180 F. Supp. 2d at 1380 (transfer to the District of Minnesota "permits the Panel to effect the Section 1407 assignment to a major metropolitan court that," among other things, "is centrally located.").[10]

\*        \*        \*

In sum, transfer to the District of Minnesota is the most logical choice for an MDL because it is the only suggested venue that has a nexus to the litigation, it has numerous qualified judges and extensive experience handling MDLs in general (and products liability MDLs in particular),

---

there. The possibility of promoting this state/federal coordination is another factor favoring the selection of the Northern District of Illinois as the transferee forum."); *In re Ford Motor Co. DPS6 PowerShift Transmission Prod. Liab. Litig.*, 289 F. Supp. 3d 1350, 1353 (J.P.M.L. 2018) ("Centralization in [the Central District of California] also will facilitate coordination with California state court litigation involving the same alleged defect.").

[10]    *See also In re: Medtronic, Inc., Sprint Fidelis Leads Prod. Liab. Litig.*, 536 F. Supp. 2d 1375, 1376 (J.P.M.L. 2008) ("Because Medtronic has its headquarters within the District of Minnesota, relevant discovery may be found there. Transfer to this district also provides a centrally located forum for actions filed in several locations nationwide."); *In re: Target Corp. Customer Data Sec. Breach Litig.*, 11 F. Supp. 3d 1338, 1339 (J.P.M.L. 2014) ("[T]he District of Minnesota is easily accessible and relatively centrally located for the parties to this litigation, which is nationwide in scope.").

transfer will promote federal and state court coordination, and Minneapolis/St. Paul is centrally located, with two federal courthouses near a major international airport.

## III.   THE MIDDLE DISTRICT OF TENNESSEE WOULD ALSO BE AN APPROPRIATE FORUM.

Several non-movant plaintiffs have objected to consolidation in the District of Minnesota, including on the grounds that it is 3M's home district.  (*E.g.*, Docket No. 11, at 3; Docket No. 77, at 5-6.)  However, the convenience of the parties and the location of relevant evidence weigh *in favor* of consolidation in that district, and not against it.  But to the extent the Panel is inclined to consider a different forum, then the Middle District of Tennessee would be an appropriate "neutral" choice for several reasons.

*First*, the Middle District of Tennessee is well-equipped to handle and manage these large and complex actions, and has experience managing complex MDLs.  The Panel has transferred at least 9 prior MDLs to the Middle District of Tennessee, including at least one large products liability MDL.[11]  Two of the four judges in the Middle District of Tennessee have presided over MDLs.[12]  And none of the four judges are presently presiding over an active MDL.[13]

*Second*, like the District of Minnesota, the Middle District of Tennessee is centrally located and convenient for all parties and witnesses.  An international airport services Nashville, and provides nonstop service to more than 65 domestic and international markets.  (*See*

---

[11]     *Multidistrict Litigation Terminated Through September 30, 2018*, at 28 (available at https://www.jpml.uscourts.gov/sites/jpml/files/JPML_Cumulative_Terminated_Litigations-FY-2018.pdf).

[12]     (*Id.*)

[13]     *MDL Statistics Report - Distribution of Pending MDL Dockets by District*, at 3 (available at  https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-January-15-2019.pdf)

https://www.flynashville.com/flights/pages/default.aspx.)  This airport is less than 10 miles from the federal courthouse in downtown Nashville.

   **Third**, the Middle District of Tennessee is "neutral" ***not only*** as between 3M and plaintiffs, but ***also*** as between the various competing plaintiff groups.  Several of the responses to the MDL transfer motion argue for a particular district on the grounds that it contains a military base and thus a large cluster of potential plaintiffs.  (*E.g.*, Docket No. 11, 12-13 (arguing that the Western District of Missouri is close to a large military base); Docket 55, at 3-4 (arguing that the Central District of California is close to many military bases).)  These arguments provide no good reason to select one group of plaintiffs over another.  Selecting the Middle District of Tennessee allows the Panel to avoid that problem entirely because—in addition to not being 3M's "home" district— it is not the "home" location of any group of responding plaintiffs.  *Cf. In re Diet Drugs Prod. Liab. Litig.*, 990 F. Supp. 834, 836 (J.P.M.L. 1998) ("With respect to selection of the transferee district, we note that this is truly a nationwide litigation in which no particular district or region emerges as the geographic center of gravity.")

   **Finally**, although there are no cases pending in the Middle District of Tennessee, "that is no impediment to its selection as a transferee district," particularly where, as here, the litigation is nationwide in scope, and thus almost every district other than Minnesota has the same level of connection to the proceedings.  *In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prod. Liab. Litig.*, 996 F. Supp. 2d 1380, 1382-83 (J.P.M.L 2014).  Although 3M believes that the District of Minnesota has the greatest connection to this litigation, to the extent the Panel is inclined to look for a neutral forum elsewhere, 3M submits that the Middle District of Tennessee is a very strong option.

**IV.    THE FORUMS PROPOSED IN OTHER RESPONSES ARE NOT APPROPRIATE FOR THIS LITIGATION.**

Certain non-movant plaintiffs have filed responses contending that the Panel should transfer the MDL to one of several alternative forums (and in some cases particular judges within those forums).  Suggestions to date include the Eastern District of Louisiana (*see* Docket Nos. 6, 49); Judge Bough in the Western District of Missouri (*see* Docket Nos. 11, 33, 91); the Southern District of California (*see* Docket No. 11); Judges Staton, Guilford, Selna or Carter in the Central District of California (Docket No. 55); the Middle District of Georgia (Docket No. 65); the Southern District of Georgia (Docket No. 82); Judges Schiller, Sanchez, Goldberg, or Joyner in the Eastern District of Pennsylvania (Docket No. 68, 90); the District of South Carolina (Docket No. 77, 83); Judge Rodgers in the Northern District of Florida (Docket No. 80); and the Western District of Texas (Docket No. 92).  These venues have no particular connection to this litigation.  Rather, as certain plaintiffs have stated, their preference for some of these forums is driven by the desire to consolidate the cases in a district with a large military presence or in front of a judge with military experience.  But selecting one district with a military presence over another would inequitably favor those plaintiffs over others with similar claims who happened to be located on or near a different military base.  Plaintiffs provide no reasonable justification for making such a preferential selection over a forum that is centrally located and would not objectively favor some plaintiffs over others.  Forum shopping for an MDL jurisdiction (or a particular judge) is improper and should be rejected.  *See* MULTIDISTRICT LITIGATION MANUAL § 7:7.

## CONCLUSION

For all of the foregoing reasons, 3M agrees with plaintiff's suggestion in the MDL transfer motion that the Related Actions be transferred to the District of Minnesota for coordinated pretrial proceedings.

Date:   February 19, 2019                    Respectfully submitted,


                                             KIRKLAND & ELLIS LLP


                                             By:  /s/ Kimberly O. Branscome
                                             Kimberly O. Branscome
                                             KIRKLAND & ELLIS LLP
                                             333 South Hope Street
                                             Los Angeles, CA 90071
                                             Telephone: (213) 680-8400
                                             Facsimile: (213) 680-8500
                                             Email: kimberly.branscome@kirkland.com

                                             *Attorney for Defendant*
                                             3M Company

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *Cupit*, 8:20cv97300 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

### ORDER

Plaintiff Guy Cupit has filed a Motion for Ruling on 3M Company's Waiver and/or Judicial Estoppel of Any Defense Regarding its Full Liability, *see* ECF No. 7, which 3M Company opposes, *see* ECF No. 8.  Oral argument was heard on August 11, 2011.  After careful consideration, Cupit's motion is denied without prejudice.

Cupit seeks a ruling that to the extent 3M's wholly owned subsidiaries— Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and 3M Occupational Safety LLC (collectively, "Aearo")—have any liability for the CAEv2 claims in this litigation, 3M has assumed that liability by virtue of its litigation conduct over the past three and a half years, through which 3M made clear that it bears independent and complete liability for all CAEv2-related injuries.  In Cupit's view, 3M's course of conduct constitutes a waiver of any successor liability defense with respect to the CAEv2 claims in this litigation, and he asks that the

company be judicially estopped from asserting any variation of that defense in other forums.

In the context of this litigation, Cupit's arguments are not without merit and both philosophical and equitable appeal. Nearly three and a half years ago, the Judicial Panel on Multidistrict Litigation consolidated and transferred the 3M Combat Arms Earplug Products Liability Litigation to this Court, and more specifically to the undersigned, for coordinated pretrial proceedings of all CAEv2 hearing-related claims against 3M Company and its Aearo subsidiaries.[1] *See In re 3M Combat Arms Earplug Prods. Liab. Litig*., 366 F. Supp. 3d 1368 (J.P.M.L. 2019); *see also* 28 U.S.C. § 1407. Since that time, this Court has overseen an exhaustive discovery process, involving common corporate, military and expert discovery for the nearly 300,000 cases in the MDL, as well as case-specific discovery for 19 bellwether plaintiffs. More recently, the Court instituted a procedure in which waves of individual cases (500 at a time) are proceeding with plaintiff-specific discovery and complete pretrial work up, including resolution of *Daubert* and dispositive motions by this Court, following which, the remaining Wave cases will be remanded to their respective transferor courts for trial.

---

[1] There are six named defendants in the MDL: 3M Company, 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC. Five of the six defendants—all but 3M Company—recently filed for Chapter 11 bankruptcy in the Southern District of Indiana.

Significantly, at no point since the beginning of the MDL—over the years of intensive discovery, motions practice, and bellwether trials—did 3M Company ever hint, much less represent, that any entity other than itself was responsible for the CAEv2 claims in this litigation.  Quite the contrary, 3M Company comported itself as the sole entity (besides the federal government or individual plaintiffs, of course) directly and independently responsible for the plaintiffs' claims.

From the start, Aearo was a party to this litigation in name only.  Examples abound.  As early as the Master Answer, the defendants jointly asserted an array of defenses aimed at shifting liability either to the United States military,[2] or to the plaintiffs themselves,[3] but *never to Aearo.*  During discovery, 3M Company alone verified the responses to interrogatories sent to all defendants.  Not Aearo.  3M Company produced virtually all of the discovery materials.  Not Aearo.  3M Company sent 30(b)(6) witnesses to testify at depositions.  Not Aearo.  At the initial multi-day Rule 26 conference, 22 subsequent case management conferences, countless biweekly discovery and leadership calls, Pentagon and Department of Justice meetings, a myriad of hearings and oral arguments on various matters, and in every formal and informal communication with the Court, the six defendants

---

[2] *See In re 3M*, 3:19md2885, Master Answer, ECF No. 959 at 99–100 ¶¶ 18-19.

[3] *See id.* at 94-95 ¶¶ 4-7.

maintained an unqualifiedly united front, with 3M Company—not Aearo—at the helm.

Even in the 16 bellwether trials, 3M Company maintained its posture of singularity and control. After the Court required the presence of a corporate representative at the bellwether trials, only 3M Company sent a representative. Not Aearo. When bellwether juries were instructed that 3M and Aearo would be "refer[red] to collectively as '3M'" for purposes of liability and damages, 3M did not object. *See, e.g.*, *Blum v. 3M Co.*, 7:20cv122, ECF No. 114 at 13. Regarding the apportionment of fault defense, those same bellwether juries could apportion fault only to a single defendant, 3M Company, and the company never once argued that the relative fault of any other defendant should be considered in connection with the plaintiffs' injuries, even in cases involving CAEv2 use that occurred solely *before* 3M Company acquired Aearo. *See, e.g., Adkins v. 3M Co.*, 7:20cv012, Verdict Form, ECF No. 118 at 4. Just as in discovery, the six defendants presented a united front at each bellwether trial with 3M calling all the shots, never once asserting crossclaims against other "separate" defendants for indemnification, presenting evidence that would have permitted a jury to allocate fault differently to any of the defendants, or asking for jury instructions or a verdict form that would enable juries to apportion fault among the six defendants. If the Aearo subsidiaries were, in fact, responsible parties in this litigation, and thus should have been subject

to independent liability determinations during the bellwether trials, it was a costly error to omit any such argument until now.  The bellwether trials ended with 10 out of 16 juries (13 out of 19 verdicts) finding that the defendants—again, collectively treated as "3M"— are liable for a total unreduced amount of nearly $300 million in compensatory and punitive damages.

If that was not enough, the defendants themselves have explicitly disavowed the notion that Aearo has a meaningful role or identity in this litigation.  In post-trial briefing on statutory cap issues in the Wayman and Vaughn cases, the defendants stood firm that "3M Company owns and controls 100% of the other five named defendants, rendering any suggestion that they are six separate parties for purposes of *this litigation* illusory."  *See Vaughn v. 3M*, 7:20cv134, ECF No. 179 at 10; *Wayman v. 3M*, 7:20cv149, ECF No. 194 at 4.  This was the dispositive issue under the applicable law, which imposed noneconomic damages caps on a per defendant basis.  *See* Colo. Rev. Stat. § 13-21-102.5(3)(a),(c); *Gen. Elec. Co. v. Niemet*, 866 P.2d 1361, 1366 (Colo. 1994).   For the Wayman and Vaughn cases, this meant the difference between a nearly $1 million damages cap based on a single defendant, 3M Company, and a $6 million cap based on six defendants.  Of note, the defendants argued that the two plaintiffs should  not be permitted to receive six times the statutory cap for a single defendant after making the wholly inconsistent "strategic decision" to pursue the six defendants collectively as "3M" at trial and for the

entirety of the litigation. The Court agreed, and relying on the defendants' argument, applied the nearly $1 million statutory cap for a single defendant, which in turn significantly reduced the two plaintiffs' damages awards—to the defendants' financial benefit. *See Wayman*, 7:20cv149, ECF No. 198; *Vaughn*, 7:20cv134, ECF No. 181.

Now, against this backdrop and displeased with the rulings of this Court and the bellwether jury verdicts, the defendants are attempting to evade the 3M primacy narrative but only—and *admittedly*—because it no longer fits the companies' strategic objectives. A short time ago (mere weeks, according to Aearo's bankruptcy filings), 3M and Aearo devised a scheme to escape the MDL and this Court for good. *See In re Aearo Techs. LLC*, Case No. 1:22bk2890, Informational Brief, ECF No. 12 at 5, 14 (casting the MDL as a "failure" and the bellwether verdicts as "outsized and untethered to reality"). The plan was for Aearo to file for Chapter 11 bankruptcy protection, and then seek an extension of the statutory automatic stay to 3M Company, who would remain completely solvent and never file a bankruptcy petition itself. *See id.*, ECF Nos. 1, 10. To pull this off, the entities executed a funding and indemnity agreement—on the eve of Aearo's bankruptcy filing— allocating 100% of 3M's liability for the CAEv2 claims in this litigation to Aearo. *See id.*, ECF No. 11-2. By voluntarily assuming all of the liability for the largest MDL in the federal judiciary's history, Aearo obviously wound up in dire financial

distress.   3M Company, for its part, would save the day by funding Aearo's operations and capital needs during the bankruptcy proceedings, as well as the subsequent claims trust, but desires the same protection afforded the Aearo debtors under the bankruptcy stay.[4]   Thus, for bankruptcy purposes, the defendants need Aearo to be viewed as "the real-party defendant" when it comes to the CAEv2 liability in this litigation, and the parties' funding and indemnity agreement to be viewed as validly creating an identity of interest between the depletion of Aearo's assets in bankruptcy and continued litigation against 3M Company in the MDL.  *See id*., ECF No. 10 at 14.

Although the naked duplicity inherent in this newly concocted narrative pervades the bankruptcy record, the problem for Cupit's motion is that 3M Company itself has not yet asserted (or attempted to assert) any defense that it is the "wrong party" *in this litigation*.  *See* Cupit Motion, ECF No. 7 at 2.  The United States Constitution limits federal court's jurisdiction to only present "cases" and "controversies." U.S. Const. art. III, §2.  Implicit within this constitutional limitation is that federal courts must only decide issues that are ripe for judicial review.  *See*

---

[4] The way the Court reads the funding and indemnity agreement, if the automatic stay is not extended to 3M, the agreement will still exist, which arguably means 3M will have to pursue Aearo as a creditor in bankruptcy for future CAEv2 judgments coming out of federal or state courts, essentially pitting them against the 230,000+ soldiers who are also creditors.  As for the claims trust, 3M states that it is "uncapped" and that 3M is "committed to" funding it beyond the $1 billion, *see In re Aearo Techs. LLC*, Case No. 1:22bk2890, ECF No. 11 at 6, but the Court finds nothing in the record (including in the funding and indemnity agreement) that legally requires 3M to fund the trust beyond that amount.

*Elend v. Basham*, 471 F.3d 1199, 1204–1205 (11th Cir. 2006). Beyond the constitutional limitation, the ripeness doctrine embodies "prudential considerations" that require judicial restraint when parties seek review of "potential or abstract disputes." *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). Significantly, courts must strictly apply the ripeness doctrine so as to avoid "rendering impermissible advisory opinions[.]" *See Nat'l Advert. Co. v. City of Miami, Fla*., 402 F.3d 1335, 1339 (11th Cir. 2005).

Here, the Court is deeply concerned over 3M Company's sudden, bankruptcy-eve about-face regarding the entity responsible for the CAEv2 claims in this litigation. And the Court agrees that 3M Company's new narrative bears the hallmark characteristics of a successor liability defense. *See, e.g., In re Acme Sec., Inc*., 484 B.R. 475, 487 (Bankr. N.D. Ga. 2012) (discussing essential elements for imposition of successor liability under Georgia law). However, the fact remains that Aearo's successor liability is currently only a potential defense that 3M Company has never raised in Cupit's case or any other individual case in this MDL; Aearo's new liability is on the record only in the bankruptcy court. Consequently, a ruling on whether the successor liability defense has been waived would be a premature and advisory decision on an abstract controversy, which is prohibited by well-established constitutional jurisprudence.

Case 22-50059   Doc 127   Filed 08/17/22   EOD 08/17/22 06:42:17   Pg 82 of 84
Case 3:19-md-02885-MCR-GRJ   Document 3386   Filed 08/14/22   Page 9 of 10

Page 9 of 10

Cupit's judicial estoppel argument falls short for similar reasons. "Judicial estoppel is an equitable concept invoked at a court's discretion" and is "designed to prevent the perversion of the judicial process." *Parker v. Wendy's Intern., Inc.*, 365 F.3d 1268, 1271 (11th Cir. 2004) (internal quotations and citations omitted). Generally, judicial estoppel applies when a party plays fast and loose with the judicial process by asserting inconsistent legal positions to gain an improper advantage. *See New Hampshire v. Maine*, 532 U.S. 742, 749–750 (2001). Factors relevant to the judicial estoppel analysis include the party's later position is "clearly inconsistent" with its earlier position, "whether the party has succeeded in persuading a court to accept that party's earlier position," and "whether the party seeking to assert an inconsistent position would derive an unfair advantage. . . if not estopped." *Id.* at 750–51 (citations omitted).

Here, 3M Company's statements and course of conduct since the start of the MDL are premised on two truths—that 3M Company is directly and independently responsible for the CAEv2 liability in this litigation and that its subsidiaries are parties in name only. With that said, and as discussed above, 3M Company has not yet asserted a successor liability defense in this MDL or otherwise formally taken a legal position *before this Court* that is inconsistent with its prior position. And conveniently for 3M Company, it has not yet, itself, taken any legal positions in the bankruptcy proceedings, only the Aearo subsidiaries have spoken there. To the

extent that Aearo has made inconsistent assertions in the bankruptcy proceedings that flagrantly and widely diverge from its positions in the MDL, the bankruptcy court is amply well-suited to determine whether Aearo should be judicially estopped from improperly pursuing that course in those proceedings.

Based on the foregoing, Cupit's Motion for Judgment on Waiver and Collateral Estoppel, ECF No. 3361, is **DENIED** without prejudice to refile if, and when,  3M Company asserts a successor liability defense in this matter.

**DONE AND ORDERED,** this 14th day of August 2022.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 17, 2022, a copy of the foregoing CLAIMANTS' SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE  IN SUPPORT OF THEIR OBJECTION TO THE DEBTORS' MOTION  FOR A PRELIMINARY INJUNCTION was filed electronically.  Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

*/s/ Robert J. Pfister*
Robert J. Pfister