**SO ORDERED: August 26, 2022.**



**Jeffrey J. Graham**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AEARO TECHNOLOGIES LLC, *et al.* [1] | ) | Case No. 22-02890-JJG-11 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |
| 3M OCCUPATIONAL SAFETY LLC, | ) | |
|   AEARO HOLDING LLC, | ) | |
|   AEARO INTERMEDIATE LLC, | ) | |
|   AEARO LLC, and | ) | |
|   AEARO TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 22-50059 |
| | ) | |
| THOSE PARTIES LISTED ON | ) | |
|   APPENDIX A TO THE COMPLAINT and | ) | |
|   JOHN AND JANE DOES 1-1000, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration and (II) Granting Related Relief.*

This matter comes before the Court on the *Motion for Declaratory and Injunctive Relief (I) Confirming that the Automatic Stay applies to Certain Action Against a Non-Debtor; (II) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (III) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction* (the "PI Motion") filed by Plaintiffs/Debtors Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC (together "Aearo" or the "Aearo Plaintiffs") and Objections thereto filed by the United States Trustee (the "UST") and certain Interested Parties. Aearo filed the PI Motion to stay certain federal and stated litigation, described more fully below, involving Aearo and Aearo's parent, 3M Corporation ("3M").

The Court conducted an evidentiary hearing on Aearo's request for a preliminary injunction on August 15-17, 2022 (the "PI Hearing").[2] Having fully considered the submissions by the parties and the arguments and evidence presented to the Court at the PI Hearing, and for the reasons stated below, the Court hereby DENIES Aearo's request for a preliminary injunction and declaratory relief.

## Venue and Jurisdiction

Except as noted herein, the Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b) as well as the Standing Order of Reference by United States District Court for the Southern District of Indiana dated

---

[2] The Court conducted a hearing on Aearo's request for a temporary restraining order on July 27, 2022. At that hearing, the Court neither granted nor denied the request. Rather, the matter was resolved, at least to some extent, by a limited three-week "pause" of the subject litigation pending a hearing on Aearo's request for a preliminary injunction.

July 11, 1984.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Factual and Procedural Background

On July 26, 2022, Aearo Technologies LLC and six related entities[3] (together, the "Aearo Entities" or "Aearo") filed voluntary petitions for chapter 11 relief (the "Petition Date").  The cases are being jointly administered under Case No. 22-2890.  The Aearo Entities are operating as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

### Aearo and 3M

The Aearo Entities are headquartered in, and have operated out of, Indianapolis in one form or another for over forty years.  They are, with one exception, limited liability companies and are each incorporated under the laws of Delaware.  Aearo currently manufactures and sells custom noise, vibration, thermal, and shock protection, primarily serving the aerospace, commercial vehicle, heavy equipment, and electronics industries.  Aearo had $108 million in direct sales in 2021.  Approximately 330 employees work directly for the Aearo Entities.

In the late 1990s Aearo designed a product called the Combat Arms earplug.  After noise reduction rating testing in 1999 and 2000, Aearo began selling Combat Arms earplugs in 2000.  Aearo eventually designed and manufactured an earplug sold to the United States military under the name Combat Arms Earplug Version 2

---

[3]  The related entities are:  Aearo LLC, Aearo Intermediate LLC, Aearo Holding, LLC, Aearo Mexico Holding Corp., Cabot Safety Intermediate LLC, and 3M Occupational Safety LLC.

(the "CAEv2") and to civilian consumers under the name Arc Plug (the CAEv2 and Arc Plug, collectively, the "CAEv2").

3M is a multinational technology and manufacturing company that develops products across a wide range of markets including pharmaceuticals, chemicals, digital imaging and sound technology, office supply and consumer goods. 3M is incorporated under the laws of Delaware and headquartered in St. Paul, Minnesota. 3M is a large, profitable company, boasting $35 billion in net sales in 2021.

3M acquired the Aearo Entities in April of 2008 through a stock purchase for approximately $1.2 billion. For the first two years following the acquisition, Aearo's business remained separate from 3M. This changed in 2010, as Aearo transferred its Head, Eye, Ear, Hearing and Face Safety business, including the CAEv2 business, to 3M (the "Upstream"). The Upstream generated a receivable on Aearo's books of approximately $965 million that remains unpaid and for which Aearo has made no demand. After the Upstream, 3M continued to manufacture, market and sell the CAEv2 until 2015.[4] Approximately 80% of all sales relating to the CAEv2 occurred prior to the Upstream. It is unclear whether 3M assumed any liabilities from Aearo relating to the Upstream or if such liabilities remained with Aearo.

Aearo became much more integrated into 3M after the Upstream, relinquishing many functions to 3M. Pursuant to a Shared Services Agreement (the "SSA"), 3M agreed to provide, among other things, legal, accounting and insurance

---

[4] There were less than $100 in CAEv2 sales in 2016.

services to Aearo in exchange for a fee. 3M has not charged Aearo for services under the SSA since 2016.

In 2016, relators filed a *qui tam* action styled as *United States ex rel. Moldex-Metric, Inc. v. 3M Company*, Case No. 1601533. The action was dismissed by stipulation in July of 2018, following execution of a settlement agreement and 3M's payment of $9,100,000 to the United States thereunder. Shortly thereafter, servicemembers began to file lawsuits against 3M and/or Aearo alleging defects and injuries related to their use of the CAEv2.

<u>The MDL</u>

On April 3, 2019, approximately 700 CAEv2 lawsuits were consolidated into multidistrict litigation (the "MDL") before the Honorable M. Casey Rodgers in the United States District Court for the Northern District of Florida (the "MDL Court"). The Aearo Plaintiffs and 3M are co-defendants in the MDL and in approximately 2000 lawsuits pending in the state courts of Minnesota (the MDL and Minnesota actions, collectively, the "Pending Actions"). The Court notes that most, though not all, of the claims filed in the Pending Actions assert that 3M and Aearo are jointly and severally liable. Some of the claims, however, have been asserted against only 3M.

To say that the MDL is large is an understatement of epic proportions. According to a July 15, 2022 statistical report of the United States Judicial Panel on Multidistrict Litigation, the MDL had grown to include more than 290,000 claims, down from a high of over 308,000 claims. It is the largest MDL in history by an

order of magnitude and represents a staggering 30% of cases currently pending in the federal district courts.

The Pending Actions allege that the CAEv2 hearing protection devices manufactured, distributed and sold by the Aearo Entities and/or 3M were defective, resulting in hearing loss and related hearing defects. The purported design flaws at issue in the Pending Actions allegedly date to a period prior to 3M's acquisition of Aearo.

As part of the MDL process, 27 claimants were designated as "bellwethers." Of that group, eight plaintiffs' claims were dismissed prior to trial. As to the remaining plaintiffs, the parties have participated in 16 trials. Ten of the bellwether trials resulted in verdicts for 12 claimants, and the remaining six resulted in verdicts in favor of 3M and Aearo. The verdicts, each of which imposed joint and several liability against 3M and Aearo, ranged from $1.7 million to $77.5 million. Appeals are pending in five of the bellwether cases, and to date, no payment has been made to any of the plaintiffs who have obtained a verdict in their favor. Attempts to negotiate a settlement in the MDL have, to date, failed.

The MDL Court has selected several "waves" of cases, approximately 500 at a time, to engage in active discovery. Three such waves have been created to date which, after accounting for voluntary dismissals, include approximately 1,200 cases in active discovery. It is the Court's understanding that the MDL Court is poised to remand for trial some or all of those 1,200 cases to the district courts from which they originated.

As to the Pending Actions asserted in state court, the first of the bellwether trials is scheduled to begin on August 29, 2022, with four additional trial dates selected for 2023 and 2024. Thirty additional bellwether state cases are in various phases of discovery in preparation for trials scheduled within the next two years.

<u>The Funding Agreement</u>

Beginning in March 2022, 3M began exploring strategic alternatives to the MDL. Among those alternatives was a chapter 11 bankruptcy for the Aearo Entities. 3M appointed two disinterested directors to Aearo's Board of Directors: Jeffrey Stein and Roger Meltzer (the "Independent Directors"). The Independent Directors were tasked with negotiating the terms under which 3M would fund a chapter 11 bankruptcy as well as a claims trust for the CAEv2 claims and certain "respirator claims" (the "Respirator Claims") that are also the subject of litigation involving both 3M and Aearo but which are not the subject of the instant proceeding. A draft funding agreement—circulated by Kirkland & Ellis, proposed bankruptcy counsel for the Aearo Entities—became the framework for negotiations between 3M and the Independent Directors.

Stein testified that the negotiations among 3M and the Independent Directors were "vigorous." Hyperbole aside, Aearo did obtain several significant concessions from 3M. Pertinent to our discussion here, early versions of a funding agreement contained the following provisions:

- No funded trust for CAEv2 claims or Respirator Claims outside of a chapter 11 plan;

- Aearo Entities indemnification of 3M with no funding obligation from 3M;

- Any funding requests to be conditioned on an extension of the stay of the Pending Actions to 3M;

- Each funding request required to include an officer certification, detailed narrative, documentation, and assurances regarding use;

- Inclusion of several events of default, including conversion or dismissal of the bankruptcy case as well as if the bankruptcy court declined to extend the stay or grant a restraining order in favor of 3M; and

- Termination as a remedy for an event of default.

Aearo, through the Independent Directors, pushed back on these points, as well as asking 3M to collateralize its funding commitment and maintain its credit ratings.

Negotiations continued, and 3M's initial ask on the terms highlighted above were modified as set forth below:

- 3M made a commitment of $1.24 billion, including $240 million for funding a chapter 11 case and a trust of $1 billion for CAEv2 claims and Respirator Claims, the commitment being uncapped and funded inside or outside of bankruptcy;

- Aearo would indemnify 3M but not assume liabilities, paragraph added to funding agreement where a "Permitted Funding Use" would be for 3M to pay any liability of the Aearo Entities to 3M, including indemnification obligations;

- Funding not conditioned on extension of the stay or any other requests; Aearo must only abide by a budget;

- Events of default no longer include extension of the automatic stay, conversion or dismissal; 3M does not have right to terminate agreement; and

- No financial conditions on 3M other than 3M to use commercially reasonable efforts to maintain credit rating.

These changes were presented to the Aearo Board on July 23, 2022, at which the time the Board resolved to execute the funding agreement. The Independent Directors advised that Aearo "[s]hould not take the risk Bankruptcy Court declines to extend the automatic stay, or other bankruptcy [events of default], leaving the Aearo Entities marooned in chapter 11 proceeding without funding."

3M and the Aearo Entities executed a final funding agreement on July 25, 2022 (the "Funding Agreement"). Per the Funding Agreement's Recitals, 3M has committed to "satisfy all of the respective Aearo Entities' Liabilities specified herein on the terms set forth herein, such that each of the respective Aearo Entities will have assets with a value greater than its Liabilities and will have the financial capacity to satisfy its obligations as they become due in the ordinary course of its business . . . ." An initial $1 billion was committed to fund a trust to compensate allowed CAEv2 claims and Respirator Claims, as well as $240 million to fund the chapter 11 cases.

In exchange for this commitment, Aearo has agreed to indemnify 3M and its non-debtor affiliates for liabilities related to the CAE2v and Respirator Claims. 3M's commitment under the Funding Agreement, both as to the chapter 11 case expenses and the trust, is on an uncapped basis. The Funding Agreement is not a loan, as it does not impose any real repayment obligations on Aearo.

The Court needs to pause a moment and explain why it used the phrase "real repayment obligations." Section 2(d) of the Funding Agreement States:

> <u>No Requirement of Repayment</u>. For the avoidance of doubt, the Aearo Entities shall not be required to return or repay any Payment, in

9

whole or in part, except to the extent any Payment is used to satisfy the Aearo Entities' obligations under Section 3.

Section 3 of the Funding Agreement contains the Aearo Entities' indemnification of any 3M liability relating to the CAEv2 claims and the Respirator Claims. This language initially gave the Court pause, as it seems to say there is a repayment obligation as to the indemnity. But § 2(c) of the Funding Agreement—the section referenced in the recap of the Funding Agreement negotiations—provides that a Permitted Funding Use includes a request "to pay Liabilities of an Aearo Entity owed by [3M], including any indemnification or obligation of any Aearo Entity under Section 3."

A plain reading of the Funding Agreement is that Aearo must repay any indemnity obligation to 3M, but may do so by asking 3M for the money to do so. The net effect to Aearo is zero.[5] But if we assume, for the purposes of this opinion, that the language of the Funding Agreement is ambiguous, the Court resolves that ambiguity in favor of Aearo. Aearo's Board approved the Funding Agreement after being told, via a Power Point slide deck presentation, of the negotiated change that Aearo could pay any indemnity obligation to 3M by making a funding request to 3M. Aearo provided no evidence or testimony that there was a repayment obligation under the Funding Request. Furthermore, counsel for 3M went on record at the July 27, 2022, hearing when posed with questions about what payments under Aearo's first day motions might create a claim by 3M against Aearo:

---

[5] One might call this circular. In fact, more than one does call it such as discussed later.

10

> This was something that we discussed in connection with the funding agreement and 3M's agreements to provide shared services during the cases. 3M Company will not be seeking any type of claim or any reimbursement from the debtors during the cases on account of any of the payments it makes pursuant to the funding agreement. So that applies across the various relief requested in all of the first day motions.

Transcript of Miscellaneous Motions by Plaintiffs/Debtors, July 27, 2022 P.M. Session, at 24, lines 6-12 (Docket No. 43).

Given the conduct and statements of Aearo and 3M before the Court and in negotiations of the Funding Agreement, the Court finds that if there is a repayment obligation "ado" under § 3 of the Funding Agreement, § 2(c) makes it much ado about nothing. We now return to the discussion of the Funding Agreement as a whole.

The Funding Agreement is not without condition, however. 3M is obligated to pay Aearo's Chapter 11 administrative expenses and indemnification obligations only after Aearo has exhausted its own assets, including cash reserves and all available insurance.[6] Significantly, 3M's obligations under the Funding Agreement are not conditioned on Aearo seeking or obtaining a stay of the Pending Litigation at to 3M.

The Independent Directors reviewed 3M's finances and concluded that 3M will be able to fund the payments provided for under the Funding Agreement. 3M's

---

[6]   The Funding Agreement provides that the Aearo Entities must exhaust all of their assets before 3M's funding commitment is triggered. At the PI Hearing, Aearo focused only on its obligation to use its cash reserves and available insurance under the Funding Agreement and did not address whether there are other assets—i.e., physical assets—that might need to be liquidated prior to funding or whether the liquidation of such assets, if any, would impact Aearo's estate or ability to reorganize.

11

most recent SEC filings show it to be strong financially with no going concern warnings. Specifically, Stein testified that he was confident of 3M's financial wherewithal and believed that the Funding Agreement provided a "clear path" to restructuring the Aearo Entities even absent a stay of the Pending Actions.

<u>Insurance</u>

3M manages two insurance programs that might cover the CAEv2 claims: the "3M Tower" and the "Aearo Legacy" programs. The 3M Tower provides $1.05 billion in coverage for claims made during the applicable policy period of March 1, 2018, to March 1, 2019. 3M pays the premiums related to, and is the primary insured under, the 3M Tower; however, Aearo is named as an additional insured under the 3M Tower. On June 28, 2019, 3M provided notice to its insurers of the CAEv2 claims, and these are the only claims for which notice has been given. The 3M Tower coverage is otherwise fully available and free of any other demands.

The Aearo Legacy provides $550 million in coverage. The policies were paid for by Aearo and existed prior to 3M's purchase of Aearo in 2008. The coverage provided by the policies covers "occurrences" during the years 1997 to 2008. Aearo is the named insured. On June 28, 2019, 3M provided notice to the insurers in the Aearo Legacy program of the CAEv2 claims.

The only payments made, to date, by any insurer have come from an Aearo Legacy insurer. Liberty Mutual Insurance Company issued four checks of $1,000,000 each to 3M and the Aearo Entities. Liberty Mutual issued these checks on February 17, 2002, as partial payment to 3M of a verdict issued in the MDL. 3M

12

has not resolved certain issues related to Liberty Mutual's coverage and, thus, has not negotiated the checks. The checks currently sit in 3M's vault.

Procedural Posture

On the Petition Date, Aearo filed its *Complaint for Declaratory and Injunctive Relief (I) Confirming that the Automatic Stay Applies to Certain Actions against a Non-Debtor; (II) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (III) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction Motion* (the "Complaint"), along with the PI Motion, against "those Parties listed on Appendix to the Complaint," *i.e.*, the named plaintiffs in the Pending Actions, as well as any party who holds, or may seek to hold, Aearo and/or 3M liable for injury related to the CAEv2 (the "Stay Defendants").

The Complaint, coupled with the PI Motion, seek to stay the Pending Actions as to 3M and its affiliates. More specifically, Aearo insists that the automatic stay imposed by § 362(a) of the Bankruptcy Code prohibits further prosecution of the Pending Actions against not just Aearo, but also 3M. Per the PI Motion, Aearo essentially makes three arguments: (1) that the Stay Defendants have asserted claims of joint and several liability against 3M and Aearo, essentially treating them as a single entity, such that a judgment against 3M is effectively a judgment against Aearo; (2) 3M and Aearo are co-insured under shared insurance policies, the proceeds of which may be depleted if the Pending Actions are not stayed as to 3M; and (3) Aearo is obligated to indemnify 3M and its non-debtor affiliates for any losses related to the CAEv2 claims. For essentially these same reasons, Aearo

13

alternatively asks the Court to exercise its authority under § 105(a) of the Bankruptcy Code to enjoin the Pending Actions as to 3M.

Various of the firms who represent the Stay Defendants in the Pending Actions (collectively, the "Objecting Parties"),[7] have appeared in this proceeding—either on their own behalf or on behalf of their Stay Defendant clients. They, along with the UST, have objected to the PI Motion. While no committee of the firms or the Stay Defendants themselves has yet been formed[8] in the bankruptcy case itself (and, as such, they do not formally speak with one voice), the Objecting Parties do, as a group, oppose Aearo's requested relief. And while the Objecting Parties concede that the Court generally has the power to enjoin non-debtor parties, at least pursuant to § 105(a) of the Bankruptcy Code, they vehemently insist that the facts and equities here do not warrant such extraordinary relief.

## Discussion and Decision

At the outset of its discussion, the Court wishes to make clear what this decision is *not* about. Much has been written and said about the MDL and the MDL process as overseen by Judge Rodgers. But this Court's decision is not a referendum on the MDL or Judge Rodgers' administration thereof. This Court is neither authorized nor inclined to address or review Judge Rodgers' handling of the MDL or

---

[7]  The Objecting Parties include: The Bailey Glasser and Pulaski Kherkher Plaintiffs; the Adkins, Wilkerson & Vaughn Plaintiffs; the Heninger Garrison Davis, LLC Plaintiffs; The Gori Law Firm, P.C. Plaintiffs; the Cory Watson, P.C. Plaintiffs; and Charles Rataj, along with the law firms of Paul, LLP, Keller Postman LLC; Aylstock, Witkin Kreis & Overholtz, PLLC; Seeger Weiss LLP; Clark, Love & Hutson, PLLC; Tracey Fox King & Walters; The Johnson Law Group; Weitz & Luxenberg, P.C.; and Quinn Emanuel, Urquart & Sullivan, LLP.

[8]  The UST's objection is largely based on the fact that no committee has yet been formed.

14

her rulings. The Court is similarly not authorized or inclined to review or opine on the results of the bellwether trials or on the evidence or argument presented therein.

This is also not a debate as to the relative merits or demerits of the MDL and bankruptcy processes. Both are merely tools, engineered by Congress, for the adjudication and resolution of claims. Neither is perfect and each present both risk and reward for all of the various constituencies. There has been some suggestion that the bankruptcy process is the *only* avenue by which the claimants may globally settle the Claims. But this is not so. Multidistrict litigation, through the bellwether process, is itself designed to "enhance and accelerate both the [litigation process itself and the global resolutions that often emerge from that process." ELDON E. FALLON ET. AL., *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2337 (2008)." *See also, In re E. I. Du Pont De Nemours*, 204 F. Supp. 3d 962 (S.D. Ohio 2016) (discussion bellwether process and its value in encouraging settlement). The fact that the bellwether trials conducted in the MDL have not yet yielded a global settlement does not mean that the MDL itself is broken.

That said, the Court also takes issue with the suggestions made by the Objecting Parties throughout this proceeding that the bankruptcy process necessarily deprives the Stay Defendants of their Constitutional right to a jury trial before an Article III judge. Even in bankruptcy that right is preserved. *See* 28 U.S.C. § 157(b)(5). It is accurate to say, however, that most mass tort claims in a bankruptcy are resolved not through jury trials before a district court, but by

15

consensual resolution through a plan of reorganization, often through a trust mechanism akin to § 524(g) of the Bankruptcy Code. But it is also accurate to say that it is unlikely that all of the 290,000 Stay Defendants will have a jury trial in the MDL if the Pending Actions are not stayed.

Finally, the Court emphasizes that this Order is not a decision as to whether the Aearo Entities' bankruptcy petitions were filed in good faith. No party has, at least to date, moved for dismissal, and the Court expresses no opinion as to the various suggestions made by the Objecting Parties that Aearo sought bankruptcy protection for an improper purpose or with "unclean hands," as those issues are not squarely before the Court. Nor does the Court express any opinion, more generally, as to the propriety of the various devices used here and in other jurisdictions— including the much-maligned "Texas Two-Step"—by entities facing mass tort liability. Again, those issues are not squarely before the Court.

In response to charges made within the MDL that 3M is acting in bad faith in seeking a stay,[9] Judge Rodgers has indicated that she believes that Aearo is a defendant in the Pending Actions "in name only," stating that Aearo has had no meaningful role or identity in the MDL. Certainly, the Court does not question Judge Rodgers' prerogative to reach that conclusion *within the context of the MDL*. But this Court, at present, has a necessarily different vantage point. Pending before this Court are bankruptcy petitions and a related adversary proceeding filed by companies currently (and historically) operating in Indiana. The Aearo Entities

---

[9] The Court emphasizes that 3M itself did not seek an extension of the stay and is not a party to this proceeding.

16

are named as defendants in most, if not nearly all, of the Pending Actions for their role in designing, manufacturing and selling the CAEv2 both prior to and after their purchase by 3M.  The Stay Defendants presumably have claims against Aearo as that term is defined by § 101(5) of the Bankruptcy Code.  Positions 3M and/or Aearo may have taken in the MDL do not alter this Court's view that the Aearo Entities, at least for purposes of the PI Motion, are appropriate debtors with cognizable liabilities under the Bankruptcy Code and that this Court has jurisdiction to at least consider whether an injunction of the Pending Actions as to 3M is necessary or appropriate.  The positions or courses of conduct allegedly taken by any of the parties to the Pending Actions to the contrary are not relevant to this Court's inquiry here.

With that out of the way, the Court moves onto what this matter *is* about— whether the Pending Actions are, or should be stayed, as to 3M under the relevant provisions of the United States Bankruptcy Code, Title 28 of the United States Code, and controlling decisional law in light of the facts and evidence properly before the Court.

### 11 U.S.C. § 362(a)

When a bankruptcy petition is filed, the stay provisions of § 362(a) automatically take effect and pre-petition creditors are prohibited from taking certain actions to collect their debts. See 11 U.S.C. § 362; *In re Vitreous Steel Prod. Co.*, 911 F.2d 1223, 1231 (7th Cir.1990). The automatic stay is self-executing, effective upon filing of the bankruptcy petition. *In re Gruntz*, 202 F.3d 1074, 1081

(9th Cir.2000). "The automatic stay is indeed a powerful tool of the bankruptcy courts" designed to "'protect the debtor from an uncontrollable scramble for its assets in different courts. . . . '" *Fox Valley Constr. Workers Fringe Benefit Funds v. Pride of the Fox Masonry and Expert Restorations*, 140 F.3d 661, 666 (7th Cir.1998) (quoting *A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.)*, 788 F.2d 994, 998 (4th Cir.1986)).

The purpose of the automatic stay is "'to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'" *In re Rexene Prod. Co.,* 141 B.R. 574, 576 (Bankr. D. Del. 1992) (quoting *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3rd Cir. 1991)). The stay preserves what remains of the debtor's estate and "provide[s] a systematic equitable liquidation procedure for all creditors, secured as well as unsecured . . . thereby preventing a 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'" *Holtkamp v. Littlefield (In re Holtkamp)*, 669 F.2d 505, 508 (7th Cir. 1982) (quoting *In re Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y. 1981)).

Here, Aearo argues that the Pending Actions are, or should be, stayed under both §§ 362(a)(1) and (a)(3) of the Bankruptcy Code as the Pending Actions relate to 3M. Those sections provide a stay immediately upon the filing of a bankruptcy petition as to:

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title;

\* \* \* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a). The Court will answer these questions in the order they were received and address first whether § 362(a)(1) has any direct applicability—at least within governing Seventh Circuit law—to non-debtors.  As explained below, the Court must conclude that it does not.

### 11 U.S.C. § 362(a)(1)

Section 362(a)(1), while broad, generally protects only the debtor, not non-bankrupt co-debtors like 3M. *Pitts v. Unarco Indus., Inc.*, 698 F.2d 313, 314 (7th Cir. 1983) ("The clear language of Section 362(a)(1) thus extends the automatic stay provision only to the debtor filing bankruptcy proceedings and not to non-bankrupt co-defendants."); *Lee v. RCN Corp.*, No. 03 C 5866, 2004 WL 2108577, at *1 (N.D. Ill. Sept. 20, 2004) (§ 362 is intended to protect the assets of the debtor for the benefit of creditors and is "not designed to afford collateral benefits to non-debtor parties involved in litigation with the debtor as party defendants or as co-defendants."). This section "does not prevent actions against non-debtor obligors, debtor's sureties or guarantors.  It does not protect separate legal entities, corporations, partnerships or non-debtor co-defendants in pending litigation." *In re Lengacher*, 485 B.R. 380, 383 (Bankr. N.D. Ind. 2012); *see also In re White*, 415 B.R.

696, 698 (Bankr. N.D. Ill. 2009) ("Generally, the automatic stay protects the bankruptcy debtor and does not bar suits against third parties, such as non-debtor entities, even when wholly owned by the debtor, or the debtor's insurers, guarantors, and sureties.").

Based on the foregoing authority and the plain language of the Bankruptcy Code, the Court is reluctant to conclude that § 362(a)(1), standing alone, offers sufficient statutory authority to conclude that the Pending Actions are stayed automatically as to 3M or to extend the protections of the stay to 3M.

Admittedly, there is ample case law holding otherwise. Most significantly, the Fourth Circuit, in two opinions issued in the context of the *A.H. Robins Co.* bankruptcy case, held that a bankruptcy court has multiple statutory bases for extending the stay to a non-debtor party, including directly under § 362(a)(1). *See A.H. Robins*, 788 F.2d at 1001-1003, and *A.H. Robins Co., Inc. v. Aetna (In re A.H. Robins Co., Inc.),* 828 F.2d 1023-24 (4th Cir. 1987).

In particular, the Fourth Circuit identified two exceptions to the general rule that § 362(a)(1) does not apply to non-debtor parties: (1) where there is such identity between the debtor and third-party defendant where a judgment against the third-party defendant will in effect be a judgment against the debtor, and (2) where the pending litigation, though not brought against the debtor, would cause the debtor irreparable harm. *A.H. Robins*, 788 F.2d at 999. Application of these exceptions is rare and reserved for "unusual circumstances." *Id.*

20

But while the Seventh Circuit, and other courts within the Circuit, have cited *A.H. Robins* and the above exceptions to § 362(a)(1)'s seemingly plain language, the Circuit has not, to date, expansively discussed or formally adopted *A.H. Robins* in this regard.  *See Harley-Davidson Credit Corp. v. JHD Holdings, Inc.*, 19-cv-155jdp, 2020 WL 7078828 at *1 (W.D. Wis. Dec. 3, 2020) *and In re Caesars Entm't Operating Co.*, 540 B.R. 637, 643 n.8 (Bankr. N.D. Ill. 2015).  Nor has the Circuit actually extended the stay to a non-debtor party under that reasoning.  As observed recently by the district court in *Edelson, PC v. Girardi*, No. 20 C 7115, 2021 WL 3033616 (N.D. Ill. July 19, 2021):

> The Seventh Circuit has not yet had the opportunity to consider the correct process for invoking an exception to the general rule regarding the applicability of section 362(a)(1). That is because in the handful of times the Seventh Circuit has considered *A.H. Robins* or other exceptions to section 362(a)(1), it has found that the non-debtor does not qualify for the exceptions.  *See Harley-Davidson Credit Corp. v. JHD Holdings Inc.*, No. 19-CV-155-JDP, 2020 WL 7078828, at *1 (W.D. Wis. Dec. 3, 2020); *Fernstrom*, 938 F.2d at 736 (deciding non-debtor did fit within *A.H. Robins'* exception; *Fox Valley*, 140 F.3d at 666 (rejecting attorney's argument that the automatic stay deprived the district court of jurisdiction to sanction him).

*Id.* at *14.

The bankruptcy court in *In re LTL Mgmt. LLC*, 638 B.R. 291, 299-301 (Bankr. N.J. 2022), recently grappled with this same issue under similar facts—having been asked to extend the stay to enjoin certain mass tort litigation as to non-debtor parties. While the *LTL* court ultimately applied *A.H. Robins*' more expansive view of a bankruptcy Court's power to "extend the stay" to non-debtor parties directly under § 362(a)(1), the court

nevertheless acknowledged that "many courts have used some iteration of the phrases "extension of the stay" and "injunctive relief" interchangeably when discussing whether to permit actions against nondebtor third parties to proceed," while other courts have cited only to § 105. *Id*. at 300. *See also*, *Girardi*, 2021 WL 3033616 at *2 ("'It should be noted that . . . extensions [of section 362(a)(1)] to non-debtors, although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court after hearing and the establishment of unusual need to take this action [under § 105] to protect the administration of the bankruptcy estate.'") (quoting *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993)).

Without more explicit guidance from the Seventh Circuit, the Court declines Aearo's invitation to extend § 362(a)(1) to 3M and instead frames its analysis pursuant to the Court's authority to issue injunctive relief under § 105(a) of the Bankruptcy Code.

<u>11 U.S.C. § 362(a)(3)</u>

Whereas § 362(a)(1) extends only to a debtor, § 362(a)(3) extends to property of the estate. Specifically, § 362(a)(3) operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The scope of § 363(a)(3) is, therefore, broader than just the debtor. *See Nat'l Tax Credit Partners v. Havlik*, 20 F.3d 705, 708 (7th Cir. 1994) (§ 362(a)(3) "reaches farther, encompassing every effort to 'exercise control over property of the estate.'"). Aearo argues that this broader scope includes

22

the Pending Actions against 3M.  If that is the case, the Pending Actions were automatically stayed by § 362(a)(3) as of the Petition Date, obviating the need for an injunctive relief.  All Aearo needs is a declaration that the automatic stay applies to the Pending Actions. The Objecting Parties, not surprisingly, disagree.  So does the Court.

The Fourth Circuit's *A.H. Robins* decision again looms large in this analysis, as that court held that § 362(a)(3) is one of "four independent grounds on which it could stay the plaintiff's suit against [the nondebtor third party]." *A.H. Robins.*, 828 F.2d at 1024 (the other three being §§ 362(a)(1) and § 105(a) of the Bankruptcy Code and a court's inherent powers under 28 U.S.C. § 1334); *LTL Mgmt.* 638 B.R. at 300-01.  And the Court agrees with this conclusion to the extent that the non-debtor third party seeks to exercise control over property of a debtor's estate given the plain language of the Bankruptcy Code and the Seventh Circuit's pronouncement in *Havlik*.

Whether § 362(a)(3) stays an action is a two-step inquiry.  First, a court must determine whether property of the estate is at issue; second, a court must determine whether the action in question constitutes an action to obtain possession of, or exercise control over, the property in question.  *See, e.g., In re Klarchek*, 508 B.R. 386, 395 (Bankr. N.D. Ill. 2014); *see also In re Lee*, 524 B.R. 798 (Bankr. S.D. Ind. 2014).

Aearo asserts the property at issue here are its insurance policies, both the Aearo Legacy and the 3M Tower.  This assertion is in line with Seventh Circuit

caselaw, which has held that "[a]s a general matter, insurance contracts in which the debtor has an interest at the time the petition is filed constitute property of the estate for the purposes of § 541(a) [of the Bankruptcy Code]." *In re Stinnett*, 465 F.3d 309, 312 (7th Cir. 2006). But that is in the general. As to the specific, the analysis hinges on whether a payment will inure to the debtor's pecuniary benefit. *Id.* at 313.[10] The Court will assume, for the purposes of this opinion, that the Aearo Legacy and 3M Tower insurance policies are property of the estate.

Having made this assumption, the Court turns to the second prong of the § 362(a)(3) analysis and whether the Pending Actions are an effort to exercise control over property of the estate. There is no evidence that the Stay Defendants are proceeding directly against the insurance policies. And 3M has taken no action against the insurance policies other than to put insurers on notice of the Pending Actions, although it apparently will seek reimbursement from the policies to the extent that judgements are entered against it and Aearo in the Pending Actions. So, there currently are no direct efforts to exercise control over property of the estate, a factor found in many of the cases staying nondebtor actions against property of the debtor pursuant to § 362(a)(3). *See Girardi*, 2021 WL 3033616 at * 16 (staying imposition of constructive trust over payments to debtor); *Klarchek*, 508 B.R. at 397 (staying dissolution of trust intended to interfere with possible claims by chapter 7 trustee) and *Lee*, 524 B.R. at 804 (staying termination of membership interests and voting rights).

---

[10] The Seventh Circuit's repeated focus on the pecuniary effect to the estate will be a recurring theme throughout this opinion.

24

But *Havlik* teaches that § 362(a)(3) encompasses "every effort to 'exercise control over property of the estate'", not just direct efforts. *Havlik*, 20 F.3d at 708. It follows, then, that indirect efforts may also fall under § 362(a)(3)'s stay. But what constitutes an indirect effort? How far can § 362(a)(3) extend? Contract rights are property of the estate[11], so can a debtor stop suits by a third party against the contractual counter-party?

Fortunately, the Court does not have to go down this parade of horribles. At the heart of the Seventh Circuit's analysis under § 362(a)(3) is whether a third party's effort has a pecuniary effect on the estate. Let us start with *Havlik*, the seminal 362(a)(3) case from the Seventh Circuit. Rather than veering off into the esoteric, the Seventh Circuit plainly states that "[t]his case is all about how much money will come into the debtor's coffers." *Id.*, 20 F.3d at 709. Other courts in the Seventh Circuit have acknowledged the same. *See Stinnett*, 465 F.3d at 313 (overriding question is whether a payment will inure to the debtor's pecuniary benefit); *Klarchek*, 508 B.R. at 397 (court looked to see if the action may have a potential adverse impact on the property of the estate); and *In re Gatke Corp.*, 117 B.R. 406, 410 (Bankr. N.D. Ind. 1989) (staying action against insurance policies where there was a threat of inequitable distribution of insurance proceeds to asbestos claimants).

Distilled to that essence, the Court finds that the Pending Actions are not stayed by § 362(a)(3) because, ultimately, 3M will fully fund any liability incurred

---

[11] *See Klarchek*, 508 B.R. at 395.

by Aearo relating to the Pending Actions pursuant to the Funding Agreement.
Granted, the Funding Agreement requires Aearo to seek recovery under the Aearo
Legacy insurance policies—and possibly the 3M Tower as well—prior to seeking
payment under the Funding Agreement.  However, there is no threat of inequitable
distribution of insurance proceeds here as the Funding Agreement operates as a
complete, uncapped backstop to the insurance policies.  So tapping the insurance
policies to cover any liability incurred in the Pending Actions does not affect the
amount of money Aearo can pay its creditors because the Funding Agreement
covers all claims arising from the Pending Actions in the absence or exhaustion of
the applicable insurance.

## 11 U.S.C. § 105(a)

That leaves Aearo's argument that the Court should enjoin the Pending
Actions pursuant to § 105(a) of the Bankruptcy Code.  Under that section,
bankruptcy courts have the express authority "to issue any order, process or
judgment that is necessary or appropriate to carry out the provisions of this title."
11 U.S.C. § 105(a); *see also, In re Caesars Entm't. Operating Co.*, 808 F.3d 1186,
1188 (7th Cir. 2015).  "Though § 105(a) does not give the bankruptcy court *carte
blanche*—the Court cannot, for example, take an action prohibited by another
provision of the Bankruptcy Code—it grants extensive equitable powers that
bankruptcy courts need in order to be able to perform their statutory duties."  *Id.*
The authority to "stay actions in other courts extends beyond claims by and against
the debtor, to include "suits to which the debtor need not be a party but which may

affect the amount of property in the bankrupt estate," *Zerand–Berna Grp., Inc.,* 23
F.3d 159, 161–62 (7th Ct. 1994), or "the allocation of property among creditors." *In re
Mem'l Estates, Inc.*, 950 F.2d 1364, 1368 (7th Cir.1992) (7th Cir.), *cert. denied*, 504
U.S. 986 (1992).

The burden is on the movant—here the Aearo Plaintiffs—to clearly establish
by a preponderance of the evidence the necessity for injunctive relief.  *See In re
Gathering Rest., Inc.*, 79 B.R. 992, 1000 (Bankr. N.D. Ind. 1986) (citations omitted).
"This will ordinarily require convincing evidence of an adverse impact on the
debtor's estate which seriously threatens the debtor's ability to formulate and carry
out a plan of reorganization." *Id.* (quoting *In re Arrow Huss, Inc.*, 51 B.R. 853, 859
(Bankr. D. Utah 1985).

"Section 105, however, is merely a vehicle to carry out the otherwise provided
powers of the bankruptcy court [and] [m]ay not be used to create new law."  *In re
Sybaris Clubs Inter., Inc.*, 189 B.R. 152, 155 (Bankr. N.D. Ill. 1995) (citing *In re
Lloyd*, 37 F.3d 271, 275 (7th Cir. 1994)).  To that end, then, a proper exercise of the
Court's authority to issue an injunction under § 105 first necessitates a finding by
the Court that the matter Aearo seeks to enjoin—the Pending Actions as they relate
to 3M—falls within the Court's jurisdiction.  *See Celotex Corp. v. Edwards*, 514 U.S.
300, 307 (1995).  "It is the relation of dispute to estate, and not of party to estate,
that establishes jurisdiction," *Feld v. Zale Corp. (In re Zale Corp)*, 62 F.3d 746 (5th
Cir. 1995) (citing *Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics)*, 813, F.2d 127
(7th Cir. 1987)).  *See also Dore v. Assoc.'s Contracting, Inc. v. American Druggist Ins.*

*Co.,* 54 B.R. 353, 357 (Bankr. W.D. Wis. 1985) ("Two separate inquiries need to be undertaken before the bankruptcy court may issue a preliminary injunction pursuant to § 105(a): The first inquiry is jurisdictional and the second inquiry is the appropriateness of the injunction . . . .").

<u>Jurisdiction</u>

The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute.  Section 1334(b) of Title 28 provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." The district courts may, in turn, refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district."  Proceedings "arising in" the Bankruptcy Code are those that concern a matter exclusive to bankruptcy law and practice.  *Bush v. U.S.*, 939 F.3d 839, 844 (7th Cir. 2019).  Similarly, proceedings "arising under" the Bankruptcy Code are those that present a substantive question of bankruptcy law.  *Id.*  Finally, proceedings "related to" the Bankruptcy Code are those that have a potential effect on other creditors.  *Id.* at 844-46.

Here, the parties agree that the Court should focus its § 105 analysis on the Court's "related to" jurisdiction.  The Court agrees.[12]  As the court in *Zerand-Bernal*

---

[12]    The Court notes that there is at least some argument to be made that it has "arising under" jurisdiction to issue an injunction under § 105.  *See In re Caesars Entm't Operating Co, Inc.*, 533 B.R. 714 (Bankr. N.D. Ill. 2015) ("[A] claim to enjoin civil actions in other courts [] is created by § 105(a) of the Code" and, thus, can be said to "arise under" the Bankruptcy Code).  While the Seventh Circuit did not expressly reject that statement in reversing the bankruptcy court on appeal, the Court emphasized (literally) that the

28

instructs, "related to" jurisdiction is "primarily intended to encompass tort, contract, and other legal claims by and against the debtor, claims that, were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that § 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum." *Zerand–Bernal*, 23 F.3d at 161 (citation omitted). *See also Fisher v. Apostalou*, 155 F.3d 876, 882 (7th Cir. 1998). Taken one step further, it would seem that claims asserted against a joint-tortfeasor of the debtor are subject to this same logic.

Many courts recognize that an indirect effect upon the estate might be sufficient to confer jurisdiction under an interpretation of § 1334(b)'s "related to" jurisdiction adopted by many circuits. That sweeping standard requires only that the outcome of the proceeding "could conceivably have any effect" upon the bankruptcy estate. *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984); *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991); *A.H. Robins Co.*, 788 F.2d 994, 1002 at n. 11; *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987); *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 583–84 (6th Cir. 1990); *In re Dogpatch U.S.A., Inc.*, 810 F.2d 782, 786 (8th Cir. 1987); *In re Fietz*, 852 F.2d 455, 457 (9th Cir.1988); *In re*

---

bankruptcy court's "related to" jurisdiction was the appropriate focus. *See Caesars*, 808 F.3d at 1188 (Section 1334(b) provides that "'the district courts have original but not exclusive jurisdiction of all civil matters arising under title 11, or arising in or *related to* cases under title 11.'") (quoting 38 U.S.C. § 1334(b) (emphasis added by the Seventh Circuit). Even without *Caesar's* guidance, the Court is disinclined to read "arising under" so broadly, as it would render § 105(a) far too powerful in light of the Court's otherwise limited jurisdiction.

*Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990); *In re Lemco Gypsum, Inc.*, 910 F.2d 784, 788 (11th Cir.1990).

The Seventh Circuit, however, has adopted a more constrained approach to "related to" jurisdiction and has repeatedly emphasized that the bankruptcy court should interpret its jurisdiction narrowly. *Zerand–Bernal*, 23 F.3d at 161; *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 749 (7th Cir. 1989). Under this more constrained approach, "[a] case is 'related' to a bankruptcy when the dispute 'affects the amount of property for distribution [i.e., the debtor's estate] or the allocation of property among creditors.'" *Mem'l. Estates*, 950 F.2d at 1368 (quoting *Xonics,* 813 F.2d at 131).

"[C]ommon sense cautions against an open-ended interpretation of the 'related to' statutory language 'in a universe where everything is related to everything else." *Matter of FedPak Sys., Inc.*, 80 F.3d 207, 214 (7th Cir. 1996). Thus, simply because a dispute may have some type of nexus to a bankruptcy proceeding is not enough to give the court "related to" jurisdiction over it. *Home Ins. Co.*, 889 F.2d at 749. That jurisdiction requires a direct effect upon either the assets of the estate or their distribution to creditors. "Overlap between the bankrupt's affairs and another dispute is insufficient . . . " *Home Ins. Co.*, 889 F.2d at 749.

At first blush, common sense would seem to readily support the conclusion that the Pending Actions, as they relate to 3M, fall within even the Seventh Circuit's limited view of the Court's "related to" jurisdiction. Aearo's obligation to

indemnify 3M for any liability 3M incurs by virtue of the CAEv2 claims arguably amounts to liability against Aearo. But such a conclusion ignores the economic realities of the Funding Agreement. So additional scrutiny is required.

It is true that the Aearo Entities have agreed to indemnify all liabilities related to the CAEv2 and Respirator Claims. But the Funding Agreement also provides for an *uncapped, non-recourse* commitment from 3M to fund *all* of the Aearo Entities liabilities pre- and post-petition financing, including those arising from CAEv2 claims and Respirator Claims. This includes any indemnity obligations arising from an assessment of liability against 3M relating to the Pending Actions. In support of their objections, the Objecting Parties insist that the Funding Agreement amounts to nothing more than a "circular arrangement."

To counter that charge, Aearo points to Aearo's requirement to first exhaust its own assets, namely cash and insurance coverage, before triggering 3M's funding obligation. However, the Funding Agreements makes clear that if Aearo's assets are "or are projected to be . . . insufficient to pay or satisfy the Liabilities or amounts or otherwise maintain the Minimum Balance,"[13] then 3M must honor Aearo's funding request. Moreover, while Aearo seemingly is obligated to repay any indemnity obligations to 3M, Aearo is authorized to make a funding request for such indemnification from 3M. In essence, Aearo is able to ask 3M for the funds required to pay Aearo's indemnity obligation to…3M. This does indeed seem to be a circular arrangement as the Objecting Parties argue.

---

[13] "Minimum Balance" is defined as $5 million cash on hand held, in the aggregate, by the Aearo Entities.

Significantly, 3M commitment under the Funding Agreement does not depend on the Court enjoining the Pending Actions—a commitment that Aearo expressly negotiated under the belief that it might be "marooned" in bankruptcy with no funding source if such a condition was included and if the Court denied the PI Motion. It would seem, then, that whatever liability the Pending Actions generate—in bankruptcy, outside of bankruptcy, stay in place, or no stay—Aearo can satisfy such liability by making a payment request under the Funding Agreement. From this, the Court is unable to discern any financial impact to creditors, let alone a significant and adverse one, from the continuation of the Pending Actions. Stated differently, the Court cannot conclude that continuation of the Pending Actions will affect the amount of property for distribution or the allocation of property among creditors.

A number of other courts have extended the stay notwithstanding the existence of an uncapped funding agreement. *See, e.g.*, *LTL Mgmt*, 638 B.R. at 291; *In re Aldrich Pump LLC*, No. 20-30608, 2021 WL 3729335 (Bankr. W.D.N.C. August 23, 2021); and *In re Bestwall LLC*, 606 B.R. 243 (Bankr. W.D.N.C. 2019). Respectively, this Court cannot follow suit. Given the Seventh Circuit's instruction in *Xonics* and its progeny, the Court must focus its analysis on the *actual* economic effect continuation of the Pending Actions will have on the Aearo's estate and creditors, a concern that was a not a limiting factor in the above-cited decisions.

It is true that 3M's commitment under the Funding Agreement is not without condition, but Aearo's obligation to exhaust its own assets (namely, its cash reserves

32

and available insurance policies) do not functionally impair the Aearo Entities from operating or from offering a fully funded plan of reorganization (or a trust outside of bankruptcy, for that matter). Or, perhaps more to the point, Aearo failed to articulate what impairment, behind the merely theoretical, the conditions pose. Aearo itself must have believed that a reorganization was possible, with the financial assistance of 3M, without the promise of a stay in favor of 3M because Aearo itself negotiated for the removal of that condition from the Funding Agreement.

Of course, 3M's ability to honor its commitment under the Funding Agreement is very much the elephant in the room. To this point, Objecting Parties Keller Postman LLC and Charles Rataj (collectively, "Keller"), in support of its objection to the PI Motion,[14] presented the expert testimony of Dr. J.B. Heaton that 3M's liability for the CAEv2 claims is at least $100 billion, an amount that far exceeds 3M's cash reserves and would, according to Dr. Heaton, take 3M 17 years to repay. Based on that testimony, the Court could readily conclude that continuation of the Pending Actions as to 3M would have a significant, if not disastrous, effect on Aaero's bankruptcy, notwithstanding 3M's commitment under the Funding Agreement.

---

[14]   In its Objection, Keller asked the Court, as conditions to 3M's enjoyment of any injunction, to preclude 3M from effectuating stock dividends, stock repurchases and a planned spin-off of its health care division. Dr. Heaton's testimony was offered in at attempt not to show that an injunction under § 105(a) was appropriate but to instead suggest that 3M should be compelled to protect its viability—in order to meet its obligations under the Funding Agreement—should it enjoy an injunction of the Pending Actions.

However, Keller presented Dr. Heaton's testimony during the Objecting Parties' case[15] for the limited purpose of seeking a condition on the stay should the Court be inclined to grant the PI Motion. Presumably fearing the Court might rely on Dr. Heaton's testimony more broadly, the other Objecting Parties did not support or adopt Dr. Heaton's testimony. Aearo, for its part, objected to the Court hearing the testimony under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), arguing that Dr. Heaton's methodology was flawed.

While the Court overruled Aearo's objection, it is unwilling to consider Dr. Heaton's testimony for anything other than the limited purpose for which it was offered. The evidence that Aearo—the party that bears the burden of proof under § 105(a)—presented in support of the PI Motion emphasizes that 3M is more able to honor the Funding Agreement, even if the Pending Actions proceed. The Court accepts that evidence at face value.[16]

The Court also rejects Aearo's insistence that Court should invoke its § 105(a) powers because the Pending Actions create a significant "distraction" such that 3M will be unable to perform fully under the SSA. The Court puts little stock on this

---

[15]  Dr. Heaton was Keller's witness; however, he did testify out of order and during Aearo's case-in-chief, as an accommodation to Dr. Heaton's availability. But Dr. Heaton was not called as part of Aearo's case-in-chief.

[16]  In its closing argument, Aearo suggested that perhaps there was some truth in Dr. Heaton's testimony, notwithstanding Aearo's earlier objection to it. The Court recognizes that Aearo may have tactical reason not to question 3M's ability to withstand the seemingly obvious financial peril the Pending Actions pose, but in failing to present evidence to that end (and instead providing evidence to establish that 3M has more than enough financial wherewithal to honor the Funding Agreement), the Court is compelled to conclude that continuation of the Pending Actions will not endanger or otherwise impair Aearo's reorganization.

34

claim.  Aearo and 3M have been embroiled in the MDL for over three years, yet the Court heard no evidence that 3M has, to date, been unable to perform under the SSA.  Undoubtedly those 3M employees tasked with providing services under the SSA are busy and likely taxed on a regular basis in the ordinary course of 3M's business.  But the Court has otherwise heard no evidence to conclude that Aearo's operations or its administration of these bankruptcy cases will be impacted in the manner that Aearo argues.

Based on the foregoing, the Court declines Aearo's request to enjoin the Pending Actions as to 3M pursuant § 105(a).  The Court notes that even if it were to find that it has subject matter jurisdiction over the Pending Actions, the Court would reach the same conclusion.  An injunction under § 105(a) should issue only[17] in extraordinary circumstances where it is "necessary or appropriate" to carry out the provisions of the Code.  In the end, the Court's focus remains on the actual economic effect that a continuation of the Pending Actions would have on Aearo's bankruptcy estate and, ultimately, its distribution to creditors.  Having found no such effect in light of the Funding Agreement, the Court finds no basis upon which to invoke its § 105(a) powers.

---

[17]  In *Fisher*, the Seventh Circuit held that to obtain the benefit of a § 105(a) injunction, a debtor need only show that (1) that there is a likelihood of success on the merits; and (2) that the injunction serves the public interest."  *Fisher*, 155 F.3d at 882.  The Court finds no need to discuss these requirements here, as *Fisher* makes clear that a court does not reach those issues unless it first concludes that the third-party litigation would "defeat or impair" the Court's jurisdiction.  *Id*.  The Court can make no such conclusion for the reasons already stated.

Of course, the Court recognizes that this conclusion may ultimately prove improvident if Dr. Heaton's estimation of 3M's liability and financial wherewithal ultimately proves accurate. But as the Seventh Circuit's decision in *Bush* instructs, this Court's analysis of "related to" jurisdiction is *ex ante*. *Bush*, 939 F.3d at 856. From the evidence currently before the Court, the Court is unable to conclude that 3M is unable or unwilling to honor its commitment under the Funding Agreement and, as such, an injunction of the Pending Actions is neither necessary nor appropriate.

## Conclusion

Admittedly, it is tempting to be swayed by the sheer size of the MDL at issue in this case, but that alone provides insufficient reason for the Court to conclude that an injunction is necessary for Aearo's reorganization or that creditors will be negatively impacted in the absence of an injunction. Might a stay influence these proceedings or, more to the point, provide Aearo and/or 3M with additional leverage to negotiate a global settlement? And might the Bankruptcy Code provide certain tools that Aearo and 3M will lack outside of bankruptcy? The Court believes the answer to both these questions is a resounding yes. Alas, those questions are not things to be considered when reviewing the language of §§ 362(a)(1) and (a)(3), or in a determination of subject matter jurisdiction for purposes of § 105(a).

For the reasons stated above, the Court hereby SUSTAINS the objections of the Objecting Parties—other than those relating to unclean hands—and DENIES

the PI Motion.  Because of the denial of the PI Motion, the Court OVERRULES as moot the Keller Objection to the extent it sought conditions on an injunction.

###